### ORAL ARGUMENT NOT YET SCHEDULED

# United States Court of Appeals
# for the District of Columbia Circuit

## No. 23-5065

NATIONAL ASSOCIATION OF REALTORS,

*Petitioner-Appellee,*

*v.*

UNITED STATES OF AMERICA; UNITED STATES DEPARTMENT
OF JUSTICE, ANTITRUST DIVISION; JONATHAN KANTER,
in his official capacity as Assistant Attorney General, Antitrust Division,

*Respondents-Appellants.*

*On Appeal from the United States District Court for the District of
Columbia in No. 1:21-cv-02406-TJK, Timothy J. Kelly, U.S. District Judge*

## PROOF BRIEF FOR PETITIONER-APPELLEE
## NATIONAL ASSOCIATION OF REALTORS

ETHAN C. GLASS
COOLEY LLP
1299 Pennsylvania Avenue, NW,
   Suite 700
Washington, DC 20004
Tel: (202) 842-7800
Fax: (202) 842-7899
eglass@cooley.com

CHRISTOPHER G. MICHEL
MICHAEL D. BONANNO
WILLIAM A. BURCK
RACHEL G. FRANK
QUINN EMANUEL URQUHART &
   SULLIVAN, LLP
1300 I Street, NW,
   Suite 900
Washington, DC 20005
Tel:  (202) 538-8000
Fax: (202) 538-8100
christophermichel@quinnemanuel.com
mikebonanno@quinnemanuel.com
williamburck@quinnemanuel.com
rachelfrank@quinnemanuel.com

*Counsel for Plaintiff-Appellee*

## CERTIFICATE OF PARTIES, RULINGS, AND RELATED CASES

### A.    PARTIES, INTERVENORS, AND AMICI

All parties appearing before the district court and this Court are listed in the Brief for Respondent-Appellant.  No intervenors or amici appeared in the district court.  No intervenors or amici have yet appeared in this Court.

### B.    RULINGS UNDER REVIEW

References to the rulings at issue appear in the Brief for Respondent-Appellant.

### C.    RELATED CASES

This case was not previously before this Court or any other court other than the district court.  This case is related to *United States v. National Ass'n of Realtors*, No. 20-cv-3356 (D.D.C. filed Nov. 19, 2020), which was dismissed on July 1, 2021. Counsel for Petitioner-Appellee is unaware of any cases pending in this Court or any other court involving substantially the same parties and the same or similar issues.

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure Rule 26.1(a) and D.C. Circuit Rule 26.1, Petitioner-Appellee National Association of REALTORS® ("NAR") certifies that NAR has no parent companies and there are no publicly-held companies with a 10% or greater ownership interest in NAR.

NAR is a trade association that represents more than 1.5 million residential and commercial brokers, salespeople, property managers, appraisers, counselors, and others engaged in the real-estate industry. NAR's purpose is to promote the interests of member real-estate professionals as they preserve, protect, and advance the right to real property for all.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................v

INTRODUCTION ................................................................................1

PERTINENT STATUTES .....................................................................2

STATEMENT OF THE CASE ...............................................................3

    A.    The NAR Policies Subject To Investigation By DOJ ...........................3

    B.    The Settlement Between NAR And DOJ ..............................................4

    C.    The Parties' Initial Implementation Of The Settlement.......................6

    D.    DOJ's Withdrawal From The Consent Decree And Resumption Of The Investigation...................................................................................8

    E.    The District Court's Order Quashing The 2021 CID..........................11

SUMMARY OF ARGUMENT ............................................................14

STANDARD OF REVIEW .................................................................16

ARGUMENT ....................................................................................17

I.    THE DISTRICT COURT CORRECTLY QUASHED THE 2021 CID .......17

    A.    The Parties Agree That The ACPA Requires Quashing The 2021 CID If It Is Barred By Their Settlement ....................................18

    B.    The 2021 CID Is Barred By The Parties' Settlement..........................20

        1.    The contract language supports the district court's reading......................................................................................21

        2.    The negotiation history supports the district court's reading......................................................................................25

        3.    The parties' course of performance supports the district court's reading......................................................................27

C.    The Government's Contrary Arguments Lack Merit .........................29

    1.    DOJ misreads the relevant contract language ..........................29

    2.    Extrinsic evidence undermines rather than supports DOJ ........34

    3.    DOJ's reliance on sovereignty and prosecutorial discretion is misplaced ............................................36

    4.    The Tunney Act process does not support DOJ's position .......39

    5.    The district court's reading does not produce absurd results .......................................................42

II.    IN THE ALTERNATIVE, THIS COURT SHOULD REMAND FOR CONSIDERATION OF NAR'S REMAINING OBJECTIONS .................46

CONCLUSION .......................................................48

CERTIFICATE OF COMPLIANCE ....................................49

CERTIFICATE OF SERVICE ..........................................50

ADDENDUM ........................................................51

iv

# TABLE OF AUTHORITIES

**Page**

## Cases

*AFL-CIO v. FEC*,
   333 F.3d 168 (D.C. Cir. 2003)............................................................23

*Appleby v. Delaney*,
   271 U.S. 403 (1926)............................................................................25

*Bailey v. Fed. Nat. Mortg. Ass'n*,
   209 F.3d 740 (D.C. Cir. 2000)....................................................17, 19

*Biden v. Nebraska*,
   143 S. Ct. 2355 (2023)........................................................................23

*Bowen v. Pub. Agencies Opposed to Soc. Sec. Entrapment*,
   477 U.S. 41 (1986)..............................................................................37

*CFPB v. Accrediting Council for Indep. Colls. & Sch.*,
   854 F.3d 683 (D.C. Cir. 2017)............................................................16

*Cities of Bethany v. FERC*,
   727 F.2d 1131 (D.C. Cir. 1984)..........................................................27

*City of New Orleans v. Citizens' Bank of Louisiana*,
   167 U.S. 371 (1897)..............................................................................5

*Conti v. San Francisco Ass'n of Realtors*,
   No. 3:21-cv-1934 (N.D. Cal. Mar. 19, 2021)....................................24

*United States v. CVS Health Corp.*,
   No. 1:18-cv-02340-RJL (D.D.C. Feb. 13, 2019)...............................40

*Doe v. SEC*,
   28 F.4th 1306 (D.C. Cir. 2022)...........................................................46

*EEOC v. George Washington Univ.*,
   No. 17-cv-1978, 2020 WL 3489478 (D.D.C. June 26, 2020) ...........47

*Flores v. Barr*,
   934 F.3d 910 (9th Cir. 2019) ..............................................................45

v

*United States v. Fokker Servs. B.V.*,
    818 F.3d 733 (D.C. Cir. 2016)............................................................40

*Food Lion, Inc. v. United Food & Commercial Workers Int'l Union*,
    103 F.3d 1007 (D.C. Cir. 1997)........................................................47

*United States v. Garcia*,
    956 F.2d 41 (4th Cir. 1992) ..............................................................19

*Green v. AFL-CIO*,
    No. 09-7130, 2010 WL 2160003 (D.C. Cir. May 10, 2010) .............19

*Haggart v. United States*,
    943 F.3d 943 (Fed. Cir. 2019) ..........................................................45

*United States v. Harvey*,
    791 F.2d 294 (4th Cir. 1986) ............................................................38

*Heckler v. Chaney*,
    470 U.S. 821 (1985).........................................................................39

*Huron v. Cobert*,
    809 F.3d 1274 (D.C. Cir. 2016) ..................................................37, 40

*United States v. ITT Cont'l Baking Co.*,
    420 U.S. 223 (1975).........................................................................31

*Kurtz v. Kimberly-Clark Corp.*,
    321 F.R.D. 482 (E.D.N.Y. 2017)......................................................34

*Leachman v. Beech Aircraft Corp.*,
    694 F.2d 1301 (D.C. Cir. 1982)........................................................23

*Leeder v. National Ass'n of Realtors*,
    No. 1:21-cv-430 (N.D. Ill. Jan. 25, 2021) ........................................24

*In re Leopold to Unseal Certain Elec. Surveillance Applications & Ords.*,
    964 F.3d 1121 (D.C. Cir. 2020)........................................................23

*Local Union 1395 v. NLRB*,
    797 F.2d 1027 (D.C. Cir. 1986)........................................................25

*Marbury v. Madison*,
   5 U.S. 137 (1803)..................................................................45

*Mastrobuono v. Shearson Lehman Hutton, Inc.*,
   514 U.S. 52 (1995)................................................................22

*Merrion v. Jicarilla Apache Tribe*,
   455 U.S. 130 (1982)..............................................................37

*United States v. Microsoft Corp.*,
   56 F.3d 1448 (D.C. Cir. 1995)..............................................40

*United States v. Moreno-Membache*,
   995 F.3d 249 (D.C. Cir. 2021)........................................27, 38

*Morrison v. Olson*,
   487 U.S. 654 (1988)..............................................................21

*Murray v. City of Charleston*,
   96 U.S. 432 (1877)................................................................25

*Nat'l R.R. Passenger Corp.* v. *Atchison Topeka & Santa Fe Ry. Co.*,
   470 U.S. 451 (1985)..............................................................44

*Pollack v. Hogan*,
   703 F.3d 117 (D.C. Cir. 2012)..............................................46

*United States v. Pollard*,
   959 F.2d 1011 (D.C. Cir. 1992)............................................17

*Puckett v. United States*,
   556 U.S. 129 (2009)..............................................................38

*Retail Clerks Int'l Ass'n Local No. 455 v. NLRB*,
   510 F.2d 802 (D.C. Cir. 1975)..............................................27

*Richardson v. Edwards*,
   127 F.3d 97 (D.C. Cir. 1997)................................................17

*Santobello v. New York*,
   404 U.S. 257 (1971)..............................................................38

*Schellenbach v. SEC*,
   989 F.2d 907 (7th Cir. 1993) ........................................................31, 32

*Seaboard Lumber Co. v. United States*,
   308 F.3d 1283 (Fed. Cir. 2002) ............................................................20

*Segar v. Mukasey*,
   508 F.3d 16 (D.C. Cir. 2007) ................................................22, 27, 32

*Senate of the Commonwealth of P.R. on Behalf of Judiciary Comm. v. U.S. DOJ*, 823 F.2d 574 (D.C. Cir. 1987) ...........................................23, 31

*Sinking-Fund Cases*,
   99 U.S. 700 (1879) .................................................................................45

*United States v. Winstar Corp.*,
   518 U.S. 839 (1996) ...............................................................25, 37, 38

*Urquhart-Bradley v. Mobley*,
   964 F.3d 36 (D.C. Cir. 2020) ...............................................................46

*Vill. of Kaktovik v. Watt*,
   689 F.2d 222 (D.C. Cir. 1982) ............................................................20

## Statutory Authorities

15 U.S.C. § 16(b)–(h)...........................................................................7, 39, 41

15 U.S.C. § 1312(c)(1)............................................................................18, 46

15 U.S.C. § 1314(b) ...............................................................................11, 18

## Rules and Regulations

D.C. Cir. Rule 26.1 ........................................................................................ ii

Fed. R. App. P. 26.1(a) ................................................................................. ii

Fed. R. Civ. P. 26(b)(1).........................................................................46, 47

# **Other Authorities**

Authority of the United States to Enter Settlements Limiting the Future Exercise of Executive Branch Discretion, 23 Op. OLC 126 (June 15, 1999) .................................................................................................44

*Close*, *Black's Law Dictionary* (11th ed. 2019) .......................................................21

*Close*, *Merriam-Webster Dictionary*, https://www.merriam-webster.com/dictionary/close ...............................................................21

*End*, *Merriam-Webster Dictionary*, https://www.merriam-webster.com/dictionary/end ...............................................................21

Restatement (Second) of Contracts § 202 (1981) ..................... 22, 23, 24, 25, 27, 29

Restatement (Second) of Contracts § 203 (1981) ....................................................32

11 Williston on Contracts § 32:5 (4th ed. 2012) .....................................................27

## GLOSSARY

| | |
|---|---|
| ACPA | Antitrust Civil Process Act, 15 U.S.C. §§ 1311–1314 |
| CID | Civil Investigative Demand |
| CIS | Competitive Impact Statement |
| DOJ | U.S. Department of Justice |
| MLS | Multiple-Listing Service |
| NAR | National Association of REALTORS® |
| Tunney Act | Antitrust Procedures and Penalties Act, 15 U.S.C. § 16(b)–(h) |

## INTRODUCTION

In the fall of 2020, the National Association of REALTORS® (NAR) and the U.S. Department of Justice (DOJ) entered into a settlement to resolve a federal antitrust investigation. The settlement had two parts: NAR agreed to accept entry of a consent decree requiring it to modify certain policies. In return, DOJ agreed that it would close its investigation into two other NAR policies—the Participation Rule and Clear Cooperation Policy—and that NAR would have no obligation to respond to the corresponding Civil Investigative Demands (CIDs).

NAR upheld its end of the bargain. DOJ did not. In the summer of 2021, the Antitrust Division resumed the investigation it had committed to close and reissued the CIDs it had promised NAR would not have to answer. Applying "common-sense" principles of contract law, the district court set aside the reissued CID under the Antitrust Civil Process Act. JA __ (Op. 8). That straightforward decision is correct. Having agreed to close the investigation and rescind the CIDs in exchange for consideration from NAR, DOJ was not free to resume its investigation and reissue the CIDs based solely on a change of leadership or a change of heart.

On appeal, DOJ does not dispute that it promised to close its investigation and rescind the corresponding CIDs. DOJ does not dispute that it resumed that investigation and reissued those CIDs. And DOJ does not suggest that NAR changed its policies or breached the agreement. DOJ's sole contention is that closing the

1

investigation required only telling NAR that it was closed, after which DOJ could resume the investigation and reissue the CIDs at any time and for any reason.

That strained reading defies the ordinary understanding of a promise to close an investigation in return for consideration. It disregards DOJ's commitment that NAR "will have no obligation to respond to" the CIDs. JA __ (Closing Letter). It nullifies the parties' bargaining over the government's limited reservation of rights. And it is irreconcilable with the government's own conduct, which confirms DOJ's understanding that the agreement foreclosed resumption of the investigation and reissuance of the CIDs.

At a deeper level, DOJ's arguments are alarming. The government settles vast numbers of enforcement actions against civil and criminal defendants. Those defendants rely on the government to keep its word. A holding that an agency can escape its commitments as easily as DOJ claims it can here would call into question countless negotiated resolutions. The Court should not destabilize the law in that manner. As the district court recognized, DOJ retains ample mechanisms to investigate NAR. But "[t]he government, like any party, must be held to the terms of its settlement agreements, whether or not a new administration likes those agreements." JA __ (Op. 11). The decision below should be affirmed.

## PERTINENT STATUTES

Pertinent statutory provisions are reproduced in an Addendum to this Brief.

2

## STATEMENT OF THE CASE

### A.     The NAR Policies Subject To Investigation By DOJ

NAR is the nation's leading trade association for professionals in the real-estate industry.  JA __ (Compl. ¶ 6).  Among other functions, NAR has for decades promulgated a Code of Ethics and related policies designed to ensure that its members serve the best interests of home buyers and sellers.  JA __ (Pet. ¶¶ 2, 20).

Of particular relevance here, NAR maintains rules and policies for local associations of REALTORS® that operate multiple listing services ("MLSs").  JA __ (Pet. ¶ 2).  MLSs compile databases of information about homes listed for sale in their local geographic area by the participants in the MLS.  *Id.*  By providing a single location where home buyers can search local homes listed for sale and home sellers can advertise to in-market buyers, MLSs streamline the home-buying process and reduce transaction costs for consumers.  *See id.*

In 2019, the DOJ Antitrust Division opened an investigation concerning various NAR policies relating to MLSs.  JA __ (Pet. ¶ 24).  As part of the investigation, the Division issued a sweeping CID to NAR on April 12, 2019, seeking a broad array of information related to 14 separate subjects, including a longstanding NAR rule called the Participation Rule, which was first adopted in the

1970s.  JA __ (CID No. 29935); *see* JA __ (NAR July 6, 2020 Letter 2).[1]  The Division issued a second CID on June 29, 2020, seeking multiple categories of information about a newly adopted NAR rule called the Clear Cooperation Policy. JA __ (CID No. 30360).[2]

### B.    The Settlement Between NAR And DOJ

From the beginning of the investigation, NAR both maintained the legality of all the relevant policies and also sought to cooperate with DOJ to address its concerns.  *See* JA __ (NAR July 6, 2020 Letter 1–2).  By the fall of 2020, NAR and DOJ had come to a rough understanding of the terms of a potential settlement: the government would close its ongoing investigations into the Participation Rule and Clear Cooperation Policy, while—in return—NAR would accept a consent decree requiring changes to a separate set of MLS-related policies.  JA __ (Pet. ¶ 26).[3]

On October 14, 2020, DOJ provided NAR with a draft consent decree.  JA __ (DOJ Oct. 14, 2020 Email).  Although it generally tracked the parties' agreed-upon terms, it included a broad reservation-of-rights provision stating that it would not

---

[1]  The Participation Rule requires a broker who chooses to participate in an MLS following NAR's rules to make an offer of compensation—of any amount—to other brokers who help sell the property.

[2]  The Clear Cooperation Policy requires MLS participants to submit a listing to the MLS within one business day of marketing the property to the public.

[3]   The separate NAR policies related to the disclosure and filtering of certain information on MLSs and to access to lockbox keys by non-MLS participants.

"limit the right of the United States to investigate … any NAR Rule, including … NAR's Participation Rule … or any other Rule adopted or enforced by NAR or any Member Board … that is not already specifically enjoined by this Final Judgment." JA __ (NAR Oct. 16, 2020 Email Attachment 16).  Because that proposal permitted continued investigation into the "Participation Rule" and Clear Cooperation Policy (a rule not "specifically enjoined by th[e] Final Judgment"), *id.*, it did not "follow the" parties' agreement, JA __ (NAR Oct. 16, 2020 Email 1).  NAR accordingly returned a draft consent decree on October 16 eliminating the reservation-of-rights provision.  JA __ (NAR Oct. 16, 2020 Email Attachment 16).

On October 21, 2020, DOJ responded with a new draft containing a narrower reservation-of-rights provision.  JA __ (DOJ Oct. 21, 2020 Email 1).  The revised provision eliminated the language permitting continued investigation of the Participation Rule and "any other Rule … not already specifically enjoined by this Final Judgment."  JA __ (NAR Oct. 16, 2020 Email Attachment 16).  It instead provided: "Nothing in this Final Judgment shall limit the right of the United States to investigate … any Rule or practice adopted or enforced by NAR or any of its Member Boards."  JA __ (NAR Oct. 26, 2020 Email Attachment 15).

To confirm that the revised reservation-of-rights provision embodied the parties' agreement, NAR returned DOJ's draft with a comment stating that "NAR will only agree to sign a consent decree including this [reservation-of-rights]

provision if DOJ provides written confirmation … that it will issue a closing letter to NAR upon execution of the decree that confirms" four critical points. JA __ (NAR Oct. 26, 2020 Email Attachment 15). The four points were: "1. the Division has closed its investigation of the Participation Rule; 2. the Division has closed its investigation of the Clear Cooperation Policy; 3. NAR has no obligation to respond to CID No. 29935 … ; and 4. NAR has no obligation to respond to CID No. 30360." *Id.* NAR's cover email reiterated that "NAR will not agree to the consent decree without prior written assurances that these provisions will be included in the closing letter from DOJ." JA __ (NAR Oct. 26, 2020 Email 1).

On October 28, 2020, DOJ accepted NAR's terms, explaining that "once the consent decree is filed, the Division will notify NAR in its closing letter that it has closed its investigation into the Participation Rule and the Clear Cooperation [Policy] and that NAR will have no obligation to respond to CID Nos. 29935 and 30360." JA __ (DOJ Oct. 28, 2020 Email 1).

## C.    The Parties' Initial Implementation Of The Settlement

To implement the parties' agreement, DOJ filed three documents in the district court and sent the Closing Letter to NAR on November 19, 2020. Only the Closing Letter referenced the Participation Rule and Clear Cooperation Policy.

First, DOJ filed a Complaint alleging that the separate set of MLS-related policies discussed—but not the Participation Rule or Clear Cooperation Policy—violated the Sherman Act.  JA __ (Complaint); *see* p. 3, *supra*.

Second, DOJ filed a Proposed Final Judgment (*i.e.*, consent decree) that would resolve the claims in the Complaint without an admission of liability from NAR or acceptance of DOJ's allegation.  JA __ (Proposed Final Judgment).  The Proposed Final Judgment required NAR to make changes to the MLS-related policies addressed in the Complaint and undertake related obligations, including appointing an antitrust compliance officer and providing certain notice to its members.  *Id.*

Third, because the Proposed Final Judgment could not take effect until after the completion of procedures required by the Tunney Act, 15 U.S.C. § 16(b)–(h), DOJ filed a Stipulation that would apply in the interim.  JA __ (Stipulation); *see* pp. 39–42, *infra* (further discussing the Tunney Act requirements).  The Stipulation provided that NAR would comply with certain terms in the Proposed Final Judgment while the procedural steps were completed.  JA __ (Stipulation ¶ 3).  The Stipulation also provided that DOJ could withdraw from the Proposed Final Judgment before its entry by the Court.  JA __ (Stipulation ¶ 2).

Finally, DOJ sent NAR a Closing Letter stating that:

[T]he Antitrust Division has closed its investigation into the … Clear Cooperation Policy and Participation Rule.  Accordingly, NAR will have no obligation to respond to CID Nos. 29935 and 30360 … .

7

> No inference should be drawn, however, from the Division's decision to close its investigation into these rules, policies or practices not addressed by the consent decree.

JA __ (Closing Letter).

NAR promptly complied with its obligations under the settlement. It appointed an antitrust compliance officer, provided notice of the settlement to its members, and submitted proposed rule changes to DOJ for its review. *See* JA __ (Pet. ¶¶ 55–60). NAR's local affiliates then began to change their practices in reliance on the terms of the settlement. JA __ (Pet. ¶ 61).

### D. DOJ's Withdrawal From The Consent Decree And Resumption Of The Investigation

Although NAR submitted its proposed rule changes to DOJ on January 4, 2021, DOJ did not respond for more than three months. JA __ (Op. 3); JA __ (Glass Decl. ¶¶ 15–17). When it did, Antitrust Division Staff conveyed that the Division wanted to modify the reservation-of-rights provision in the Proposed Final Judgment. JA __ (Glass Decl. ¶ 18). Specifically, Antitrust Division Staff proposed revising the provision to state that the "final judgment shall only terminate the claims expressly raised in the complaint" and "shall not in any way affect any other charges or claims filed by the United States subsequent to the commencement of this action." *Id.* NAR's counsel asked whether that proposed revision was intended to modify any aspect of DOJ's commitment to close its prior investigations or withdraw the

related CIDs.  JA __ (Glass Decl. ¶ 19).  Antitrust Division Staff responded that it was not prepared to answer that question.  *Id.*

NAR's counsel and Antitrust Division Staff spoke again on April 22, 2021. JA __ (Glass Decl. ¶ 20).  On that call, NAR's counsel told Antitrust Division Staff that NAR would consider modifying the reservation-of-rights provision, but NAR did not understand the purpose of the change, given that the new language was so similar to the existing language in the Proposed Final Judgment.  JA __ (Glass Decl. ¶ 21).  NAR's counsel also noted that DOJ's commitment in the settlement to close the investigations and withdraw the CIDs did not mean that NAR had immunity from all future investigations.  JA __ (Glass Decl. ¶ 23).  For example, if NAR made material changes to the Participation Rule or Clear Cooperation Policy, DOJ would be able to investigate those changes.  *Id*.

NAR next heard from the Division on June 1, 2021.  JA __ (Glass Decl. ¶ 24). During a call the next day, Antitrust Division Staff claimed NAR's position was that it would only agree to modify the reservation-of-rights provision in the Proposed Final Judgment if DOJ agreed that the Closing Letter forever barred any investigation of NAR.  JA __ (Glass Decl. ¶ 25).  NAR's counsel explained that NAR had never made such a demand and that NAR would consider DOJ's proposed change to the reservation-of-rights provision once it understood how DOJ believed the change would impact its other commitments under the settlement.  *Id.*

9

Almost a month later, on June 30, 2021, Antitrust Division Staff reiterated their mistaken understanding of NAR's position, adding for the first time that, if "NAR does not agree to modify the decree unencumbered by its condition, … we will take steps towards withdrawing our consent for the proposed Final Judgment starting at noon tomorrow." JA __ (DOJ June 30, 2021, 7:19 PM Email 1). Alarmed by that escalation, NAR asked the next day to meet with the Acting Assistant Attorney General. JA __ (NAR July 1, 2021, 11:27 AM Email 1).

Antitrust Division Staff responded that they had "explained that the current reservation does not adequately protect the Division's ability to investigate in the future NAR rules that may harm competition." JA __ (DOJ July 1, 2021, 2:45 PM Email 1). About an hour later, the Division filed a notice with the district court indicating that it had withdrawn its consent to entry of the Consent Judgment so that it could "eliminate any potential limitation on the future ability of the United States to investigate and challenge additional potential antitrust violations committed by" NAR. JA __ (Notice of Withdrawal of Consent). The Division also voluntarily dismissed the Complaint. JA __ (Notice of Voluntary Dismissal).

DOJ simultaneously issued a press release explaining that it was "taking this action to permit a broader investigation of NAR's rules and conduct to proceed without restriction." JA __ (DOJ July 1, 2021 Press Release). The Acting Assistant Attorney General stated in the press release that the "proposed settlement will not

sufficiently protect the government's ability to pursue future claims against NAR," and that DOJ "cannot be bound by a settlement that prevents our ability to protect competition in a market that profoundly affects Americans' financial well-being." *Id.* The press release added that the "proposed settlement … prevented [DOJ] from pursuing other antitrust claims relating to NAR's rules." *Id.*

Just days after withdrawing from the consent decree, the government sent a CID (the "2021 CID") to NAR. JA __ (CID No. 30729). Most of the requests in that CID were copied—sometimes almost verbatim—from the requests in the prior CIDs that the government had agreed to withdraw. JA __ (CID No. 29935); JA __ (CID No. 30360); JA __ (Comparison between CIDs). In particular, the 2021 CID sought information regarding the Participation Rule and the Clear Cooperation Policy—the subjects of the investigation that DOJ had committed to close. JA __ (CID No. 30729). DOJ accordingly described the CID "as a 'resumption of its investigative efforts.'" JA __ (Op. 4) (citation and brackets omitted).

### E.     The District Court's Order Quashing The 2021 CID

NAR timely petitioned to quash the 2021 CID under the Antitrust Civil Process Act ("ACPA"), which authorizes a court to set aside a CID "based upon any failure of such demand to comply with the provisions of [the ACPA], or upon any constitutional or other legal right or privilege." 15 U.S.C. § 1314(b)(2). As pertinent here, NAR contended that the 2021 CID was barred by DOJ's agreement to "close[]

11

its investigation into the" Participation Rule and Clear Cooperation Policy and its commitment that "NAR will have no obligation to respond to" the previously issued CIDs.  JA __ (Closing Letter).  The district court agreed, setting aside the 2021 CID because it was barred by "a validly executed settlement agreement."  JA __ (Op. 6).[4]

Applying principles of "contract interpretation," the district court found that the parties' settlement "encompasse[d]" two parts:  (i) NAR's "agree[ment] to the consent decree," and (ii) DOJ's reciprocal commitment to "close its investigations into the Participation Rule and Clear Cooperation Policy and effectively rescind the CIDs."  JA __ (Op. 6–7).  The court emphasized that DOJ's promise "was essential to the parties' reaching a settlement" and "must be considered part of the overall agreement."  JA __ (Op. 7–8).

"With that common-sense interpretation of the parties' settlement in hand," the district court held, "it is not hard to conclude that the [2021] CID violates the agreement."  JA __ (Op. 8).  "Because the agreement included the Antitrust Division's commitment to close its investigation into NAR's current Participation Rule and Clear Cooperation Policy, the government breached the agreement by reopening the investigation into those same rules and serving the [2021] CID."  *Id.*

---

[4]  NAR also argued that the 2021 CID should be quashed as excessively broad and burdensome, but the district court did not reach that contention in light of its holding that the 2021 CID was barred by the settlement.  JA __ (Op. 4, 10 n.3).

The court rejected any suggestion that the 2021 CID was part of a "'new investigation,'" finding that the Participation Rule and Clear Cooperation Policy "have not 'been changed, modified, or amended since the Antitrust Division closed its investigation in 2020,'" the 2021 CID was not materially different from "the CIDs issued previously," and DOJ "itself has described its actions as '*resuming* its investigative efforts.'" JA __ (Op. 8 n.2) (citations and brackets omitted). Indeed, the court found, "the only intervening change was that in presidential administrations." JA __ (Op. 10).

The district court rejected DOJ's contention that its obligations under the settlement agreement required nothing more than sending a letter "confirming closure of its investigation." JA __ (Op. 9). Under that reading, the court explained, "the agreement contemplated only a letter worth nothing but the paper on which it was written." *Id.* The court found that "NAR explicitly negotiated for a letter 'giving it relief from the investigations,'" and the "letter would hardly provide such 'relief' if the Antitrust Division was free to reopen the investigations into both the Participation Rule and Clear Cooperation Policy and reissue substantially similar CIDs right after closing the same." *Id.* (citations and brackets omitted).

The district court also rejected DOJ's reliance on the sentence of the Closing Letter stating that "[n]o inference should be drawn … from the Division's decision to close its investigation into … rules, policies or practices that are not addressed by

13

the consent decree." JA __ (Op. 9) (citation and brackets omitted). The court explained that the sentence did not negate DOJ's commitment to close its investigation into the "same, unchanged Participation Rule and Clear Cooperation Policy." *Id.* The court rejected DOJ's reliance on the reservation-of-rights provision in the Proposed Final Judgment for similar reasons. JA __ (Op. 10). The court noted that the provision, by its terms, pertains only to the "*final judgment*," and accordingly did not affect DOJ's commitments in the Closing Letter. *Id.*

Finally, the district court underscored that its decision did not mean "that the Antitrust Division has agreed to never investigate NAR or some future version or application of NAR's Participation Rule and Clear Cooperation Policy." JA __ (Op. 10). Rather, the court held "only that the government, in committing to close an investigation into these policies one year and then reopening it the next—when the only intervening change was that in presidential administrations—violated the parties' agreement." *Id.*

## SUMMARY OF ARGUMENT

I.    The district court's careful decision is correct, and it should be affirmed. At the outset, the parties agree on several important points: First, a district court must set aside a CID that is barred by a valid settlement agreement. Second, the parties entered into a valid settlement agreement in which NAR agreed to accept the obligations of the consent decree in return for DOJ's commitment to close its

investigation into the Participation Rule and Clear Cooperation Policy and relieve NAR of its obligation to respond to the accompanying CIDs.  Third, those policies have not changed, and DOJ asserts no other basis for resuming the investigation and reissuing the CIDs.

The key question is thus whether DOJ's promise to close the investigation and rescind the CIDs left it free to resume the investigation and reissue the CIDs based solely on its preference to do so.  As the district court held, the answer is no.  The contract language, negotiation history, and parties' course of performance—along with common sense and the rule of law—all support that result.

A reasonable person in the position of the parties would not understand DOJ's promise to close an investigation in return for consideration to mean that the investigation could be resumed at any time and for any reason.  The Closing Letter's text reinforces that understanding by stating that NAR "will have no obligation to respond to" the CIDs.  JA __ (Closing Letter).  The parties' negotiation history further demonstrates that the Closing Letter—which induced NAR to enter the agreement—promised more than a discretionary pause.  And DOJ itself appeared to understand as much; otherwise, it would not have tried to renegotiate the settlement or waited to reissue the CIDs until after it withdrew from the consent decree.

DOJ's contrary arguments lacks merit.  The government presses an implausibly narrow construction of its obligation to close the investigation that has

no basis in the parties' agreement, their extensive bargaining, or DOJ's own prior understanding.  DOJ reaches for forfeited and inapposite arguments based on the unmistakability doctrine and the Tunney Act.  And DOJ ends by suggesting that NAR should have foreseen the upcoming flip-flop because a new administration was set to commence.  That is not how contracts work.  While DOJ has authority to investigate NAR policies not subject to the settlement—and to investigate the Participation Rule and Clear Cooperation Policy if those policies change—it has no authority to breach a binding agreement.

II.    If this Court were to disagree, it should remand for the district court to address NAR's other grounds for setting aside the 2021 CID.  The district court did not reach those grounds in the decision below, and this Court should not attempt to resolve them in the first instance.  That is especially so because NAR's objections include record-intensive questions about the breadth and burden of the 2021 CID. The district court is far better positioned to address those questions if any further proceedings are necessary.

## STANDARD OF REVIEW

A CID is a "form of administrative subpoena," and a district court's decision to quash or "enforce an administrative subpoena is reviewed for abuse of discretion." *CFPB v. Accrediting Council for Indep. Colls. & Sch.*, 854 F.3d 683, 688 (D.C. Cir. 2017); *see* Gov't Br. 24.  A district court's interpretation of the language in "consent

decrees and the agreements underlying them" is a legal question reviewed de novo. *Richardson v. Edwards*, 127 F.3d 97, 101 (D.C. Cir. 1997). "Where the issue is instead the application of" such language, this Court "review[s] district court findings under a clearly erroneous standard." *United States v. Pollard*, 959 F.2d 1011, 1023–24 (D.C. Cir. 1992). Similarly, "the determination that parties have contractually bound themselves" is "a legal conclusion subject to … de novo review," but "the findings upon which that conclusion is based are factual and thus may not be overturned unless clearly erroneous." *Bailey v. Fed. Nat. Mortg. Ass'n*, 209 F.3d 740, 744 (D.C. Cir. 2000) (citation omitted).

## ARGUMENT

## I.    THE DISTRICT COURT CORRECTLY QUASHED THE 2021 CID

It is common ground that the ACPA requires a district court to quash a CID barred by a valid settlement, that the parties entered a valid settlement, and that no facts relevant to the settlement have changed. The issue before this Court is accordingly whether the settlement—while requiring NAR to accept significant obligations—left DOJ with complete discretion to resume the investigation and reissue the CIDs at any time and for any reason after it sent the Closing Letter. As the district court correctly found, it did not. The language of the parties' agreement, their negotiation history, and their course of performance all reinforce that reading. DOJ's contrary reading defies those settled sources of contract meaning, and it

17

ultimately suggests that the government obtained something in return for essentially nothing.  This Court should not accept that troubling and counterintuitive result.

### A. The Parties Agree That The ACPA Requires Quashing The 2021 CID If It Is Barred By Their Settlement

As an initial matter, the issues before the Court are narrowed by the parties' agreement on three significant points.  *First*, the ACPA requires a district court to quash a CID barred by a valid settlement agreement.  *Second*, the parties formed a valid settlement agreement, of which the Closing Letter is a binding part.  And *third*, DOJ's interpretation of the Closing Letter is its only basis for resuming the investigation and issuing the 2021 CID.

1. The ACPA authorizes the recipient of a CID to petition a district court to "set[] aside" the CID based on "any failure of such demand to comply with the provisions of th[e ACPA], or upon any constitutional or other legal right or privilege of such person."  15 U.S.C. § 1314(b).  Among the "provisions of th[e ACPA]" with which a CID must comply, *id.*, is 15 U.S.C. § 1312(c)(1), which states that a CID may not require the submission of material that "would be protected from disclosure under" either "the standards applicable to subp[o]enas … issued by a court of the United States in aid of a grand jury investigation," or "the standards applicable to discovery requests under the Federal Rules of Civil Procedure."

The standards applicable to both grand-jury subpoenas and civil discovery bar information requests that conflict with a valid settlement agreement.  *See, e.g.*,

18

*United States v. Garcia*, 956 F.2d 41, 42, 44 (4th Cir. 1992) (grand-jury subpoena);

*Green v. AFL-CIO*, No. 09-7130, 2010 WL 2160003, at *1 (D.C. Cir. May 10, 2010)

(civil discovery); JA __ (Op. 5) (citing additional cases).  And while DOJ recites its

generally broad authority to issue CIDs (Br. 4–6, 27–28), "the government never

disputes that the CID would be invalid if precluded by a settlement agreement."  JA

__ (Op. 6 n.1).  It is thus undisputed that "a CID barred by the terms of a settlement

agreement is invalid."  JA __ (Op. 6).

> **2.**     NAR and DOJ entered into a valid settlement.  As the district court

found, all the requisite elements of a binding contract were present in the parties'

two-part agreement:  NAR agreed to entry of the consent decree, which required it

to modify specified policies and accept other obligations.  In return, DOJ agreed that

it would close its investigation into the Participation Rule and Clear Cooperation

Policy, and that NAR would have no obligation to respond to the corresponding

CIDs. JA __ (Op. 6–8).  Both components provided necessary consideration for the

other side to enter into the bargain.  *See* JA __ (Op. 7).

> Although DOJ includes seemingly grudging references (Br. 28, 38) to a

"supposed 'overall agreement,'" the government does not dispute the district court's

legal or factual findings that the parties formed a binding settlement containing the

two components discussed above.  *See Bailey*, 209 F.3d at 744 (noting that such

factual findings are reviewed for clear error).  Nor does the DOJ dispute that the

settlement, like any other "agreement to settle a legal dispute," is an enforceable contract.  *Vill. of Kaktovik v. Watt*, 689 F.2d 222, 230 (D.C. Cir. 1982).

**3.**     Finally, DOJ does not contend that any facts relevant to the contract changed.  DOJ does not argue, for instance, that NAR materially altered the Participation Rule or Clear Cooperation Policy, such that the 2021 CID was actually part of a new investigation rather than the one that DOJ committed to close.  *See* JA __ (Op. 8 n.2).  Nor does DOJ assert that the 2021 CID was sufficiently different from the earlier CIDs as to fall outside DOJ's promise in the Closing Letter that NAR would not have to respond to the earlier CIDs.  *See id.*  And DOJ does not invoke mistake, frustration of purpose, or any other contract-law basis for escaping its obligations.  *See, e.g.*, *Seaboard Lumber Co. v. United States*, 308 F.3d 1283, 1296 (Fed. Cir. 2002).  Instead, DOJ's sole argument for the validity of the 2021 CID is that the Closing Letter imposed no restriction on the government's enforcement discretion after the letter was sent.  *See* JA __ (Op. 6 n.1).

### B.     The 2021 CID Is Barred By The Parties' Settlement

The district court's interpretation of the parties' settlement is correct.  Having agreed "to close its investigation into NAR's current Participation Rule and Clear Cooperation Policy" in return for consideration, DOJ did not have unfettered discretion to resume "the investigation into those same rules" by issuing the 2021

CID.  JA __ (Op. 8).  The relevant contract language, the negotiation history, and the parties' course of performance all confirm that straightforward construction.

### 1.    *The contract language supports the district court's reading*

The Closing Letter states "that the Antitrust Division has closed its investigation into the … Clear Cooperation Policy and Participation Rule" and that NAR "[a]ccordingly will have no obligation to respond to" the corresponding CIDs.  JA __ (Closing Letter).  "The word 'close' means 'to bring to an end.'" JA __ (Op. 8)  (quoting    Merriam-Webster    Dictionary,    https://www.merriam-webster.com/dictionary/close); *see also Close*, *Black's Law Dictionary* (11th ed. 2019) ("To conclude; to bring to an end <the case was closed>.").  Under that definition, the letter's meaning "is not hard to" discern:  by stating that it had "closed its investigation," DOJ committed that the investigation had reached its "'end.'"  JA __ (Op. 8 & n.2) (citations omitted).  The prospect of *resuming* the investigation is at odds with *ending* it (as compared to, for example, pausing it).  After all, the meaning of "end" is the "cessation of a course of action, pursuit, or activity."  *End*, *Merriam-Webster  Dictionary*,  https://www.merriam-webster.com/dictionary/end.  Resuming an investigation that has ended is thus a contradiction in terms.  *Cf. Morrison v. Olson*, 487 U.S. 654, 706 (1988) (Scalia, J., dissenting) ("This is somewhat like referring to shackles as an effective means of locomotion.").

Even if there were ambiguity about the meaning of "closed" in the abstract, the use of the word in the context of the parties' agreement would resolve it. *See Segar v. Mukasey*, 508 F.3d 16, 22 (D.C. Cir. 2007) (explaining that contract interpretation requires understanding words in the context of a whole contract); *accord* Restatement (Second) of Contracts § 202(2) & cmts. (b), (d) (1981) (Restatement) . Immediately after confirming that "the Antitrust Division has closed its investigation into the … Clear Cooperation Policy and Participation Rule," the Closing Letter states that "[a]ccordingly, NAR *will have no obligation* to respond to" the CIDs associated with that investigation. JA __ (Closing Letter) (emphasis added). That forward-looking language is a strong indicator that DOJ was required to do more than simply say it had closed the investigation. After all, if DOJ could pause the investigation and then resume it by reissuing the same CIDs, NAR *would have* an obligation to respond to the CIDs—in contravention of the letter's language. The district court's reading thus properly implements the "cardinal principle of contract construction[] that a document should be read to give effect to all its provisions and to render them consistent with each other." *Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 63 (1995); *see Segar*, 508 F.3d at 22.

The district court's reading also properly implements the principle that contract terms should be interpreted to reflect "the meaning they have in ordinary English usage unless there is some reason to believe the parties had a different one

in mind." *Leachman v. Beech Aircraft Corp.*, 694 F.2d 1301, 1307 (D.C. Cir. 1982); *see* Restatement § 202(3)(a) & cmt. (e). In some situations, an ordinary speaker might well understand the term "closed" to convey an expectation of limited duration—for example, closing a door. *Cf.* Gov't Br. 32. Even then, however, context would be critical: a parent who instructed a child to "close the door when you leave for school" would surely feel misunderstood if the child closed the door and then immediately reopened it before departing for the day. *Cf. Biden v. Nebraska*, 143 S. Ct. 2355, 2376–82 (2023) (Barrett, J., concurring) (elaborating on the importance of context in legal interpretation).

In the context of a government investigation, the ordinary meaning of "closed" does not convey the prospect of unfettered resumption absent a material change in circumstances. To take just one example, this Court has explained that public-disclosure statutes apply differently depending on whether an investigation is "close[d]" or "ongoing." *AFL-CIO v. FEC*, 333 F.3d 168, 175 (D.C. Cir. 2003); *see In re Leopold to Unseal Certain Elec. Surveillance Applications & Ords.*, 964 F.3d 1121, 1133 (D.C. Cir. 2020). That distinction would make little sense if a "closed" investigation were constantly subject to resumption at the government's unilateral prerogative. *Cf. Senate of the Commonwealth of P.R. on Behalf of Judiciary Comm. v. U.S. DOJ*, 823 F.2d 574, 578, 586 (D.C. Cir. 1987) (discussing an investigation that was "closed officially" but was "reopened … *on the basis of new evidence*")

23

(emphasis added). DOJ confirms the point by acknowledging (Br. 53) that "as a practical matter most closed investigations are not reopened."

Critically, that common understanding of closing an investigation—*i.e.*, that it cannot be resumed based solely on a change of heart—is the only one that makes sense of the parties' overall agreement. *See* Restatement § 202(1) (explaining that contract language must be interpreted "in the light of all the circumstances" and "the principal purpose of the parties"). NAR made significant concessions by agreeing to accept the consent decree, which required it to modify the policies specified in the Complaint, among other obligations. *See* p. 7, *supra*. Indeed, DOJ's filing of the Complaint provoked several copycat private suits against NAR.[5]

If the Closing Letter meant only that DOJ had "closed its investigation" at the moment it sent the letter—with absolute discretion to resume it at any time, just as it had before sending the letter—NAR would have accepted those substantial burdens in return for effectively nothing. The district court rightly refused to accept that the parties' "agreement contemplated only a letter worth nothing but the paper on which it was written." JA __ (Op. 9). The Supreme Court has consistently applied the same principle, rejecting "the Government's suggestion that the parties

---

[5] *See* Compl., *Leeder v. National Ass'n of Realtors*, No. 1:21-cv-430 (N.D. Ill. Jan. 25, 2021), ECF No. 1; Compl., *Conti v. San Francisco Ass'n of Realtors*, No. 3:21-cv-1934 (N.D. Cal. Mar. 19, 2021), ECF No. 1.

meant to say only that the [contracted-for result] would apply as an initial matter, subject to later change at the Government's election." *United States v. Winstar Corp.*, 518 U.S. 839, 909–10 (1996) (plurality opinion); *see, e.g.*, *Appleby v. Delaney*, 271 U.S. 403, 413 (1926) ("It is not reasonable to suppose that the grantees would pay [a substantial sum] … and leave to the city authorities the absolute right completely to nullify the chief consideration for seeking this property."); *Murray v. City of Charleston*, 96 U.S. 432, 445 (1877) ("A promise to pay, with a reserved right to deny or change the effect of the promise, is an absurdity.").

### 2. *The negotiation history and the parties' overall agreement supports the district court's reading*

For similar reasons, the "bargaining history" that produced the parties' overall settlement agreement confirms that the parties understood DOJ to commit to more than a momentary closing of the investigation. *Local Union 1395 v. NLRB*, 797 F.2d 1027, 1036 (D.C. Cir. 1986); *see* Restatement § 202(1).

DOJ initially proposed a consent decree that would have expressly reserved its right to continue investigating the Participation Rule and Clear Cooperation Policy. JA __ (NAR Oct. 16, 2020 Email Attachment 16). NAR struck that provision, explaining that it needed "relief from the investigations" into those policies. JA __ (NAR Oct. 16, 2020 Email 1). DOJ responded by excluding any reference to the Participation Rule or Clear Cooperation Policy in the consent decree's reservation-of-rights provision. JA __ (DOJ Oct. 21, 2020 Email

25

Attachment 16). And critically, DOJ coupled that provision—which addressed only the effect of "this Final Judgment," *id.*—with the Closing Letter, which closed the investigation into the Participation Rule or Clear Cooperation Policy and provided that NAR "will have no obligation to respond to" the corresponding CIDs, JA __ (Closing Letter).

The parties' negotiations thus make clear that DOJ's promise in the Closing Letter was a deliberate carveout from the reservation-of-rights provision in the consent decree. As the district court found, that carveout was essential to NAR's decision to enter into the agreement. JA __ (Op. 9). And as the court further found, the agreement "would hardly provide" the "'relief'" that the parties contemplated "if the Antitrust Division was free to reopen the investigations into both the Participation Rule and Clear Cooperation Policy and reissue substantially similar CIDs right after closing the same." *Id.*

Indeed, reading the Closing Letter to allow DOJ to resume the investigation into those policies at its discretion would leave the parties in essentially the same position as if the Closing Letter had not been sent—with DOJ having total control over the investigation and issuance of the CIDs. That result would directly nullify the parties' bargained-for resolution of a central issue and violate the principle that contracts must be read—if possible—to "give all provisions a reasonable, lawful, and/or effective meaning." *Segar*, 508 F.3d at 22 (alteration omitted); *see, e.g.*,

26

*United States v. Moreno-Membache*, 995 F.3d 249, 256 (D.C. Cir. 2021) (declining to read a plea agreement to contain only "a meaningless and valueless promise"); *Retail Clerks Int'l Ass'n Local No. 455 v. NLRB*, 510 F.2d 802, 806 n.15 (D.C. Cir. 1975) ("It is a settled rule of contract interpretation that contract language should not be interpreted to render the contract promise illusory or meaningless."); 11 Williston on Contracts § 32:5 (4th ed.) ("An interpretation which gives effect to all provisions of the contract is preferred to one which renders part of the writing superfluous, useless or inexplicable.").

### 3. The parties' course of performance supports the district court's reading

Finally, the "parties' course of performance"—another established indicator of contract meaning—demonstrates that DOJ understood the parties' settlement to restrict its ability to resume the investigation. *Cities of Bethany v. FERC*, 727 F.2d 1131, 1144 (D.C. Cir. 1984); *see* Restatement § 202(5) & cmt. g ("The parties to an agreement know best what they meant, and their action under it is often the strongest evidence of their meaning.").

At first, DOJ performed its obligations under the parties' agreement without any suggestion that it could resume the investigation. *See* p. 8, *supra*. DOJ's views about the wisdom of the settlement apparently shifted after the change in administration. Yet when DOJ reapproached NAR in April 2021, it did not immediately resume the investigation or reissue the CIDs—as it could have done if

it thought the Closing Letter imposed no continuing restrictions. *Cf.* Gov't Br. 30–32. Instead, DOJ sought NAR's agreement to broaden the reservation-of-rights provision in the consent decree. *See* p. 8–9, *supra*. When NAR declined, DOJ withdrew from the consent decree, explaining publicly that the "proposed settlement … prevented the department from pursuing other antitrust claims relating to NAR's rules," and that it was "taking this action to permit a broader investigation of NAR's rules and conduct to proceed without restriction." JA __ (DOJ July 1, 2021 Press Release); *see* JA __ (DOJ July 1, 2021 Emails) (similar).

DOJ did not specify which "restriction[s]" in the proposed settlement "prevented" it from undertaking "a broader investigation." JA __ (DOJ July 1, 2021 Press Release). But the Closing Letter was the only settlement component that imposed any restrictions on DOJ's discretion to investigate practices "other" than those addressed in the consent decree. *Id.* Sure enough, five days after issuing the press release and withdrawing from the consent decree, DOJ reissued a CID that copied, often almost verbatim, the requests in the previous CIDs—precisely what the Closing Letter "prevented" DOJ from doing. JA __ (2021 CID).

The necessary implication of DOJ's statements and conduct is that it understood that the Closing Letter "prevented" it from investigating NAR's Participation Rule and Clear Cooperation Policy. JA __ (DOJ July 1, 2021 Press Release). That understanding is correct. It is also irreconcilable with DOJ's current

28

position that the Closing Letter required nothing more than closing the investigation at the moment it sent the letter.  As between DOJ's contemporaneous understanding while performing the contract and the post hoc rationalization presented in this litigation, the former is entitled to far "great[er] weight."  Restatement § 202(1); *see id.* cmt. b ("In interpreting the words and conduct of the parties to a contract, a court seeks to put itself in the position they occupied at the time the contract was made.").

## C.    The Government's Contrary Arguments Lack Merit

As noted, DOJ accepts that it entered into a contract to close its investigation into the Participation Rule and Clear Cooperation Policy and relieve NAR of its obligation to respond to the corresponding CIDs.  DOJ does not contend that those policies changed or that the 2021 CID materially differs from those referenced in the Closing Letter.  DOJ's contention is instead that the Closing Letter permitted it to resume the same investigation that it closed and to compel compliance with the same CIDs that it promised NAR would not have to answer.  That position defies the language of the parties' agreement, their bargaining history and course of performance, and basic rule-of-law principles.

### 1.    *DOJ misreads the relevant contract language*

**a.**    The government's lead argument (Br. 29–34) is that the operative language of the Closing Letter—stating that "the Antitrust Division has closed its investigation into the … Clear Cooperation Policy and Participation Rule" and that

29

NAR "[a]ccordingly will have no obligation to respond to" the corresponding CIDs —imposed no restrictions on DOJ conducting the investigation. JA __ (Closing Letter). Rather, the government contends, DOJ simply had to *say* that the investigation was closed. That reading is unpersuasive on its own terms and implausible in the context of the parties' overall agreement.

DOJ relies heavily (Br. 30–31) on the "present perfect tense" of the statement that "the Antitrust Division has closed its investigation," reasoning that the letter "simply cannot be read to impose a *future* obligation on either party." As an initial matter, however, that focus on verb tense overlooks the second half of the same sentence, which states that "NAR *will have* no obligation to respond to" the then-outstanding CIDs. JA __ (Closing Letter) (emphasis added). That future-tense formulation plainly imposes a future obligation—one that DOJ violated when it reissued a CID in 2021 requesting substantially the same information as the CIDs referenced in the Closing Letter. *See* JA __ (Op. 8 n.2, 9).

Moreover, DOJ's premise that use of a present-perfect verb tense precludes commitments about future conduct is wrong as a matter of plain language. An advocate who is told that her time at the podium "has expired" would surely understand that statement to have implications for future conduct (or restraint therefrom). The same is true for the term "has closed." When a bank informs a customer that a transaction "has closed," or an agency informs the public that the

period for comment "has closed," an ordinary English speaker would not infer

unfettered discretion to continue negotiating the transaction or submitting

comments.  To be sure, banks may sometimes reopen transactions and agencies may

sometimes reopen comment periods (just as courts can extend arguments).  But, as

every reasonable listener would understand, that would be the exception rather than

the rule.  The government's "strained construction" of "has closed" turns that term's

"normal meaning" upside down.  *United States v. ITT Cont'l Baking Co.*, 420 U.S.

223, 235 (1975).

DOJ cites several cases (Br. 32–33) that it says buttress its position on the

implications of the Closing Letter.  But most of those cases involved no government

promise to close an investigation, so the circumstances under which the respective

investigations were resumed have little bearing here.  And in any event, those

circumstances ultimately reinforce the ordinary understanding that reopening an

investigation typically requires some justification beyond mere second thoughts.

*See, e.g.*, *Senate of the Commonwealth of P.R.*, 823 F.2d at 578, 586 (describing a

reopening "on the basis of new evidence"); *accord* Gov't Br. 53 ("[A]s a practical

matter most closed investigations are not reopened.").

One case cited by DOJ (Br. 33–34) did involve a closing letter:  *Schellenbach

v. SEC*, 989 F.2d 907 (7th Cir. 1993).  Critically, however, that letter was not issued

as part of a contract in which the recipient provided consideration in return; it was a

mere gratuitous promise, which all agree is unenforceable. *Id.* at 911. DOJ's reliance on that case thus only underscores that it seeks to avoid its contractual obligations in this case.[6]

**b.** The government invokes other language in the Closing Letter and the Proposed Final Judgment (Br. 38–41), but that language provides no more support for DOJ's position.

First, DOJ points (Br. 38–39) to the final sentence in the Closing Letter, which states that "[n]o inference should be drawn … from the Division's decision to close its investigation into" the Participation Rule and Clear Cooperation Policy. JA __ (Closing Letter). DOJ interprets that general proviso to undermine the ordinary meaning of the operative language of the letter, which—as explained above —precludes DOJ from continuing the same investigation that it closed and reissuing the same CIDs that it promised NAR would not have to answer. This Court has previously rejected attempts by the government to construe one provision of a contract "as saying 'never mind' to" other parts of the same agreement. *Segar*, 508 F.3d at 23–24. The same logic applies here. *Cf.* Restatement § 203 ("[S]pecific terms and exact terms are given greater weight than general language.").

---

[6] In addition, the Seventh Circuit held that the dispute in *Schellenbach* involved matters about which "the [closing] letter made no representations." *Id.*

The government's proposed reading is especially unpersuasive because the "no inferences" language serves other evident purposes, such as confirming that DOJ had reached no determination on the policies' lawfulness. *See* JA __ (Op. 9–10). The language also says nothing about DOJ's promise that NAR "will have no obligation to respond to" the existing CIDs. JA __ (Closing Letter). And in any event, overreliance on the language is inappropriate because DOJ added it unilaterally. JA __ (Op. 10). As the district court correctly explained, "under the law of contract the Antitrust Division was not free to unilaterally change the terms of the settlement agreement by adding an ambiguous sentence to a letter designed to simply confirm that it had upheld its side of the deal." *Id.*

DOJ also invokes the reservation-of-rights provision in the consent decree, which states that "[n]othing in this Final Judgment shall limit the right of the United States to investigate and bring actions to prevent or restrain violations of the antitrust laws concerning any Rule or practice adopted or enforced by NAR or any of its Member Boards." JA __ (Proposed Final Judgment § XI). In DOJ's view (Br. 40–41), that language precludes reading the Closing Letter to limit DOJ's discretion to investigate the Participation Rule and Clear Cooperation Policy. But that argument fails at the starting gate because the first words in the reservation-of-rights provision make clear that it applies only to the *Final Judgment*—not the Closing Letter. *See* JA __ (Op. 10). The government, moreover, knows how to reserve rights in a closing

33

letter when it can obtain agreement to do so. *See, e.g.*, *Kurtz v. Kimberly-Clark Corp.*, 321 F.R.D. 482, 545 (E.D.N.Y. 2017) (discussing Federal Trade Commission closing letter stating that "the Commission 'reserves the right to take such further action as the public interest may require'"). No such language appears here.[7]

### 2. *Extrinsic evidence undermines rather than supports DOJ*

In addition to its flawed textual argument, DOJ invokes (Br. 42–45) various forms of extrinsic evidence that it claims bolster its reading of the parties' agreement. But the extrinsic evidence DOJ cites does not support its position. And DOJ ignores critical extrinsic evidence that overwhelmingly supports NAR.

**a.** DOJ asserts that the Antitrust "Division *three times* refused to make any commitment about future investigations and never retreated from that position." Br. 42; *see id.* at 2, 12, 27 (similar). But as DOJ's own account of that history demonstrates, the government's rejection of earlier NAR proposals sheds little light on the one it ultimately accepted. Specifically, DOJ notes that it rejected NAR's initial proposal that the "Participation Rule would not be subject to further

---

[7] DOJ suggests (Br. 47–48) that the later-filed Competitive Impact Statement (CIS) describes the reservation of rights in the consent decree more broadly. As an initial matter, DOJ's quotation omits the end of the CIS's (paraphrased) description of the consent decree's reservation-of-rights provision, which states that "*nothing in the Final Judgment* shall limit those rights." JA __ (CIS 16) (emphasis added). In any event, DOJ cannot unilaterally expand the scope of the carefully negotiated reservation-of-rights provision in the consent decree by paraphrasing it in broader terms in a later filing that was not negotiated with NAR.

investigation *any time in the next ten years*," and it informed NAR twice that "the Division cannot commit to *never* investigating or challenging NAR's rules and policies in the future." *Id.* at 42–43 (emphasis added; citations omitted). But because neither the district court nor NAR construed the parties' agreement to embody a ten-year timeframe or a commitment to "never" investigate "NAR rules and policies," *id.*, DOJ's rejections of those positions are largely beside the point.

DOJ also fails to grapple with the import of the changes that it made to the reservation-of-rights provision during the parties' negotiation. As outlined in detail above, DOJ's initial draft consent decree expressly allowed further investigation of the Participation Rule and Clear Cooperation Policy, but DOJ then deleted that language and agreed to send the Closing Letter in response to NAR's position that it needed "relief from the investigations." JA __ (Op. 9) (citation omitted); *see* pp. 5–6, *supra*. DOJ's position seems to be that, regardless of the intense bargaining and express changes that the Antitrust Division agreed to make at NAR's request, the agreement meant essentially the same thing both before and after those negotiations. That is not a plausible account of the parties' interactions, and it squarely contradicts the district court's factual finding that DOJ's promise to close the investigation—and not merely to send an empty letter—"was essential to the parties' reaching a settlement." JA __ (Op. 8); *see* JA __ (Op. 9).

**b.**    Moreover, the government's reliance on extrinsic evidence overlooks some of the most probative such evidence available:  DOJ's own performance of the agreement.  As explained above, DOJ spent months in 2021 trying to persuade NAR to agree to change the reservation-of-rights provision in the consent decree—and then ultimately withdrew from the consent decree—because it believed the reservation-of-rights provision "prevented the department from pursuing other antitrust claims relating to NAR's rules."  JA __ (DOJ July 1, 2021 Press Release); *see* p. 10–11, *supra*.  Only after its withdrawal did DOJ (just days later) resume the investigation of the Participation Rule and Clear Cooperation Policy and issue the 2021 CID.  *See* p. 10–11, *supra*.  The unmistakable implication is that DOJ itself understood that it did *not* have total discretion to resume the investigation; otherwise its course of conduct would make very little sense.  As discussed, DOJ was right on that point—which underscores that it is wrong now.

### 3.    *DOJ's reliance on its sovereign authority and enforcement discretion is misplaced*

In an argument advanced for the first time on appeal, DOJ asserts that the district court's interpretation of the settlement contradicts the "unmistakability doctrine," which in certain circumstances requires the presence of "unmistakable terms" in a contract that "waive[s] a sovereign power of the United States."  Gov't Br. 34 (citation omitted).  As an initial matter, that argument is forfeited, because— while DOJ now accuses the district court (Br. 37) of "flouting" the doctrine—DOJ

36

never even mentioned it below.  It is thus a paradigmatic example of a "legal theor[y] not asserted at the District Court level" that should "not be heard on appeal." *Huron v. Cobert*, 809 F.3d 1274, 1280 (D.C. Cir. 2016).

In any event, DOJ's "argument mistakes the scope of the unmistakability doctrine." *Winstar*, 518 U.S. at 871.  That doctrine arises from cases in which the government allegedly breached a contract as result of a subsequent act of legislative power. *See id.* at 871–80 (surveying the doctrine).  In that rare fact pattern, the Court has required a clear statement of intent to relinquish sovereign authority as a means to protect "Congress' reserved power to alter the law." *Bowen v. Pub. Agencies Opposed to Soc. Sec. Entrapment*, 477 U.S. 41, 54 (1986).  For example, when a lease addressing oil-and-gas royalties said nothing about an Indian tribe's sovereign authority to impose taxes, the Court held that the lease did not silently waive that authority. *Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 148 (1982).  The Court, however, has stressed the limited scope of the doctrine and emphasized that "[w]hen the United States enters into contract relations, its rights and duties therein are governed generally by the law applicable to contracts between private individuals." *Winstar*, 518 U.S. at 895 (plurality opinion) (citation omitted).

The unmistakability doctrine has no application here.  DOJ did not breach its agreement because of a subsequent legislative action or other similar development; it breached its agreement simply because it no longer wanted to be bound.  Nor was

37

the agreement silent on the government's investigation or the CIDs; as discussed, it spoke directly to those issues. JA __ (Closing Letter). Tellingly, DOJ does not cite any case applying the unmistakability doctrine to the settlement of an enforcement action like this one, even though virtually every case in which the government forebears from criminal prosecution or civil enforcement could theoretically be regarded as one in which it relinquishes sovereign power. To the contrary, the Supreme Court and this Court have routinely reviewed cases involving plea bargains, consent decrees, and other enforcement-related agreements under standard contract law, without any unmistakability-doctrine overlay. *See, e.g.*, *Puckett v. United States*, 556 U.S. 129, 137, 138 n.1 (2009); *Santobello v. New York*, 404 U.S. 257, 262 (1971); *Moreno-Membache*, 995 F.3d at 256. Indeed, courts have frequently construed ambiguities in such agreements against the government—the opposite of the result DOJ seeks here. *See, e.g.*, *United States v. Harvey*, 791 F.2d 294, 300–01 (4th Cir. 1986) (collecting cases). A contrary rule would "produce the untoward result of compromising the Government's practical capacity to make contracts, which [the Supreme Court] ha[s] held to be 'of the essence of sovereignty' itself." *Winstar*, 518 U.S. at 884 (plurality opinion).

For similar reasons, DOJ's invocation (Br. 54–55) of general principles of prosecutorial discretion is misplaced. As DOJ observes, "an agency's decision not to prosecute or enforce … is a decision generally committed to an agency's absolute

discretion." *Heckler v. Chaney*, 470 U.S. 821, 831 (1985). But here, DOJ exercised that discretion to enter into the settlement at issue. No one disputes DOJ's right to exercise ongoing enforcement discretion as a general matter; the only question is how to interpret the particular agreement that DOJ used its discretion to enter. Answering that question entails no more of an incursion on prosecutorial discretion or sovereign prerogatives than any other case involving a government contract.

Finally, even if the unmistakability doctrine applied, its requirements would be satisfied. As explained above, and as the district court found, it is "not hard to" discern the meaning of the parties' settlement from their language, bargaining, and course of performance. JA __ (Op 8). Indeed, before its recent reimagination, DOJ itself recognized that the settlement "prevented" it from resuming the investigation and reissuing the CIDs. JA __ (DOJ July 1, 2021 Press Release).

### 4.    *The Tunney Act process does not support DOJ's position*

Reaching even further beyond the ordinary meaning of the agreement, DOJ suggests (Br. 46–50) that its handling of the procedural requirements imposed by the Tunney Act, 15 U.S.C. § 16(b)–(h), bolsters its understanding of the settlement. The crux of DOJ's contention seems to be that the Tunney Act would have required it to reference the Closing Letter in certain submissions if the letter had in fact barred the government from resuming its investigation—and that, because the Antitrust Division did not reference the letter in those submissions, this Court should infer

that the letter did not have such an effect.  That strained argument fails for multiple reasons:  It is forfeited.  It misreads the Tunney Act.  And in all events, it sheds little light on the parties' understanding of the settlement.

First, DOJ's Tunney Act argument—like the unmistakability argument just discussed—was not raised before the district court and is therefore forfeited.  *See Huron*, 809 F.3d at 1280.

Regardless, DOJ's argument is at odds with Tunney Act jurisprudence.  This Court has held—at DOJ's urging—that a district court conducting a Tunney Act review "is only authorized to review the [consent] decree itself."  *United States v. Microsoft Corp.*, 56 F.3d 1448, 1459 (D.C. Cir. 1995).  A court thus may not "reach beyond the complaint to evaluate claims that the government did *not* make and to inquire as to why they were not made."  *Id.*; *accord, e.g.*, *United States v. Fokker Servs. B.V.*, 818 F.3d 733, 743 (D.C. Cir. 2016) (reiterating that the Tunney Act does not authorize "reaching beyond the complaint to examine practices the government did not challenge" (quoting *Microsoft*, 56 F.3d at 1460)).[8]

---

[8]    DOJ itself consistently defends that reading.  *See, e.g.*, Response of Plaintiff United States to Public Comments on the Proposed Final Judgment at 32, *United States v. CVS Health Corp.*, No. 1:18-cv-02340-RJL (D.D.C. Feb. 13, 2019), ECF No. 56 (DOJ stating that issues that "do not relate to whether the proposed Final Judgment reasonably addresses the harms alleged in the Complaint" are "beyond the scope of [a] Tunney Act proceeding").

That understanding forecloses the government's argument here. By any definition, the Participation Rule and Clear Cooperation Policy are "practices the government did not challenge" in the Complaint. *Fokker Servs.*, 818 F.3d at 743. They were instead addressed only in the Closing Letter. The Tunney Act accordingly would not have permitted inquiry into the Closing Letter. *See id.* That would remain true no matter what DOJ thought the Closing Letter meant, because referencing the letter would have amounted to improperly "reaching beyond the complaint." *Id.* There is accordingly no basis to infer anything about DOJ's understanding of the Closing Letter from its failure to reference the letter in the Tunney Act process.

In any event, even if some inference about DOJ's understanding of the Closing Letter could be drawn from the Tunney Act process, that inference would be weak. DOJ points to nothing in the record suggesting that it declined to reference the Closing Letter in the Tunney Act process because it viewed the letter as having no significant effect. To the contrary, as explained above, the record overwhelmingly indicates that DOJ knew the letter *did* have a significant effect: preventing it from investigating the Participation Rule and the Clear Cooperation Policy as those policies existed at the time of the settlement. *See* p. 10–11, *supra*. DOJ's explicit, contemporaneous statements provide far greater insight into its

understanding of the Closing Letter than the strained series of post-hoc inferences that DOJ asks the Court to draw from its handling of the Tunney Act process.[9]

### 5.    *The district court's reading does not produce absurd results*

Finally, DOJ contends that enforcing the parties' settlement as the district court read it would produce "absurd results."  Gov't Br. 50; *see id.* at 51–55.  In making that argument, however, DOJ overstates the scope of the settlement.  DOJ discusses the implications, for example, of "construing the November 2020 letter to shield NAR from federal antitrust scrutiny" and of "depriving the United States of Executive authority for no benefit."  *Id.* at 50–51.  But those are not accurate characterizations of the settlement as understood by the district court or NAR.

The Closing Letter does not, on any plausible reading, "shield NAR from federal antitrust scrutiny."  Gov't Br. 50.  It applies only to the Participation Rule and Clear Cooperation Policy as those policies existed at the time of the settlement, JA __ (Closing Letter).  Nor does the settlement deprive DOJ of any enforcement discretion "for no benefit."  Gov't Br. 51.  The price of the Closing Letter for NAR

---

[9]    DOJ's suggestion (Br. 48–49) that such inferences can be drawn from *NAR's handling* of the Tunney Act process is even less persuasive.  The Tunney Act instructions relevant here are addressed to "the United States."  15 U.S.C. § 16(b)–(d).  NAR had no substantive responsibilities in the Tunney Act process and no basis to object to DOJ's handling of that process, particularly given that NAR had agreed not to oppose entry of the consent decree.  More fundamentally, it is implausible to look to NAR's silence on DOJ's handling of the Tunney Act process as a basis to determine NAR's understanding of the parties' agreement when so many more probative indicia are available.  *See* p. 21–29, *supra*.

was agreement to the Proposed Final Judgment, which required NAR to modify other policies at DOJ's request and accept other burdens that DOJ surely considered benefits, such as installing a new antitrust compliance officer who would issue reports to the government. *See* p. 8, *supra*.[10]

In making its absurdity argument, DOJ seems to subtly pivot from its characterization of the settlement to the present position of the parties. In particular, DOJ suggests (Br. 53) that it is "anomalous" and "absurd" that "NAR has been relieved of its obligations under the Proposed Final Judgment" while DOJ remains bound by the Closing Letter. Critically, however, DOJ overlooks the reason why "NAR has been relieved of its obligations under the Proposed Final Judgment." *Id.* It is because *DOJ chose to withdraw* from the Proposed Final Judgment and dismiss its Complaint against NAR. *See* p. 10, *supra*. DOJ (unlike NAR) had the right to

---

[10]  While ignoring the significant benefits that it received from NAR's agreement to the consent decree, DOJ attempts (Br. 51–53) to inflate the benefits that NAR purportedly received from the Closing Letter as DOJ conceives it. But DOJ's bulleted list of purported benefits—which includes, for example, not having to respond to the CIDs at the moment DOJ sent the letter—only reinforces the correctness of the district court's finding that DOJ treats the letter as "worth nothing but the paper on which it was written." JA __ (Op. 9).

do that under the parties' Stipulation.  JA __ (Stipulation ¶ 2).  But if DOJ regrets that decision, it has only itself to blame.[11]

Finally, DOJ suggests that NAR should have expected the government's position to shift because "a change of administrations was coming."  Gov't Br. 55; *see, e.g.*, *id.* at 11 (emphasizing that the agreement was made by the "previous leadership of the [Antitrust] Division").  That line of argument is not only wrong but alarming.  Although a new administration is free to change the government's policies, it is not free to repudiate the government's contracts.  *See Nat'l R.R. Passenger Corp. v. Atchison Topeka & Santa Fe Ry. Co.*, 470 U.S. 451, 466 (1985) ("Policies, unlike contracts, are inherently subject to revision and repeal.").  That is part of what it means to say that we have "a government of laws, and not of men."

---

[11]    In a footnote, DOJ seems to gesture (Br. 50 n.10) at an argument that its withdrawal from the Proposed Consent Judgment relieved it of its obligations under the Closing Letter.  But DOJ does not press that interpretation in this litigation, and wisely so.  As explained above, the parties' settlement had two component parts: the Proposed Consent Decree (with its accompanying Stipulation) and the Closing Letter.  The Stipulation gave DOJ the unilateral right to "withdraw its consent" to "the proposed Final Judgment."  JA __ (Stipulation ¶ 2).  But DOJ's exercise of that option under the first component of the settlement had no impact on its obligations under the second component of the settlement (the Closing Letter).  To the extent DOJ suggests (Br. 50 n.10) that its withdrawal from the Proposed Consent Judgment "nullified" the parties' overall agreement, that is plainly wrong.  DOJ's withdrawal from the Proposed Consent Judgment *implemented* an option expressly contemplated by the parties' agreement, as DOJ itself elsewhere recognizes.  *See* Gov't Br. 31 n.7 ("It is undisputed that the Division had, and properly exercised, the right to withdraw from the Proposed Final Judgment.").

*Marbury v. Madison*, 5 U.S. 137, 163 (1803); *cf. City of New Orleans v. Citizens' Bank of Louisiana*, 167 U.S. 371, 389 (1897) ("The mere fact that there has been a change in the person holding the office does not destroy the effect" of res judicata.).

Accordingly, it is well-established that "the Attorney General is free to enter into settlements that would limit the future exercise of executive branch discretion when that discretion has been conferred upon the executive branch pursuant to statute and there exists no independent statutory limitation on the authority of the executive branch to so limit the future exercise of that discretion." Authority of the United States to Enter Settlements Limiting the Future Exercise of Executive Branch Discretion, 23 Op. OLC 126, 127–28 (June 15, 1999). When the government enters into such settlements, it is legally bound to follow them, and its counterparties are entitled to rely on them. *See Sinking-Fund Cases*, 99 U.S. 700, 719 (1879) ("The United States are as much bound by their contracts as are individuals. If they repudiate their obligations, it is as much repudiation, with all the wrong and reproach that term implies."). Contrary to DOJ's suggestion, neither a change in leadership nor a change of heart supports deviation from that principle. *See, e.g.*, *Haggart v. United States*, 943 F.3d 943, 946 (Fed. Cir. 2019) ("'[T]he Settlement Agreement was and remains a binding and enforceable contract' that '[t]he [G]overnment cannot avoid . . . even if it now has had a change of heart and wishes to back out.'"); *Flores v. Barr*, 934 F.3d 910, 912 (9th Cir. 2019) (explaining enforcement of

unaccompanied-minors consent decree across multiple administrations).  In issuing the narrow relief in this case, the district court upheld that enduring principle:  "The government, like any party, must be held to the terms of its settlement agreements, whether or not a new administration likes those agreements."  JA __ (Op. 11).

## II.  IN THE ALTERNATIVE, THIS COURT SHOULD REMAND FOR CONSIDERATION OF NAR'S REMAINING OBJECTIONS

Because the district court held that the government breached the parties' agreement, it did "not resolve NAR's objections to [the] breadth and burdensomeness" of the 2021 CID.  JA __ (Op. 10 n.3).  DOJ nevertheless asks this Court to engage in a "review … de novo" of "NAR's relevance and burden objections."  Gov't Br. 25; *see id.* at 55–60.  But this Court could not engage in any such "review" because there is no district court decision addressing the issue.  *See Doe v. SEC*, 28 F.4th 1306, 1316 (D.C. Cir. 2022) (explaining that "an appellate court" is "a court of review, not of first view" (citation omitted)).  If this Court disagrees with the district court's holding, it should follow its "usual" practice, *Pollack v. Hogan*, 703 F.3d 117, 121 (D.C. Cir. 2012), and remand NAR's unaddressed objections "for the district court's resolution in the first instance," *Urquhart-Bradley v. Mobley*, 964 F.3d 36, 48 (D.C. Cir. 2020).

As NAR elaborated in its petition, the 2021 CID seeks more information than permitted by the federal civil discovery standards that the ACPA incorporates.  15 U.S.C. § 1312(c)(1)(B); *see* JA __ (Pet. ¶¶ 177–87).  Specifically, the Federal Rules

of Civil Procedure limit discovery requests to "nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). The CID fails that test in multiple ways.

As an initial matter, Request Nos. 2, 3, 4, 5, 6, 7, 8, 9, 10, 12, 14, 17, and 18 seek "all documents" concerning a broad array of subjects. JA __ (2021 CID). Such requests for "all documents" are "not designed to capture relevant, unique information; rather, they are designed to capture great swaths of information without regard to whether that information is likely relevant and unique." *EEOC v. George Washington Univ.*, No. 17-cv-1978, 2020 WL 3489478, at *7 (D.D.C. June 26, 2020). Likewise, information sought merely "to explore" the hypothetical effects of rule or policy changes that have not in fact occurred—as DOJ acknowledges it is seeking (Br. 59)—is not adequately connected to "any party's claim or defense," Fed. R. Civ. P. 26(b)(1), and thus fails the relevance standard, *see Food Lion, Inc. v. United Food & Commercial Workers Int'l Union*, 103 F.3d 1007, 1013 (D.C. Cir. 1997). In addition, Request Nos. 14 and 15 seek documents from throughout a fifteen-year period relating to the conduct and intentions of the hundreds of thousands of members of REALTOR®-association owned multiple listing services spread throughout the country—thereby imposing a search burden far out of proportion to the needs of the case. JA __ (2021 CID). And the government's

47

requests that seek privileged information are contrary to civil discovery standards for that reason alone.  *See* Fed. R. Civ. P. 26(b)(1).

Contrary to DOJ's conclusory assertion (Br. 55) that those objections all have a "complete lack of merit," they raise serious issues that require careful factual and legal analysis.  The district court is best suited to address the objections in the first instance, if they need to be addressed at all.

## CONCLUSION

For the foregoing reasons, this Court should affirm the district court's decision quashing the 2021 CID.

Dated:  July 21, 2023                  Respectfully submitted,

                                        /s/ *Christopher G. Michel*

Ethan C. Glass                          Christopher G. Michel
COOLEY LLP                              Michael D. Bonanno
1299 Pennsylvania Avenue, NW,           William A. Burck
   Suite 700                            Rachel G. Frank
Washington, DC 20004                    QUINN EMANUEL URQUHART &
Tel: (202) 842-7800                        SULLIVAN, LLP
Fax: (202) 842-7899                     1300 I Street, NW,
eglass@cooley.com                          Suite 900
                                        Washington, DC 20005
                                        Tel:  (202) 538-8000
                                        Fax: (202) 538-8100
                                        christophermichel@quinnemanuel.com
                                        mikebonanno@quinnemanuel.com
                                        williamburck@quinnemanuel.com
                                        rachelfrank@quinnemanuel.com

                                        *Counsel for Petitioner-Appellee*
                                        *National Association of Realtors*

48

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 11,794 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f). This brief also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because the brief has been prepared in a proportional typeface using Microsoft Word 2013 in 14-point Times New Roman font.

Dated: July 21, 2023

/s/ *Christopher G. Michel*
Christopher G. Michel
QUINN EMANUEL URQUHART & SULLIVAN, LLP
1300 I Street, NW,
  Suite 900
Washington, DC 20005
(202) 538-8000

*Counsel for Petitioner-Appellee*
*National Association of Realtors*

# CERTIFICATE OF SERVICE

I, Christopher G. Michel, hereby certify that, on July 21, 2023, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit using the appellate CM/ECF system. Registered CM/ECF users participating in the case will be served by the appellate CM/ECF system

July 21, 2023                     Respectfully submitted,


                                   /s/ *Christopher G. Michel*
                                   Christopher G. Michel
                                   QUINN EMANUEL URQUHART & SULLIVAN, LLP
                                   1300 I Street, NW,
                                     Suite 900
                                   Washington, DC 20005
                                   (202) 538-8000

                                   *Counsel for Petitioner-Appellee*
                                   *National Association of Realtors*

# ADDENDUM

## TABLE OF CONTENTS

15 U.S.C. § 16 ................................................................................................. A1

15 U.S.C. § 1311 ............................................................................................. A5

15 U.S.C. § 1312 ............................................................................................. A6

15 U.S.C. § 1313 ............................................................................................. A9

15 U.S.C. § 1314 ........................................................................................... A10

## § 15f. Actions by Attorney General

### (a) Notification to State attorney general

Whenever the Attorney General of the United States has brought an action under the antitrust laws, and he has reason to believe that any State attorney general would be entitled to bring an action under this Act based substantially on the same alleged violation of the antitrust laws, he shall promptly give written notification thereof to such State attorney general.

### (b) Availability of files and other materials

To assist a State attorney general in evaluating the notice or in bringing any action under this Act, the Attorney General of the United States shall, upon request by such State attorney general, make available to him, to the extent permitted by law, any investigative files or other materials which are or may be relevant or material to the actual or potential cause of action under this Act.

(Oct. 15, 1914, ch. 323, §4F, as added Pub. L. 94–435, title III, §301, Sept. 30, 1976, 90 Stat. 1395.)

#### Editorial Notes

##### REFERENCES IN TEXT

The antitrust laws, referred to in subsec. (a), are defined in section 12 of this title.

This Act, referred to in text, is act Oct. 15, 1914, ch. 323, 38 Stat. 730, as amended, known as the Clayton Act, which is classified generally to sections 12, 13, 14 to 19, 21, and 22 to 27 of this title, and sections 52 and 53 of Title 29, Labor. For further details and complete classification of this Act to the Code, see References in Text note set out under section 12 of this title and Tables.

#### Statutory Notes and Related Subsidiaries

##### EFFECTIVE DATE

Injuries sustained prior to Sept. 30, 1976, not covered by this section, see section 304 of Pub. L. 94–435, set out as a note under section 15c of this title.

## § 15g. Definitions

For the purposes of sections 15c, 15d, 15e, and 15f of this title:

(1) The term ''State attorney general'' means the chief legal officer of a State, or any other person authorized by State law to bring actions under section 15c of this title, and includes the Corporation Counsel of the District of Columbia, except that such term does not include any person employed or retained on—

(A) a contingency fee based on a percentage of the monetary relief awarded under this section; or

(B) any other contingency fee basis, unless the amount of the award of a reasonable attorney's fee to a prevailing plaintiff is determined by the court under section 15c(d)(1) of this title.

(2) The term ''State'' means a State, the District of Columbia, the Commonwealth of Puerto Rico, and any other territory or possession of the United States.

(3) The term ''natural persons'' does not include proprietorships or partnerships.

(Oct. 15, 1914, ch. 323, §4G, as added Pub. L. 94–435, title III, §301, Sept. 30, 1976, 90 Stat. 1396.)

#### Statutory Notes and Related Subsidiaries

##### EFFECTIVE DATE

Injuries sustained prior to Sept. 30, 1976, not covered by this section, see section 304 of Pub. L. 94–435, set out as a note under section 15c of this title.

## § 15h. Applicability of parens patriae actions

Sections 15c, 15d, 15e, 15f, and 15g of this title shall apply in any State, unless such State provides by law for its nonapplicability in such State.

(Oct. 15, 1914, ch. 323, §4H, as added Pub. L. 94–435, title III, §301, Sept. 30, 1976, 90 Stat. 1396.)

#### Statutory Notes and Related Subsidiaries

##### EFFECTIVE DATE

Injuries sustained prior to Sept. 30, 1976, not covered by this section, see section 304 of Pub. L. 94–435, set out as a note under section 15c of this title.

## § 16. Judgments

### (a) Prima facie evidence; collateral estoppel

A final judgment or decree heretofore or hereafter rendered in any civil or criminal proceeding brought by or on behalf of the United States under the antitrust laws to the effect that a defendant has violated said laws shall be prima facie evidence against such defendant in any action or proceeding brought by any other party against such defendant under said laws as to all matters respecting which said judgment or decree would be an estoppel as between the parties thereto: *Provided,* That this section shall not apply to consent judgments or decrees entered before any testimony has been taken. Nothing contained in this section shall be construed to impose any limitation on the application of collateral estoppel, except that, in any action or proceeding brought under the antitrust laws, collateral estoppel effect shall not be given to any finding made by the Federal Trade Commission under the antitrust laws or under section 45 of this title which could give rise to a claim for relief under the antitrust laws.

### (b) Consent judgments and competitive impact statements; publication in Federal Register; availability of copies to the public

Any proposal for a consent judgment submitted by the United States for entry in any civil proceeding brought by or on behalf of the United States under the antitrust laws shall be filed with the district court before which such proceeding is pending and published by the United States in the Federal Register at least 60 days prior to the effective date of such judgment. Any written comments relating to such proposal and any responses by the United States thereto, shall also be filed with such court and published by the United States in the Federal Register within such sixty-day period. Copies of such proposal and any other materials and documents which the United States considered determinative in formulating such proposal, shall also be made available to the public at the district court and in such other districts as the court may subsequently direct. Simultaneously with the filing of such proposal, unless otherwise instructed by the court, the United

States shall file with the district court, publish in the Federal Register, and thereafter furnish to any person upon request, a competitive impact statement which shall recite—

(1) the nature and purpose of the proceeding;

(2) a description of the practices or events giving rise to the alleged violation of the antitrust laws;

(3) an explanation of the proposal for a consent judgment, including an explanation of any unusual circumstances giving rise to such proposal or any provision contained therein, relief to be obtained thereby, and the anticipated effects on competition of such relief;

(4) the remedies available to potential private plaintiffs damaged by the alleged violation in the event that such proposal for the consent judgment is entered in such proceeding;

(5) a description of the procedures available for modification of such proposal; and

(6) a description and evaluation of alternatives to such proposal actually considered by the United States.

**(c) Publication of summaries in newspapers**

The United States shall also cause to be published, commencing at least 60 days prior to the effective date of the judgment described in subsection (b) of this section, for 7 days over a period of 2 weeks in newspapers of general circulation of the district in which the case has been filed, in the District of Columbia, and in such other districts as the court may direct—

(i) a summary of the terms of the proposal for consent judgment,

(ii) a summary of the competitive impact statement filed under subsection (b),

(iii) and a list of the materials and documents under subsection (b) which the United States shall make available for purposes of meaningful public comment, and the place where such materials and documents are available for public inspection.

**(d) Consideration of public comments by Attorney General and publication of response**

During the 60-day period as specified in subsection (b) of this section, and such additional time as the United States may request and the court may grant, the United States shall receive and consider any written comments relating to the proposal for the consent judgment submitted under subsection (b). The Attorney General or his designee shall establish procedures to carry out the provisions of this subsection, but such 60-day time period shall not be shortened except by order of the district court upon a showing that (1) extraordinary circumstances require such shortening and (2) such shortening is not adverse to the public interest. At the close of the period during which such comments may be received, the United States shall file with the district court and cause to be published in the Federal Register a response to such comments. Upon application by the United States, the district court may, for good cause (based on a finding that the expense of publication in the Federal Register exceeds the public interest benefits to be gained from such publication), authorize an alternative method of public dissemination of the public comments received and the response to those comments.

**(e) Public interest determination**

(1) Before entering any consent judgment proposed by the United States under this section, the court shall determine that the entry of such judgment is in the public interest. For the purpose of such determination, the court shall consider—

(A) the competitive impact of such judgment, including termination of alleged violations, provisions for enforcement and modification, duration of relief sought, anticipated effects of alternative remedies actually considered, whether its terms are ambiguous, and any other competitive considerations bearing upon the adequacy of such judgment that the court deems necessary to a determination of whether the consent judgment is in the public interest; and

(B) the impact of entry of such judgment upon competition in the relevant market or markets, upon the public generally and individuals alleging specific injury from the violations set forth in the complaint including consideration of the public benefit, if any, to be derived from a determination of the issues at trial.

(2) Nothing in this section shall be construed to require the court to conduct an evidentiary hearing or to require the court to permit anyone to intervene.

**(f) Procedure for public interest determination**

In making its determination under subsection (e), the court may—

(1) take testimony of Government officials or experts or such other expert witnesses, upon motion of any party or participant or upon its own motion, as the court may deem appropriate;

(2) appoint a special master and such outside consultants or expert witnesses as the court may deem appropriate; and request and obtain the views, evaluations, or advice of any individual, group or agency of government with respect to any aspects of the proposed judgment or the effect of such judgment, in such manner as the court deems appropriate;

(3) authorize full or limited participation in proceedings before the court by interested persons or agencies, including appearance amicus curiae, intervention as a party pursuant to the Federal Rules of Civil Procedure, examination of witnesses or documentary materials, or participation in any other manner and extent which serves the public interest as the court may deem appropriate;

(4) review any comments including any objections filed with the United States under subsection (d) concerning the proposed judgment and the responses of the United States to such comments and objections; and

(5) take such other action in the public interest as the court may deem appropriate.

**(g) Filing of written or oral communications with the district court**

Not later than 10 days following the date of the filing of any proposal for a consent judgment under subsection (b), each defendant shall file with the district court a description of any and all written or oral communications by or on

behalf of such defendant, including any and all written or oral communications on behalf of such defendant by any officer, director, employee, or agent of such defendant, or other person, with any officer or employee of the United States concerning or relevant to such proposal, except that any such communications made by counsel of record alone with the Attorney General or the employees of the Department of Justice alone shall be excluded from the requirements of this subsection. Prior to the entry of any consent judgment pursuant to the antitrust laws, each defendant shall certify to the district court that the requirements of this subsection have been complied with and that such filing is a true and complete description of such communications known to the defendant or which the defendant reasonably should have known.

**(h) Inadmissibility as evidence of proceedings before the district court and the competitive impact statement**

Proceedings before the district court under subsections (e) and (f) of this section, and the competitive impact statement filed under subsection (b) of this section, shall not be admissible against any defendant in any action or proceeding brought by any other party against such defendant under the antitrust laws or by the United States under section 15a of this title nor constitute a basis for the introduction of the consent judgment as prima facie evidence against such defendant in any such action or proceeding.

**(i) Suspension of limitations**

Whenever any civil or criminal proceeding is instituted by the United States to prevent, restrain, or punish violations of any of the antitrust laws, but not including an action under section 15a of this title, the running of the statute of limitations in respect to every private or State right of action arising under said laws and based in whole or in part on any matter complained of in said proceeding shall be suspended during the pendency thereof and for one year thereafter: *Provided, however,* That whenever the running of the statute of limitations in respect of a cause of action arising under section 15 or 15c of this title is suspended hereunder, any action to enforce such cause of action shall be forever barred unless commenced either within the period of suspension or within four years after the cause of action accrued.

(Oct. 15, 1914, ch. 323, § 5, 38 Stat. 731; July 7, 1955, ch. 283, § 2, 69 Stat. 283; Pub. L. 93–528, § 2, Dec. 21, 1974, 88 Stat. 1706; Pub. L. 94–435, title III, § 302(2), Sept. 30, 1976, 90 Stat. 1396; Pub. L. 96–349, § 5(a), Sept. 12, 1980, 94 Stat. 1157; Pub. L. 108–237, title II, § 221(b), June 22, 2004, 118 Stat. 668.)

**Editorial Notes**

REFERENCES IN TEXT

The antitrust laws, referred to in subsecs. (a), (b), and (g) to (i), are defined in section 12 of this title.

AMENDMENTS

2004—Subsec. (d). Pub. L. 108–237, § 221(b)(1), inserted at end "Upon application by the United States, the district court may, for good cause (based on a finding that

the expense of publication in the Federal Register exceeds the public interest benefits to be gained from such publication), authorize an alternative method of public dissemination of the public comments received and the response to those comments."

Subsec. (e). Pub. L. 108–237, § 221(b)(2), designated introductory provisions as par. (1), substituted "court shall" for "court may", added subpars. (A) and (B) and par. (2), and struck out former pars. (1) and (2) which read as follows:

"(1) the competitive impact of such judgment, including termination of alleged violations, provisions for enforcement and modification, duration or relief sought, anticipated effects of alternative remedies actually considered, and any other considerations bearing upon the adequacy of such judgment;

"(2) the impact of entry of such judgment upon the public generally and individuals alleging specific injury from the violations set forth in the complaint including consideration of the public benefit, if any, to be derived from a determination of the issues at trial."

Subsec. (g). Pub. L. 108–237, § 221(b)(3), inserted "by any officer, director, employee, or agent of such defendant" before ", or other person" in first sentence.

1980—Subsec. (a). Pub. L. 96–349 made collateral estoppel inapplicable in any action or proceeding brought under the antitrust laws to any finding made by the Commission under the antitrust laws or under section 45 of this title which could give rise to a claim for relief under the antitrust laws; struck out "or by the United States under section 15a of this title," after "under said laws"; and deleted from proviso "or to judgments or decrees entered in actions under section 15a of this title" after "testimony has been taken".

1976—Pub. L. 94–435 substituted "private or State right of action" for "private right of action" and "section 15 or 15c" for "section 15".

1974—Subsecs. (b) to (i). Pub. L. 93–528 added subsecs. (b) to (h) and redesignated former subsec. (b) as (i).

1955—Act July 7, 1955, substituted subsec. (a) for first paragraph, to provide that final judgments in actions under the antitrust laws by the United States shall be prima facie evidence in damage suits by the United States as well as in private damage suits, and substituted subsec. (b) for second paragraph, to provide for a one-year suspension of limitations.

**Statutory Notes and Related Subsidiaries**

EFFECTIVE DATE OF 1980 AMENDMENT

Pub. L. 96–349, § 5(b), Sept. 12, 1980, 94 Stat. 1157, provided that: "The amendments made by this section [amending this section] shall apply only with respect to actions commenced after the date of the enactment of this Act [Sept. 12, 1980]."

SUSPENSION OF LIMITATION

Act Oct. 10, 1942, ch. 589, 56 Stat. 781, as amended June 30, 1945, ch. 213, 59 Stat. 306, provided for the suspension of any existing statutes of limitations relating to violations of antitrust laws now indictable or subject to civil proceedings under any existing statutes, until June 30, 1946.

FINDINGS AND PURPOSES OF 2004 AMENDMENT

Pub. L. 108–237, title II, § 221(a), June 22, 2004, 118 Stat. 668, provided that:

"(1) FINDINGS.—Congress finds that—

"(A) the purpose of the Tunney Act [probably means section 2 of Pub. L. 93–528 which amended this section] was to ensure that the entry of antitrust consent judgments is in the public interest; and

"(B) it would misconstrue the meaning and Congressional intent in enacting the Tunney Act to limit the discretion of district courts to review antitrust consent judgments solely to determining whether entry of those consent judgments would make a 'mockery of the judicial function'.

"(2) PURPOSES.—The purpose of this section [amending this section] is to effectuate the original Congres-

sional intent in enacting the Tunney Act and to ensure that United States settlements of civil antitrust suits are in the public interest.''

## § 17. Antitrust laws not applicable to labor organizations

The labor of a human being is not a commodity or article of commerce. Nothing contained in the antitrust laws shall be construed to forbid the existence and operation of labor, agricultural, or horticultural organizations, instituted for the purposes of mutual help, and not having capital stock or conducted for profit, or to forbid or restrain individual members of such organizations from lawfully carrying out the legitimate objects thereof; nor shall such organizations, or the members thereof, be held or construed to be illegal combinations or conspiracies in restraint of trade, under the antitrust laws.

(Oct. 15, 1914, ch. 323, §6, 38 Stat. 731.)

### Editorial Notes

#### REFERENCES IN TEXT

The antitrust laws, referred to in text, are defined in section 12 of this title.

## § 18. Acquisition by one corporation of stock of another

No person engaged in commerce or in any activity affecting commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share capital and no person subject to the jurisdiction of the Federal Trade Commission shall acquire the whole or any part of the assets of another person engaged also in commerce or in any activity affecting commerce, where in any line of commerce or in any activity affecting commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly.

No person shall acquire, directly or indirectly, the whole or any part of the stock or other share capital and no person subject to the jurisdiction of the Federal Trade Commission shall acquire the whole or any part of the assets of one or more persons engaged in commerce or in any activity affecting commerce, where in any line of commerce or in any activity affecting commerce in any section of the country, the effect of such acquisition, of such stocks or assets, or of the use of such stock by the voting or granting of proxies or otherwise, may be substantially to lessen competition, or to tend to create a monopoly.

This section shall not apply to persons purchasing such stock solely for investment and not using the same by voting or otherwise to bring about, or in attempting to bring about, the substantial lessening of competition. Nor shall anything contained in this section prevent a corporation engaged in commerce or in any activity affecting commerce from causing the formation of subsidiary corporations for the actual carrying on of their immediate lawful business, or the natural and legitimate branches or extensions thereof, or from owning and holding all or a part of the stock of such subsidiary corporations, when the effect of such formation is not to substantially lessen competition.

Nor shall anything herein contained be construed to prohibit any common carrier subject to the laws to regulate commerce from aiding in the construction of branches or short lines so located as to become feeders to the main line of the company so aiding in such construction or from acquiring or owning all or any part of the stock of such branch lines, nor to prevent any such common carrier from acquiring and owning all or any part of the stock of a branch or short line constructed by an independent company where there is no substantial competition between the company owning the branch line so constructed and the company owning the main line acquiring the property or an interest therein, nor to prevent such common carrier from extending any of its lines through the medium of the acquisition of stock or otherwise of any other common carrier where there is no substantial competition between the company extending its lines and the company whose stock, property, or an interest therein is so acquired.

Nothing contained in this section shall be held to affect or impair any right heretofore legally acquired: *Provided*, That nothing in this section shall be held or construed to authorize or make lawful anything heretofore prohibited or made illegal by the antitrust laws, nor to exempt any person from the penal provisions thereof or the civil remedies therein provided.

Nothing contained in this section shall apply to transactions duly consummated pursuant to authority given by the Secretary of Transportation, Federal Power Commission, Surface Transportation Board, the Securities and Exchange Commission in the exercise of its jurisdiction under section 79j of this title,[1] the United States Maritime Commission, or the Secretary of Agriculture under any statutory provision vesting such power in such Commission, Board, or Secretary.

(Oct. 15, 1914, ch. 323, §7, 38 Stat. 731; Dec. 29, 1950, ch. 1184, 64 Stat. 1125; Pub. L. 96–349, §6(a), Sept. 12, 1980, 94 Stat. 1157; Pub. L. 98–443, §9(*l*), Oct. 4, 1984, 98 Stat. 1708; Pub. L. 104–88, title III, §318(1), Dec. 29, 1995, 109 Stat. 949; Pub. L. 104–104, title VI, §601(b)(3), Feb. 8, 1996, 110 Stat. 143.)

### Editorial Notes

#### REFERENCES IN TEXT

Section 79j of this title, referred to in text, was repealed by Pub. L. 109–58, title XII, §1263, Aug. 8, 2005, 119 Stat. 974.

#### AMENDMENTS

1996—Pub. L. 104–104, in sixth par., struck out "Federal Communications Commission," after "Secretary of Transportation,".

1995—Pub. L. 104–88, in sixth par., substituted "Surface Transportation Board" for "Interstate Commerce Commission" and inserted ", Board," after "vesting such power in such Commission".

1984—Pub. L. 98–443 substituted "Secretary of Transportation" for "Civil Aeronautics Board" and "Commission or Secretary" for "Commission, Secretary, or Board" in sixth par.

1980—Pub. L. 96–349, substituted "person" for "corporation" wherever appearing in first and second pars.;

---

[1] See References in Text note below.

ketball, or hockey, except the agreements to which section 1291 of this title shall apply.

(Pub. L. 87–331, §4, Sept. 30, 1961, 75 Stat. 732.)

## § 1295. "Persons" defined

As used in this chapter, "persons" means any individual, partnership, corporation, or unincorporated association or any combination or association thereof.

(Pub. L. 87–331, §5, Sept. 30, 1961, 75 Stat. 732.)

## CHAPTER 33—BRAKE FLUID REGULATION

### §§ 1301 to 1303. Repealed. Pub. L. 89–563, title I, § 117(a), Sept. 9, 1966, 80 Stat. 727

Sections, Pub. L. 87–637, §§1–3, Sept. 5, 1962, 76 Stat. 437, provided for promulgation of standards for hydraulic brake fluid used in motor vehicles and set the penalty for the unlawful sale, importation, or introduction into commerce of fluid not meeting the published standards. See chapter 38 (§1381 et seq.) of this title.

#### Statutory Notes and Related Subsidiaries

SAVINGS PROVISION

Pub. L. 89–563, title I, §117(b)–(e), Sept. 9, 1966, 80 Stat. 727, provided that persons willfully violating sections 1301 to 1303 and 1321 to 1323 of this title would be punished in accordance with provisions of laws in effect on date of violation, prior to repeal by Pub. L. 103–272, §7(b), July 5, 1994, 108 Stat. 1379.

## CHAPTER 34—ANTITRUST CIVIL PROCESS

Sec.
1311.     Definitions.
1312.     Civil investigative demands.
1313.     Custodian of documents, answers and transcripts.
1314.     Judicial proceedings.

## § 1311. Definitions

For the purposes of this chapter—

(a) The term "antitrust law" includes:

(1) Each provision of law defined as one of the antitrust laws by section 12 of this title; and

(2) Any statute enacted on and after September 19, 1962, by the Congress which prohibits, or makes available to the United States in any court of the United States any civil remedy with respect to any restraint upon or monopolization of interstate or foreign trade or commerce;

(b) The term "antitrust order" means any final order, decree, or judgment of any court of the United States, duly entered in any case or proceeding arising under any antitrust law;

(c) The term "antitrust investigation" means any inquiry conducted by any antitrust investigator for the purpose of ascertaining whether any person is or has been engaged in any antitrust violation or in any activities in preparation for a merger, acquisition, joint venture, or similar transaction, which, if consummated, may result in an antitrust violation;

(d) The term "antitrust violation" means any act or omission in violation of any antitrust law, any antitrust order or, with respect to the International Antitrust Enforcement Assistance Act of 1994 [15 U.S.C. 6201 et seq.], any of the foreign antitrust laws;

(e) The term "antitrust investigator" means any attorney or investigator employed by the Department of Justice who is charged with the duty of enforcing or carrying into effect any antitrust law;

(f) The term "person" means any natural person, partnership, corporation, association, or other legal entity, including any person acting under color or authority of State law;

(g) The term "documentary material" includes the original or any copy of any book, record, report, memorandum, paper, communication, tabulation, chart, or other document, and any product of discovery;

(h) The term "custodian" means the custodian or any deputy custodian designated under section 1313(a) of this title;

(i) The term "product of discovery" includes without limitation the original or duplicate of any deposition, interrogatory, document, thing, result of the inspection of land or other property, examination, or admission obtained by any method of discovery in any judicial litigation or in any administrative litigation of an adversarial nature; any digest, analysis, selection, compilation, or any derivation thereof; and any index or manner of access thereto; and

(j) The term "agent" includes any person retained by the Department of Justice in connection with the enforcement of the antitrust laws.

(k) The term "foreign antitrust laws" has the meaning given such term in section 12 of the International Antitrust Enforcement Assistance Act of 1994 [15 U.S.C. 6211].

(Pub. L. 87–664, §2, Sept. 19, 1962, 76 Stat. 548; Pub. L. 94–435, title I, §101, Sept. 30, 1976, 90 Stat. 1383; Pub. L. 96–349, §§2(a), 7(a)(1), Sept. 12, 1980, 94 Stat. 1154, 1158; Pub. L. 103–438, §3(e)(1)(A), Nov. 2, 1994, 108 Stat. 4598.)

#### Editorial Notes

REFERENCES IN TEXT

This chapter, referred to in text, was in the original "this Act", meaning Pub. L. 87–664, which is classified principally to this chapter. For complete classification of this Act to the Code, see Short Title note below and Tables.

The International Antitrust Enforcement Assistance Act of 1994, referred to in subsec. (d), is Pub. L. 103–438, Nov. 2, 1994, 108 Stat. 4597, which is classified principally to chapter 88 (§6201 et seq.) of this title. For complete classification of this Act to the Code, see Short Title note set out under section 6201 of this title and Tables.

AMENDMENTS

1994—Subsec. (d). Pub. L. 103–438, §3(e)(1)(A)(i), substituted ", any" for "or any" and inserted before semicolon at end "or, with respect to the International Antitrust Enforcement Assistance Act of 1994, any of the foreign antitrust laws".

Subsec. (k). Pub. L. 103–438, §3(e)(1)(A)(ii), added subsec. (k).

1980—Subsec. (g). Pub. L. 96–349, §2(a)(1), extended definition of "documentary material" to include any product of discovery.

Subsec. (h). Pub. L. 96–349, §2(a)(2), substituted a semicolon for period at end.

Subsec. (i). Pub. L. 96–349, §2(a)(3), added subsec. (i).

Subsec. (j). Pub. L. 96–349, §7(a)(1), added subsec. (j).

1976—Subsec. (a). Pub. L. 94–435, §101(1), in par. (1) inserted "and" after semicolon preceding par. (2), struck out par. (2) which included the Federal Trade Commission Act in definition of antitrust law for purposes of this chapter, redesignated par. (3) as (2), struck out "(A)" before "any restraint", and struck out subpar. (B) which related to any unfair trade practice in or affecting interstate or foreign trade or commerce.

Subsec. (c). Pub. L. 94–435, §101(2), inserted "or in any activities in preparation for a merger, acquisition, joint venture, or similar transaction, which if consummated, may result in an antitrust violation;" after "engaged in any antitrust violation".

Subsec. (f). Pub. L. 94–435, §101(3), included "any natural person" and "any person acting under color or authority of State law" in definition of "person".

Subsec. (h). Pub. L. 94–435, §101(4), substituted "the custodian" for "the antitrust document custodian".

### Statutory Notes and Related Subsidiaries

#### EFFECTIVE DATE OF 1976 AMENDMENT

Pub. L. 94–435, title I, §106, Sept. 30, 1976, 90 Stat. 1390, provided that: "The amendments to the Antitrust Civil Process Act [see section 1 of Pub. L. 87–664 set out as a Short Title note under this section] and to section 1505 of title 18, United States Code, made by this title [title I of Pub. L. 94–435] shall take effect on the date of enactment of this Act [Sept. 30, 1976], except section 3(i)(8) of the Antitrust Civil Process Act [section 1312(i)(8) of this title] (as amended by this Act) shall take effect on the later of (1) the date of enactment of this Act [Sept. 30, 1976], or (2) October 1, 1976. Any such amendment which provides for the production of documentary material, answers to interrogatories, or oral testimony shall apply to any act or practice without regard to the date on which it occurred."

#### SHORT TITLE OF 1980 AMENDMENT

Pub. L. 96–349, §1, Sept. 12, 1980, 94 Stat. 1154, provided: "That this Act [amending sections 15, 15a, 15c, 16, 18, and 1311 to 1314 of this title, section 1905 of Title 18, Crimes and Criminal Procedure, and section 1927 of Title 28, Judiciary and Judicial Procedure, and enacting provisions set out as notes under sections 15, 16, and 18 of this title] may be cited as the 'Antitrust Procedural Improvements Act of 1980'."

#### SHORT TITLE

Pub. L. 87–664, §1, Sept. 19, 1962, 76 Stat. 548, provided: "That this Act [enacting this chapter and amending section 1505 of Title 18, Crimes and Criminal Procedure] may be cited as the 'Antitrust Civil Process Act'."

#### SAVINGS PROVISION

Pub. L. 87–664, §7, Sept. 19, 1962, 76 Stat. 552, provided that: "Nothing contained in this Act [see Short Title note above] shall impair the authority of the Attorney General, the Assistant Attorney General in charge of the Antitrust Division of the Department of Justice, or any antitrust investigator to (a) lay before any grand jury impaneled before any district court of the United States any evidence concerning any alleged antitrust violation, (b) invoke the power of any such court to compel the production of any evidence before any such grand jury, or (c) institute any proceeding for the enforcement of any order or process issued in execution of such power, or to punish disobedience of any such order of process by any person, including a natural person."

## § 1312. Civil investigative demands

### (a) Issuance; service; production of material; testimony

Whenever the Attorney General, or the Assistant Attorney General in charge of the Antitrust Division of the Department of Justice, has reason to believe that any person may be in possession, custody, or control of any documentary material, or may have any information, relevant to a civil antitrust investigation or, with respect to the International Antitrust Enforcement Assistance Act of 1994 [15 U.S.C. 6201 et seq.], an investigation authorized by section 3 of such Act [15 U.S.C. 6202], he may, prior to the institution of a civil or criminal proceeding by the United States thereon, issue in writing, and cause to be served upon such person, a civil investigative demand requiring such person to produce such documentary material for inspection and copying or reproduction, to answer in writing written interrogatories, to give oral testimony concerning documentary material or information, or to furnish any combination of such material, answers, or testimony. Whenever a civil investigative demand is an express demand for any product of discovery, the Attorney General or the Assistant Attorney General in charge of the Antitrust Division shall cause to be served, in any manner authorized by this section, a copy of such demand upon the person from whom the discovery was obtained and notify the person to whom such demand is issued of the date on which such copy was served.

### (b) Contents; return date for demand for product of discovery

Each such demand shall—

(1) state the nature of—

(A) the conduct constituting the alleged antitrust violation, or

(B) the activities in preparation for a merger, acquisition, joint venture, or similar transaction, which, if consummated, may result in an antitrust violation,

which are under investigation and the provision of law applicable thereto;

(2) if it is a demand for production of documentary material—

(A) describe the class or classes of documentary material to be produced thereunder with such definiteness and certainty as to permit such material to be fairly identified;

(B) prescribe a return date or dates which will provide a reasonable period of time within which the material so demanded may be assembled and made available for inspection and copying or reproduction; and

(C) identify the custodian to whom such material shall be made available; or

(3) if it is a demand for answers to written interrogatories—

(A) propound with definiteness and certainty the written interrogatories to be answered;

(B) prescribe a date or dates at which time answers to written interrogatories shall be submitted; and

(C) identify the custodian to whom such answers shall be submitted; or

(4) if it is a demand for the giving of oral testimony—

(A) prescribe a date, time, and place at which oral testimony shall be commenced; and

(B) identify an antitrust investigator who shall conduct the examination and the cus-

todian to whom the transcript of such examination shall be submitted.

Any such demand which is an express demand for any product of discovery shall not be returned or returnable until twenty days after a copy of such demand has been served upon the person from whom the discovery was obtained.

**(c) Protected material or information; demand for product of discovery superseding disclosure restrictions except trial preparation materials**

(1) No such demand shall require the production of any documentary material, the submission of any answers to written interrogatories, or the giving of any oral testimony, if such material, answers, or testimony would be protected from disclosure under—

(A) the standards applicable to subpenas or subpenas duces tecum issued by a court of the United States in aid of a grand jury investigation, or

(B) the standards applicable to discovery requests under the Federal Rules of Civil Procedure, to the extent that the application of such standards to any such demand is appropriate and consistent with the provisions and purposes of this chapter.

(2) Any such demand which is an express demand for any product of discovery supersedes any inconsistent order, rule, or provision of law (other than this chapter) preventing or restraining disclosure of such product of discovery to any person. Disclosure of any product of discovery pursuant to any such express demand does not constitute a waiver of any right or privilege, including without limitation any right or privilege which may be invoked to resist discovery of trial preparation materials, to which the person making such disclosure may be entitled.

**(d) Service; jurisdiction**

(1) Any such demand may be served by any antitrust investigator, or by any United States marshal or deputy marshal, at any place within the territorial jurisdiction of any court of the United States.

(2) any[1] such demand or any petition filed under section 1314 of this title may be served upon any person who is not to be found within the territorial jurisdiction of any court of the United States, in such manner as the Federal Rules of Civil Procedure prescribe for service in a foreign country. To the extent that the courts of the United States can assert jurisdiction over such person consistent with due process, the United States District Court for the District of Columbia shall have the same jurisdiction to take any action respecting compliance with this chapter by such person that such court would have if such person were personally within the jurisdiction of such court.

**(e) Service upon legal entities and natural persons**

(1) Service of any such demand or of any petition filed under section 1314 of this title may be made upon a partnership, corporation, association, or other legal entity by—

(A) delivering a duly executed copy thereof to any partner, executive officer, managing agent, or general agent thereof, or to any agent thereof authorized by appointment or by law to receive service of process on behalf of such partnership, corporation, association, or entity;

(B) delivering a duly executed copy thereof to the principal office or place of business of the partnership, corporation, association, or entity to be served; or

(C) depositing such copy in the United States mails, by registered or certified mail, return receipt requested, duly addressed to such partnership, corporation, association, or entity at its principal office or place of business.

(2) Service of any such demand or of any petition filed under section 1314 of this title may be made upon any natural person by—

(A) delivering a duly executed copy thereof to the person to be served; or

(B) depositing such copy in the United States mails by registered or certified mail, return receipt requested, duly addressed to such person at his residence or principal office or place of business.

**(f) Proof of service**

A verified return by the individual serving any such demand or petition setting forth the manner of such service shall be proof of such service. In the case of service by registered or certified mail, such return shall be accompanied by the return post office receipt of delivery of such demand.

**(g) Sworn certificates**

The production of documentary material in response to a demand served pursuant to this section shall be made under a sworn certificate, in such form as the demand designates, by the person, if a natural person, to whom the demand is directed or, if not a natural person, by a person or persons having knowledge of the facts and circumstances relating to such production, to the effect that all of the documentary material required by the demand and in the possession, custody, or control of the person to whom the demand is directed has been produced and made available to the custodian.

**(h) Interrogatories**

Each interrogatory in a demand served pursuant to this section shall be answered separately and fully in writing under oath, unless it is objected to, in which event the reasons for the objection shall be stated in lieu of an answer, and it shall be submitted under a sworn certificate, in such form as the demand designates, by the person, if a natural person, to whom the demand is directed or, if not a natural person, by a person or persons responsible for answering each interrogatory, to the effect that all information required by the demand and in the possession, custody, control, or knowledge of the person to whom the demand is directed has been submitted.

**(i) Oral examinations**

(1) The examination of any person pursuant to a demand for oral testimony served under this

---

[1] So in original. Probably should be capitalized.

section shall be taken before an officer authorized to administer oaths and affirmations by the laws of the United States or of the place where the examination is held. The officer before whom the testimony is to be taken shall put the witness on oath or affirmation and shall personally, or by someone acting under his direction and in his presence, record the testimony of the witness. The testimony shall be taken stenographically and transcribed. When the testimony is fully transcribed, the officer before whom the testimony is taken shall promptly transmit a copy of the transcript of the testimony to the custodian.

(2) The antitrust investigator or investigators conducting the examination shall exclude from the place where the examination is held all other persons except the person being examined, his counsel, the officer before whom the testimony is to be taken, and any stenographer taking such testimony. The provisions of section 30[2] of this title shall not apply to such examinations.

(3) The oral testimony of any person taken pursuant to a demand served under this section shall be taken in the judicial district of the United States within which such person resides, is found, or transacts business, or in such other place as may be agreed upon by the antitrust investigator conducting the examination and such person.

(4) When the testimony is fully transcribed, the antitrust investigator or the officer shall afford the witness (who may be accompanied by counsel) a reasonable opportunity to examine the transcript; and the transcript shall be read to or by the witness, unless such examination and reading are waived by the witness. Any changes in form or substance which the witness desires to make shall be entered and identified upon the transcript by the officer or the antitrust investigator with a statement of the reasons given by the witness for making such changes. The transcript shall then be signed by the witness, unless the witness in writing waives the signing, is ill, cannot be found, or refuses to sign. If the transcript is not signed by the witness within thirty days of his being afforded a reasonable opportunity to examine it, the officer or the antitrust investigator shall sign it and state on the record the fact of the waiver, illness, absence of the witness, or the refusal to sign, together with the reason, if any, given therefor.

(5) The officer shall certify on the transcript that the witness was duly sworn by him and that the transcript is a true record of the testimony given by the witness, and the officer or antitrust investigator shall promptly deliver it or send it by registered or certified mail to the custodian.

(6) Upon payment of reasonable charges therefor, the antitrust investigator shall furnish a copy of the transcript to the witness only, except that the Assistant Attorney General in charge of the Antitrust Division may for good cause limit such witness to inspection of the official transcript of his testimony.

(7)(A) Any person compelled to appear under a demand for oral testimony pursuant to this section may be accompanied, represented, and advised by counsel. Counsel may advise such person, in confidence, either upon the request of such person or upon counsel's own initiative, with respect to any question asked of such person. Such person or counsel may object on the record to any question, in whole or in part, and shall briefly state for the record the reason for the objection. An objection may properly be made, received, and entered upon the record when it is claimed that such person is entitled to refuse to answer the question on grounds of any constitutional or other legal right or privilege, including the privilege against self-incrimination. Such person shall not otherwise object to or refuse to answer any question, and shall not by himself or through counsel otherwise interrupt the oral examination. If such person refuses to answer any question, the antitrust investigator conducting the examination may petition the district court of the United States pursuant to section 1314 of this title for an order compelling such person to answer such question.

(B) If such person refuses to answer any question on grounds of the privilege against self-incrimination, the testimony of such person may be compelled in accordance with the provisions of Part V of title 18.

(8) Any person appearing for oral examination pursuant to a demand served under this section shall be entitled to the same fees and mileage which are paid to witnesses in the district courts of the United States.

(Pub. L. 87–664, §3, Sept. 19, 1962, 76 Stat. 548; Pub. L. 94–435, title I, §102, Sept. 30, 1976, 90 Stat. 1384; Pub. L. 96–349, §2(b)(1)–(3), Sept. 12, 1980, 94 Stat. 1154; Pub. L. 103–438, §3(e)(1)(B), Nov. 2, 1994, 108 Stat. 4598.)

### Editorial Notes

#### References in Text

The International Antitrust Enforcement Assistance Act of 1994, referred to in subsec. (a), is Pub. L. 103–438, Nov. 2, 1994, 108 Stat. 4597, which is classified principally to chapter 88 (§6201 et seq.) of this title. For complete classification of this Act to the Code, see Short Title note set out under section 6201 of this title and Tables.

This chapter, referred to in subsecs. (c)(1)(B), (2) and (d), was in the original "this Act", meaning Pub. L. 87–664, known as the Antitrust Civil Process Act, which is classified principally to this chapter. For complete classification of this Act to the Code, see Short Title note set out under section 1311 of this title and Tables.

Section 30 of this title, referred to in subsec. (i)(2), was repealed by Pub. L. 107–273, div. C, title IV, §14102(f), Nov. 2, 2002, 116 Stat. 1922.

#### Amendments

1994—Subsec. (a). Pub. L. 103–438 inserted "or, with respect to the International Antitrust Enforcement Assistance Act of 1994, an investigation authorized by section 3 of such Act" after "investigation" and "by the United States" after "proceeding".

1980—Subsec. (a). Pub. L. 96–349, §2(b)(1), inserted provision for service and notice of a civil investigative demand for any product of discovery.

Subsec. (b). Pub. L. 96–349, §2(b)(2), inserted provision respecting time demand for product of discovery is returnable.

Subsec. (c). Pub. L. 96–349, §2(b)(3), designated existing provisions as par. (1), redesignated as cls. (A) and (B) former cls. (1) and (2), and added par. (2).

[2] See References in Text note below.

1976—Subsec. (a). Pub. L. 94–435 struck out "under investigation" before "may be in possession", inserted "or may have any information" after "any documentary material", and inserted provision requiring the production of documentary material for inspection or reproduction, answers in writing to written interrogatories, the giving of oral testimony concerning documentary material or information, and the furnishing of any combination of such material, answers, or testimony.

Subsec. (b). Pub. L. 94–435 restructured subsec. (b) and as so restructured, in par. (1) inserted provisions of cl. (B), in par. (2), added cls. (B) and (C), in par. (3) substituted provisions relating to written interrogatories for provisions relating to prescription of a return date for demanded material, and in par. (4), substituted provisions relating to oral testimony for provisions requiring a demand to identify the custodian to whom demanded material shall be made available.

Subsec. (c). Pub. L. 94–435 inserted provision relating to the submission of answers to written interrogatories and the giving of oral testimony, struck out provisions of par. (1) relating to the reasonableness requirement for demands for documentary material, redesignated par. (2) as (1) and provided that protected status of any information or material would be determined by standards applicable in the case of a subpena or subpena duces tecum issued by a court of the United States, and added par. (2).

Subsec. (d). Pub. L. 94–435 redesignated existing provisions as par. (1) and added par. (2).

Subsec. (e). Pub. L. 94–435 redesignated existing provisions as par. (1), inserted "return receipt requested" after "certified mail" in par. (C), and added par. (2).

Subsecs. (g) to (i). Pub. L. 94–435 added subsecs. (g) to (i).

#### Statutory Notes and Related Subsidiaries

Effective Date of 1976 Amendment

Amendment by Pub. L. 94–435 effective Sept. 30, 1976, except subsec. (i)(8) of this section effective Oct. 1, 1976, see section 106 of Pub. L. 94–435, set out as a note under section 1311 of this title.

### § 1313. Custodian of documents, answers and transcripts

#### (a) Designation

The Assistant Attorney General in charge of the Antitrust Division of the Department of Justice shall designate an antitrust investigator to serve as custodian of documentary material, answers to interrogatories, and transcripts of oral testimony received under this chapter, and such additional antitrust investigators as he shall determine from time to time to be necessary to serve as deputies to such officer.

#### (b) Production of materials

Any person, upon whom any demand under section 1312 of this title for the production of documentary material has been duly served, shall make such material available for inspection and copying or reproduction to the custodian designated therein at the principal place of business of such person (or at such other place as such custodian and such person thereafter may agree and prescribe in writing or as the court may direct, pursuant to section 1314(d)[1] of this title) on the return date specified in such demand (or on such later date as such custodian may prescribe in writing). Such person may upon written agreement between such person

---

[1] See References in Text note below.

and the custodian substitute copies for originals of all or any part of such material.

#### (c) Responsibility for materials; disclosure

(1) The custodian to whom any documentary material, answers to interrogatories, or transcripts of oral testimony are delivered shall take physical possession thereof, and shall be responsible for the use made thereof and for the return of documentary material, pursuant to this chapter.

(2) The custodian may cause the preparation of such copies of such documentary material, answers to interrogatories, or transcripts of oral testimony as may be required for official use by any duly authorized official, employee, or agent of the Department of Justice under regulations which shall be promulgated by the Attorney General. Notwithstanding paragraph (3) of this subsection, such material, answers, and transcripts may be used by any such official, employee, or agent in connection with the taking of oral testimony pursuant to this chapter.

(3) Except as otherwise provided in this section, while in the possession of the custodian, no documentary material, answers to interrogatories, or transcripts of oral testimony, or copies thereof, so produced shall be available for examination, without the consent of the person who produced such material, answers, or transcripts, and, in the case of any product of discovery produced pursuant to an express demand for such material, of the person from whom the discovery was obtained, by any individual other than a duly authorized official, employee, or agent of the Department of Justice. Nothing in this section is intended to prevent disclosure to either body of the Congress or to any authorized committee or subcommittee thereof.

(4) While in the possession of the custodian and under such reasonable terms and conditions as the Attorney General shall prescribe, (A) documentary material and answers to interrogatories shall be available for examination by the person who produced such material or answers, or by any duly authorized representative of such person, and (B) transcripts of oral testimony shall be available for examination by the person who produced such testimony, or his counsel.

#### (d) Use of investigative files

(1) Whenever any attorney of the Department of Justice has been designated to appear before any court, grand jury, or Federal administrative or regulatory agency in any case or proceeding, the custodian of any documentary material, answers to interrogatories, or transcripts of oral testimony may deliver to such attorney such material, answers, or transcripts for official use in connection with any such case, grand jury, or proceeding as such attorney determines to be required. Upon the completion of any such case, grand jury, or proceeding, such attorney shall return to the custodian any such material, answers, or transcripts so delivered which have not passed into the control of such court, grand jury, or agency through the introduction thereof into the record of such case or proceeding.

(2) The custodian of any documentary material, answers to interrogatories, or transcripts of oral testimony may deliver to the Federal Trade Commission, in response to a written request,

copies of such material, answers, or transcripts for use in connection with an investigation or proceeding under the Commission's jurisdiction. Such material, answers, or transcripts may only be used by the Commission in such manner and subject to such conditions as apply to the Department of Justice under this chapter.

**(e) Return of material to producer**

If any documentary material has been produced in the course of any antitrust investigation by any person pursuant to a demand under this chapter and—

(1) any case or proceeding before any court or grand jury arising out of such investigation, or any proceeding before any Federal administrative or regulatory agency involving such material, has been completed, or

(2) no case or proceeding, in which such material may be used, has been commenced within a reasonable time after completion of the examination and analysis of all documentary material and other information assembled in the course of such investigation,

the custodian shall, upon written request of the person who produced such material, return to such person any such material (other than copies thereof furnished to the custodian pursuant to subsection (b) of this section or made by the Department of Justice pursuant to subsection (c) of this section) which has not passed into the control of any court, grand jury, or agency through the introduction thereof into the record of such case or proceeding.

**(f) Appointment of successor custodians**

In the event of the death, disability, or separation from service in the Department of Justice of the custodian of any documentary material, answers to interrogatories, or transcripts of oral testimony produced under any demand issued pursuant to this chapter, or the official relief of such custodian from responsibility for the custody and control of such material, answers, or transcripts, the Assistant Attorney General in charge of the Antitrust Division shall promptly (1) designate another antitrust investigator to serve as custodian of such material, answers, or transcripts, and (2) transmit in writing to the person who produced such material, answers, or testimony notice as to the identity and address of the successor so designated. Any successor designated under this subsection shall have with regard to such material, answers, or transcripts all duties and responsibilities imposed by this chapter upon his predecessor in office with regard thereto, except that he shall not be held responsible for any default or dereliction which occurred prior to his designation.

(Pub. L. 87–664, § 4, Sept. 19, 1962, 76 Stat. 549; Pub. L. 94–435, title I, § 103, Sept. 30, 1976, 90 Stat. 1387; Pub. L. 96–349, §§ 2(b)(4), 7(a)(2), Sept. 12, 1980, 94 Stat. 1155, 1158.)

### Editorial Notes

#### References in Text

Section 1314(d) of this title, referred to in subsec. (b), was redesignated section 1314(e) of this title by Pub. L. 96–349.

This chapter, referred to in subsecs. (c), (e), and (f), was in the original "this Act", meaning Pub. L. 87–664,

known as the Antitrust Civil Process Act, which is classified principally to this chapter. For complete classification of this Act to the Code, see Short Title note set out under section 1311 of this title and Tables.

#### Amendments

1980—Subsec. (c)(2). Pub. L. 96–349, § 7(a)(2), provided for use of copies of documentary material by agents of the Department of Justice, including use by such agents in connection with the taking of oral testimony.

Subsec. (c)(3). Pub. L. 96–349, §§ 2(b)(4), 7(a)(2), inserted '', and, in the case of any product of discovery produced pursuant to an express demand for such material, of the person from whom the discovery was obtained'' before '', by any individual'' and reference to ''agent'' of the Department of Justice.

1976—Subsec. (a). Pub. L. 94–435 substituted ''custodian of documentary material, answers to interrogatories, and transcripts of oral testimony received under this chapter'' for ''antitrust documentary custodian''.

Subsec. (b). Pub. L. 94–435 struck out ''issued'' after ''any demand'', inserted ''for the production of documentary material'' before ''has been duly served'', and substituted ''copies for originals of all or any part of such material'' for ''for copies of all or any part of such material originals thereof''.

Subsec. (c). Pub. L. 94–435, among other changes, inserted provisions relating to answers to interrogatories and transcripts of oral testimony and, in par. (1), substituted ''of documentary material'' for ''thereof'', in par. (2), inserted ''by any duly authorized official or employee of the Department of Justice'' after ''for official use'', and inserted a provision relating to the use of documentary material, answers to interrogatories, and transcripts in connection with the taking of oral testimony, in par. (3), inserted ''Except as otherwise provided in this section'' before ''while in the possession'', substituted ''no documentary material'' for ''no material'', ''official'' for ''officer, member'', and inserted provision relating to disclosure of information to Congress or authorized committees or subcommittees thereof, in par. (4), added cl. (B).

Subsec. (d). Pub. L. 94–435, among other changes, in par. (1), inserted provisions relating to answers to interrogatories and transcripts of oral testimony, substituted a provision that an attorney designated under this section be from the Department of Justice for a provision that a designated attorney be appearing on behalf of the United States, provided that such an attorney can make an appearance under this section before a Federal administrative or regulatory agency in addition to a court or grand jury, and added par. (2).

Subsec. (e). Pub. L. 94–435, among other changes, inserted provisions of subsec. (f) relating to the institution of a case or proceeding within a reasonable time after examination and analysis of any evidence assembled during the course of an investigation, and relating to written demand for the return of such material, and, in addition, provided that copies furnished the custodian pursuant to subsec. (b) of this section need not be returned by the custodian.

Subsecs. (f), (g). Pub. L. 94–435 redesignated subsec. (g) as (f). Former subsec. (f) redesignated (e)(2).

### Statutory Notes and Related Subsidiaries

#### Effective Date of 1976 Amendment

Amendment by Pub. L. 94–435 effective Sept. 30, 1976, see section 106 of Pub. L. 94–435, set out as a note under section 1311 of this title.

### § 1314. Judicial proceedings

**(a) Petition for enforcement; venue**

Whenever any person fails to comply with any civil investigative demand duly served upon him under section 1312 of this title or whenever satisfactory copying or reproduction of any such ma-

terial cannot be done and such person refuses to surrender such material, the Attorney General, through such officers or attorneys as he may designate, may file, in the district court of the United States for any judicial district in which such person resides, is found, or transacts business, and serve upon such person a petition for an order of such court for the enforcement of this chapter.

**(b) Petition for order modifying or setting aside demand; time for petition; suspension of time allowed for compliance with demand during pendency of petition; grounds for relief**

(1) Within twenty days after the service of any such demand upon any person, or at any time before the return date specified in the demand, whichever period is shorter, or within such period exceeding twenty days after service or in excess of such return date as may be prescribed in writing, subsequent to service, by any antitrust investigator named in the demand, such person may file and serve upon such antitrust investigator, and in the case of any express demand for any product of discovery upon the person from whom such discovery was obtained, a petition for an order modifying or setting aside such demand—

(A) in the district court of the United States for the judicial district within which such person resides, is found, or transacts business; or

(B) in the case of a petition addressed to an express demand for any product of discovery, only in the district court of the United States for the judicial district in which the proceeding in which such discovery was obtained is or was last pending.

(2) The time allowed for compliance with the demand in whole or in part as deemed proper and ordered by the court shall not run during the pendency of such petition in the court, except that such person shall comply with any portions of the demand not sought to be modified or set aside. Such petition shall specify each ground upon which the petitioner relies in seeking such relief and may be based upon any failure of such demand to comply with the provisions of this chapter, or upon any constitutional or other legal right or privilege of such person.

**(c) Petition for order modifying or setting aside demand for production of product of discovery; grounds for relief; stay of compliance with demand and of running of time allowed for compliance with demand**

Whenever any such demand is an express demand for any product of discovery, the person from whom such discovery was obtained may file, at any time prior to compliance with such express demand, in the district court of the United States for the judicial district in which the proceeding in which such discovery was obtained is or was last pending, and serve upon any antitrust investigator named in the demand and upon the recipient of the demand, a petition for an order of such court modifying or setting aside those portions of the demand requiring production of any such product of discovery. Such petition shall specify each ground upon which the petitioner relies in seeking such relief and may be based upon any failure of such por-

tions of the demand to comply with the provisions of this chapter, or upon any constitutional or other legal right or privilege of the petitioner. During the pendency of such petition, the court may stay, as it deems proper, compliance with the demand and the running of the time allowed for compliance with the demand.

**(d) Petition for order requiring performance by custodian of duties; venue**

At any time during which any custodian is in custody or control of any documentary material or answers to interrogatories delivered, or transcripts of oral testimony given by any person in compliance with any such demand, such person, and, in the case of an express demand for any product of discovery, the person from whom such discovery was obtained, may file, in the district court of the United States for the judicial district within which the office of such custodian is situated, and serve upon such custodian a petition for an order of such court requiring the performance by such custodian of any duty imposed upon him by this chapter.

**(e) Jurisdiction; appeal; contempts**

Whenever any petition is filed in any district court of the United States under this section, such court shall have jurisdiction to hear and determine the matter so presented, and to enter such order or orders as may be required to carry into effect the provisions of this chapter. Any final order so entered shall be subject to appeal pursuant to section 1291 of title 28. Any disobedience of any final order entered under this section by any court shall be punished as a contempt thereof.

**(f) Applicability of Federal Rules of Civil Procedure**

To the extent that such rules may have application and are not inconsistent with the provisions of this chapter, the Federal Rules of Civil Procedure shall apply to any petition under this chapter.

**(g) Disclosure exemption**

Any documentary material, answers to written interrogatories, or transcripts of oral testimony provided pursuant to any demand issued under this chapter shall be exempt from disclosure under section 552 of title 5.

(Pub. L. 87–664, §5, Sept. 19, 1962, 76 Stat. 551; Pub. L. 94–435, title I, §104, Sept. 30, 1976, 90 Stat. 1389; Pub. L. 96–349, §2(b)(5), Sept. 12, 1980, 94 Stat. 1155.)

### Editorial Notes

#### REFERENCES IN TEXT

This chapter, referred to in text, was in the original "this Act", meaning Pub. L. 87–664, known as the Antitrust Civil Process Act, which is classified principally to this chapter. For complete classification of this Act to the Code, see Short Title note set out under section 1311 of this title and Tables.

The Federal Rules of Civil Procedure, referred to in subsec. (f), are set out in the Appendix to Title 28, Judiciary and Judicial Procedure.

#### AMENDMENTS

1980—Subsec. (b). Pub. L. 96–349, §2(b)(5)(A), designated existing provisions as par. (1), provided for fil-

ing and serving a petition for an order modifying or setting aside a demand in the case of an express demand for any product of discovery upon the person from whom the discovery was obtained, incorporated existing provision in cl. (A), added cl. (B), and designated existing provisions as par. (2).

Subsecs. (c), (d). Pub. L. 96–349, §2(b)(5)(B) to (D), added subsec. (c), redesignated former subsec. (c) as (d) and authorized petition, in the case of an express demand for any product of discovery, by the person from whom the discovery was obtained, for an order requiring performance by the custodian of his duties. Former subsec. (d) redesignated (e).

Subsecs. (e) to (g). Pub. L. 96–349, §2(b)(5)(B), redesignated former subsecs. (d) to (f) as (e) to (g), respectively.

1976—Subsec. (a). Pub. L. 94–435, §104(a), struck out provision which permitted a petition for an enforcement order to be filed in the judicial district where a person who had failed to comply with a demand and who transacted business in one or more districts, maintained his principal place of business, or in such other district, in which such person transacted business, as was agreed upon by the parties to the petition.

Subsec. (b). Pub. L. 94–435, §104(b), (c), inserted "or within such period exceeding twenty days after service or in excess of such return date as may be prescribed in writing, subsequent to service, by any antitrust investigator named in the demand," after "whichever period is shorter", substituted "antitrust investigator" for "custodian" before "a petition for an order", and inserted proviso that petitioner should comply with portions of a contested demand which are not being challenged.

Subsec. (c). Pub. L. 94–435, §104(d), substituted "or answers to interrogatories delivered, or transcripts of oral testimony given" for "delivered".

Subsec. (f). Pub. L. 94–435, §104(e), added subsec. (f).

#### Statutory Notes and Related Subsidiaries

Effective Date of 1976 Amendment

Amendment by Pub. L. 94–435 effective Sept. 30, 1976, see section 106 of Pub. L. 94–435, set out as a note under section 1311 of this title.

## CHAPTER 35—SEAT BELT REGULATION

### §§ 1321 to 1323. Repealed. Pub. L. 89–563, title I, § 117(a), Sept. 9, 1966, 80 Stat. 727

Sections, Pub. L. 88–201, §§1–3, Dec. 13, 1963, 77 Stat. 361, provided for the promulgation of standards for seat belts in motor vehicles and set the penalty for the unlawful sale, importation, or introduction into commerce of seat belts not meeting the published standards. For savings provision, see section 117(b) to (e) of Pub. L. 89–563, formerly set out as a note under section 1301 of this title.

## CHAPTER 36—CIGARETTE LABELING AND ADVERTISING

Sec.
1331.    Congressional declaration of policy and purpose.
1332.    Definitions.
1333.    Labeling.
1334.    Preemption.
1335.    Unlawful advertisements on medium of electronic communication.
1335a.    List of cigarette ingredients; annual submission to Secretary; transmittal to Congress; confidentiality.
1336.    Authority of Federal Trade Commission; unfair or deceptive acts or practices.
1337.    Omitted.
1338.    Criminal penalty.
1339.    Injunction proceedings.
1340.    Cigarettes for export.
1341.    Smoking, research, education and information.

### § 1331. Congressional declaration of policy and purpose

It is the policy of the Congress, and the purpose of this chapter, to establish a comprehensive Federal Program to deal with cigarette labeling and advertising with respect to any relationship between smoking and health, whereby—

(1) the public may be adequately informed about any adverse health effects of cigarette smoking by inclusion of warning notices on each package of cigarettes and in each advertisement of cigarettes; and

(2) commerce and the national economy may be (A) protected to the maximum extent consistent with this declared policy and (B) not impeded by diverse, nonuniform, and confusing cigarette labeling and advertising regulations with respect to any relationship between smoking and health.

(Pub. L. 89–92, §2, July 27, 1965, 79 Stat. 282; Pub. L. 91–222, §2, Apr. 1, 1970, 84 Stat. 87; Pub. L. 98–474, §6(a), Oct. 12, 1984, 98 Stat. 2204.)

#### Editorial Notes

Amendments

1984—Par. (1). Pub. L. 98–474 substituted "about any adverse health effects of cigarette smoking by inclusion of warning notices on each package of cigarettes and in each advertisement;" for "that cigarette smoking may be hazardous to health by inclusion of a warning to that effect on each package of cigarettes;".

1970—Pub. L. 91–222 reenacted section without change.

#### Statutory Notes and Related Subsidiaries

Effective Date of 1970 Amendment

Pub. L. 91–222, §3, Apr. 1, 1970, 84 Stat. 90, provided in part that: "All other provisions of the amendment made by this Act [enacting section 1341 of this title, amending this section and sections 1332 and 1335 to 1339 of this title, and enacting provisions set out as notes under this section] except where otherwise specified shall take effect on January 1, 1970."

Effective Date

Pub. L. 89–92, §12, formerly §11, July 27, 1965, 79 Stat. 284, as renumbered by Pub. L. 98–474, §5(a), Oct. 12, 1984, 98 Stat. 2203, provided that: "This Act [this chapter] shall take effect on January 1, 1966."

Short Title of 1984 Amendment

Pub. L. 98–474, §1, Oct. 12, 1984, 98 Stat. 2200, provided that: "This Act [enacting sections 1335a and 1341 of this title, amending this section and sections 1332, 1333, 1336, and 1337 of this title, and enacting provisions set out as notes under this section and sections 1333 and 1335a of this title] may be cited as the 'Comprehensive Smoking Education Act'."

Short Title of 1973 Amendment

Pub. L. 93–109, §1, Sept. 21, 1973, 87 Stat. 352, provided: "That this Act [amending sections 1332 and 1335 of this title] may be cited as the 'Little Cigar Act of 1973'."

Short Title of 1970 Amendment

Pub. L. 91–222, §1, Apr. 1, 1970, 84 Stat. 87, provided: "That this Act [enacting section 1340 of this title,