ORAL ARGUMENT NOT YET SCHEDULED

**No. 23-5065**

# In the
# United States Court of Appeals
# for the District of Columbia Circuit

—————————————

NATIONAL ASSOCIATION OF REALTORS,

*Petitioner-Appellee,*

v.

UNITED STATES OF AMERICA, *et al.,*

*Respondents-Appellants.*

—————————————

On Appeal from the United States District Court for the
District of Columbia (No. 21-cv-2406) (Kelly, J.)

—————————————

**BRIEF OF *AMICUS CURIAE*
CHAMBER OF COMMERCE
OF THE UNITED STATES OF AMERICA**

Andrew R. Varcoe
Kevin R. Palmer*
U.S. Chamber of Commerce
Litigation Center
1615 H Street, NW
Washington, D.C. 20062

Djordje Petkoski
Jacob M. Coate
Shearman & Sterling LLP
401 9th St. NW, Suite 800
Washington, D.C. 20004
(202) 508-8083

*Admitted in Massachusetts
only. Practicing under the
supervision of members of the
D.C. Bar.*

*Counsel for Amicus Curiae*

# Table of Contents

Interest of Amicus Curiae ........................................................................ 1

Introduction ............................................................................................ 2

Argument ................................................................................................. 4

    I.     The District Court's findings of fact make clear the Government's obligations in this case. ................................... 4

    II.    The rule of law requires the Government to honor its agreements, and the Government's insistence to the contrary injures its credibility and businesses' legitimate reliance interests. ................................................................. 6

Conclusion ............................................................................................ 16

# Table of Authorities

**Cases**                                                         **Page(s)**

*Bohack Corp. v. Borden, Inc.*,
  599 F.2d 1160 (2d Cir. 1979) ............................................................. 11

*Heckler v. Cmty. Health Servs. of Crawford Cnty., Inc.*,
  467 U.S. 51 (1984) ................................................................................. 9

*Hilton v. S.C. Pub. Rys. Comm'n*,
  502 U.S. 197 (1991) ............................................................................... 6

*Kasper v. Bd. of Election Comm'rs*,
  814 F.2d 332 (7th Cir. 1987) .............................................................. 10

*Lynch v. United States*,
  292 U.S. 571 (1934) ..................................................................... 7, 9, 11

*Marbury v. Madison*,
  5 U.S. (1 Cranch) 137 (1803) ............................................................... 6

*Mingo Logan Coal Co. v. EPA*,
  829 F.3d 710 (D.C. Cir. 2016) ............................................................ 10

*Mobil Oil Expl. & Producing Se., Inc. v. United States*,
  530 U.S. 604 (2000) ............................................................................... 7

*Morta v. Korea Ins. Corp.*,
  840 F.2d 1452 (9th Cir. 1988) .............................................................. 9

*Nat'l Ass'n of Realtors v. United States*,
  No. 21-cv-2406 (D.D.C. Jan. 25, 2023) ..................................... 4, 5, 14

*Perry v. United States*,
  294 U.S. 330 (1935) ............................................................................... 7

*Salazar v. Ramah Navajo Chapter*,
  567 U.S. 182 (2012) ............................................................................... 7

*Sinking Fund Cases*,
  99 U.S. 700 (1878) ............................................................................. 7, 8

*United States v. Brown,*
   5 F.4th 913 (8th Cir. 2021) ..................................................... 8, 13, 15

*United States v. United Mine Workers,*
   330 U.S. 258 (1947) ............................................................................. 6

*United States v. Winstar Corp.,*
   518 U.S. 839 (1996)............................................................ 7, 9, 10, 11

*Vill. of Kaktovik v. Watt,*
   689 F.2d 222 (D.C. Cir. 1982) ............................................................ 8

*Williams v. First Nat'l Bank,*
   216 U.S. 582 (1910)........................................................................... 12

## Rules

Fed. R. Civ. P. 25(d) ............................................................................ 13

## Other Authorities

Antitrust Division Workload Statistics FY 2010–2019 ........................... 12

Assistant Attorney General Makan Delrahim's Remarks at
   Bocconi University in Milan (May 25, 2018) ........................................ 7

Enhancing the Ease of Doing Business in APEC Countries:
   A Comprehensive Review of Literature, Asian Institute of
   Management Policy Center (May 2015) ............................................. 11

Michael A. Livermore & Daniel Richardson, Administrative
   Law in an Era of Partisan Volatility, 69 Emory L.J. 1
   (2019).................................................................................................. 10

## Interest of Amicus Curiae[1]

The Chamber of Commerce of the United States of America is the world's largest business federation. It represents approximately 300,000 direct members and indirectly represents the interests of more than 3 million companies and professional organizations of every size, in every industry sector, and from every region of the country. An important function of the Chamber is to represent the interests of its members in matters before Congress, the Executive Branch, and the courts. To that end, the Chamber regularly files *amicus curiae* briefs in cases, like this one, that raise issues of concern to the nation's business community.

This case implicates important questions about the Government's ability to back out of settlement agreements it enters into with private parties to resolve law-enforcement investigations. The Government's troubling position is that it may do so for any reason at any time, such as

---

[1] No counsel for any party authored this brief in whole or in part and no entity or person, aside from *amicus curiae*, its members, or its counsel, made any monetary contribution intended to fund the preparation or submission of this brief. The Chamber of Commerce of the United States of America ("Chamber") states that it is a non-profit, tax-exempt organization incorporated in the District of Columbia. The Chamber has no parent corporation, and no publicly held company has 10% or greater ownership in the Chamber.

when a new presidential administration decides that it does not like the result of a settlement agreed to by its predecessor. The Government's claim that settled investigations are like "doors [or] folders," which can be opened or closed at will, is a claim that undermines the rule of law and thus our system of government. If the Court accepts the Government's view, businesses and private citizens would be exposed to perpetual uncertainty regardless of the commitments or representations made by the Government in settling investigations.

## Introduction

The United States has the largest and most dynamic economy in the world. It is a top destination for companies, both domestic and foreign, looking to make investments in businesses that create new products, new technologies, and new jobs. The American economy has achieved this success in large part because the United States is a stable society with an enduring commitment to the rule of law. Part of this commitment means that the courts can be relied upon to enforce valid contracts between parties.

At bottom, this is a case about the court's basic responsibility to do just that. That one of the parties happens to be the Government is

irrelevant. The fair administration of justice and the public's belief that when the Government is required by law to do something, it *will*, is a fundamental part of our system of government and our economy.

The Government's position in this case—that it can renege on the commitments that it makes in its role as law enforcer—erodes the stability and expectation of fair dealing that is key to our system. As the District Court found, in exchange for the National Association of Realtors' (the "Association's") agreement to change certain policies and submit to a proposed consent decree, the Government agreed to close its investigation into two other policies. Now, even though the Association has upheld its end of the bargain, the Government insists that it can renege on its promise, claiming that "[a]s with doors, folders, and businesses, government investigations may be closed and then later reopened" at will. *See* Gov't Br. 32. Its underlying claim is that, because it is the Government and because a new President is in power, it can simply ignore its own settlement commitments made under the prior administration. This claim finds no support in history or precedent, defies basic fairness, harms companies' and private citizens' reliance interests, and (if accepted by this Court) will undermine the

Government's own enforcement efforts. Simply put, private parties—whether they are trade associations, businesses, or private citizens—need to be able to trust the Government to be true to its word, particularly in the context of resolving law-enforcement investigations.

This Court should do as the District Court did and hold the Government to its promise.

## Argument

## I. The District Court's findings of fact make clear the Government's obligations in this case.

In 2019, the Government opened an investigation into several of the Association's policies, including a restriction on disclosing commission information, limited access to lockboxes, certain MLS filter policies, a so-called Participation Rule, and a so-called Clear Cooperation Policy. *See Nat'l Ass'n of Realtors v. United States*, No. 21-cv-2406, 2023 WL 387572, at *1 (D.D.C. Jan. 25, 2023); Competitive Impact Statement 2, *United States v. Nat'l Ass'n of Realtors*, No. 20-cv-03356 (D.D.C. Dec. 10, 2020), ECF No. 11. In 2020, after extensive negotiations, the Government and the Association entered into a settlement agreement. As the District Court found:

1. The Association agreed to submit to a consent decree requiring it to change four of its policies and to seek the Government's approval before making other policy changes;

2. In exchange, the Government agreed to close its investigation into two other policies—the Participation Rule and the Clear Cooperation Policy—and sent the Association a letter confirming the same;

3. Only months later, the Government reneged, unilaterally withdrawing from the consent decree and reopening its investigation into the Participation Rule and the Clear Cooperation Policy; and

4. "[T]he only intervening change was that in presidential administrations."

*Nat'l Ass'n of Realtors*, 2023 WL 387572, at *1–2, 4–5.[2]

Against that factual backdrop, the District Court held: "The government, like any party, must be held to the terms of its settlement agreements, whether or not a new administration likes those agreements." *Nat'l Ass'n of Realtors*, 2023 WL 387572, at *5. The District Court's holding is wholly unremarkable. What *is* remarkable is the Government's position. The core of its argument is that it can renege on its agreements (or artificially narrow them) simply because the Government has changed personnel. Its rationale for this position ranges

---

[2] Unless otherwise indicated, internal quotation marks, citations, and alterations have been omitted from quotations throughout.

5

from a bad-faith, hyper-technical reading of "closed" to "because we are the government." But no matter how it is framed, the Government's position is fundamentally flawed.

## II. The rule of law requires the Government to honor its agreements, and the Government's insistence to the contrary injures its credibility and businesses' legitimate reliance interests.

The rule of law is the bedrock principle of our Republic: "The government of the United States has been emphatically termed a government of laws, and not of men." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 163 (1803); *see* John Adams, Thoughts on Government (April 1776) (defining a republic as "an Empire of Laws, and not of men"); Thomas Paine, Common Sense 41 (Feb. 1776) ("[I]n America, *the law is king*." (emphasis in original)). This means, most fundamentally, that no one—including the government—is above the law. *See also United States v. United Mine Workers*, 330 U.S. 258, 312 (1947) (Frankfurter, J., concurring in the judgment) ("If one man can be allowed to determine for himself what is law, every man can. That means first chaos, then tyranny.").

This principle promotes stability, predictability, and respect for the government's authority. *See also Hilton v. S.C. Pub. Rys. Comm'n*, 502

U.S. 197, 202 (1991). And it has allowed the American economy to thrive, instilling confidence in private entities that the rules of the game are known and can be relied upon. Or, as a recent head of the Antitrust Division (who oversaw the settlement agreement at issue in this case) recognized in a different context: "To ensure that businesses can enter contracts, make investments, and plan for the future, we must provide a stable and predictable environment that is free of arbitrary government action and characterized by transparent and fair procedures."[3]

It is thus unsurprising that the Supreme Court has repeatedly held that when the Government contracts with a private entity, the Government is no freer to disregard its agreed-upon obligations than anyone else. *Salazar v. Ramah Navajo Chapter*, 567 U.S. 182, 191 (2012); *Mobil Oil Expl. & Producing Se., Inc. v. United States*, 530 U.S. 604, 607 (2000); *United States v. Winstar Corp.*, 518 U.S. 839, 895 (1996) (plurality op.); *Perry v. United States*, 294 U.S. 330, 352–53 (1935); *Lynch v. United States*, 292 U.S. 571, 579 (1934); *Sinking Fund Cases*, 99 U.S. 700, 719

---

[3] Assistant Attorney General Makan Delrahim's Remarks at Bocconi University in Milan (May 25, 2018), https://www.justice.gov/opa/speech/assistant-attorney-general-makan-delrahim-delivers-remarks-bocconi-university-milan.

(1878); *see also Vill. of Kaktovik v. Watt*, 689 F.2d 222, 230 (D.C. Cir. 1982) (explaining that a settlement agreement with the government is a binding contract that "may not be unilaterally rescinded"). As Alexander Hamilton explained in 1795: "When a government enters into a contract with an individual, it deposes, as to the matter of the contract, its constitutional authority, and exchanges the character of legislator for that of a moral agent with the same rights and obligations as an individual."[4]

Indeed, if anything, the Government should be *less* free to renege than a private party. When the Government enters a contract, it is staking the credibility of the United States. So, when the Government threatens to unilaterally renege, it "threatens the honor of the government" and "public confidence in the fair administration of justice." *See United States v. Brown*, 5 F.4th 913, 916 (8th Cir. 2021) (plea-agreement context). "It is no less good morals and good law that the Government should turn square corners in dealing with the people than that the people should turn square corners in dealing with their

---

[4] *Sinking Fund Cases*, 99 U.S. 700, 731 (1878) (Strong, J., dissenting) (quoting Alexander Hamilton's address to Congress from Jan. 20, 1795, 3 HAMILTON'S WORKS 518, 519).

government." *Heckler v. Cmty. Health Servs. of Crawford Cnty., Inc.*, 467 U.S. 51, 61 n.13 (1984) (quoting *St. Regis Paper Co. v. United States*, 368 U.S. 208, 229 (1961) (Black, J., dissenting)).

Nonetheless, here, the Government insists that it has the sovereign right to ignore its contractual obligations whenever there are "changes in leadership [or] priorities." *See* Gov't Br. 54. This position runs roughshod over the rule of law and defies principles as old as the Republic itself. The Government may well have changed its mind about the desirability of its agreement with the Association, but "wise or not, a deal is a deal." *Morta v. Korea Ins. Corp.*, 840 F.2d 1452, 1460 (9th Cir. 1988) (emphasizing the "sanctity of contract [as] an important civilizing concept"). And a change of executive priorities or personnel does not excuse the Government's obligations—indeed, even a *statutory* change from *Congress* is not enough to do so. *See Winstar Corp.*, 518 U.S. at 843 (plurality op.); *Lynch*, 292 U.S. at 575, 580.

If adopted here, the Government's position would have deeply troubling impacts on the business community. In a variety of contexts— among them civil settlement agreements, criminal plea deals, and procurement contracts—U.S. businesses rely on the Government to

9

follow through on its promises, often to an even greater extent than they rely on private contractual partners. Contracting with the Government can often be an expensive and onerous undertaking. In settling disputes with the Government, as illustrated here, businesses are often required to make significant changes to their practices and structures, as well as to submit to consent decrees (which constitute their own form of intrusion). *See Kasper v. Bd. of Election Comm'rs*, 814 F.2d 332, 338 (7th Cir. 1987) (explaining that a consent decree is not just a settlement agreement but "an exercise of federal power, enforceable by contempt"). If businesses cannot trust that the Government will uphold its end of the bargain, they will be reluctant to enter agreements with the Government at all. The Government's position here will thus have "the certain result of undermining the Government's credibility at the bargaining table and increasing the cost of its engagements." *Winstar*, 518 U.S. at 884 (plurality op.).[5] That result would not be limited to settlements with the

---

[5] With increasing political polarization, sudden and significant changes in priorities have only become more common. This back-and-forth "disrupts settled expectations," "impos[es] significant cost[s]" "and contravene[s] basic notions of due process and fundamental fairness." *See Mingo Logan Coal Co. v. EPA*, 829 F.3d 710, 736 (D.C. Cir. 2016) (Kavanaugh, J., dissenting); Michael A. Livermore & Daniel Richardson, Administrative Law in an Era of Partisan Volatility 69 Emory L.J. 1, 48

Antitrust Division; it would appear to extend to all settlements entered into by the Government in its role as law enforcer and regulator.

The Government's position also undermines the stability and credibility of the American economy. "[P]unctilious fulfillment of contractual obligations is essential to the maintenance of the credit of *public* as well as private debtors." *Winstar*, 518 U.S. at 884–85 (plurality op.) (quoting *Lynch*, 292 U.S. at 580 (Brandeis, J.)) (emphasis added).[6]

Relatedly, the Government's loss of credibility would thwart otherwise efficient and beneficial settlement agreements. The Government relies heavily on settlement agreements to resolve antitrust cases, which by their nature are "notoriously lengthy and tortuously complex." *Bohack Corp. v. Borden, Inc.*, 599 F.2d 1160, 1169 n.9 (2d Cir.

---

(2019) ("Th[e] constant back and forth [of administrative priorities] is a recipe for regulatory uncertainty, high compliance costs, and ineffective programs."). But private parties should be able to trust that this administrative whiplash does *not* extend to the *contracts* the Government enters.

[6] Economic studies show that "contract enforceability problems cause greater macroeconomic volatility" and conversely, the "prevalence of [the] rule of law is associated with higher [foreign direct investment] inflows." Tristan Canare, *et al.*, Enhancing the Ease of Doing Business in APEC Countries: A Comprehensive Review of Literature, Asian Institute of Management Policy Center (May 2015), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2599112.

1979). Between 2010 and 2019, for example, the Government settled 85% of the civil antitrust cases it brought.[7] Such settlements are good all around—the Government lacks the resources to bring every case to trial, and settlement agreements allow parties to resolve the Government's concerns without burdening private parties and the courts. *See, e.g.*, *Williams v. First Nat'l Bank*, 216 U.S. 582, 595 (1910) ("Compromises of disputed claims are favored by the courts . . . ."). But if private parties think that the Government may turn around mere months later and reopen the very investigation it promised to close—as it did here—they will think twice about entering such settlement agreements. Thus, the Government's position is not only unlawful and unfair but counterproductive to the efficient administration of justice.

The *way* in which the Government has tried to justify its position in this case is also troubling. It refers to its agreement as one made by the "previous leadership of the [Antitrust] Division," Gov't Br. 11, apparently suggesting that the Government's promises are contingent on personnel—precisely the opposite of what the rule of law requires.

---

[7] Antitrust Division Workload Statistics FY 2010–2019 at 5, https://www.justice.gov/atr/file/788426/download.

Indeed, it is a well-settled principle that when the Government acts in its official capacity, a change of personnel does not threaten the continuity and durability of its actions and commitments. For example, when a party sues a government official in her official capacity, and the official is later replaced, the new official is automatically substituted as the party. Fed. R. Civ. P. 25(d). This makes sense—in lawsuits as in settlement agreements, the real party is the United States, not particular officials or administrations.

The Government also gives "closed" a hyper-technical reading, adding that "[a]s with doors, folders, and businesses, government investigations may be closed and then later reopened." Gov't Br. 32; *see* Gov't Br. 30 (emphasizing the "present perfect tense" of its promise). And so, when it said the investigation was "closed," it was describing only a fleeting and illusory promise. This is inconsistent with common usage of the word "closed" as it relates to investigations. Moreover, it is hardly the conduct of a good faith contracting partner or law enforcer. *See also Brown*, 5 F.4th at 916–17 (faulting the government's "halfhearted and begrudging" approach to its plea-agreement obligations as lacking "the meticulous fidelity" required).

13

The Government's claim that the District Court granted the Association sweeping antitrust immunity is overblown. *See* Gov't Br. 42. To begin, the District Court did not *grant* the Association anything; it merely enforced the Government's promise. Nor did it immunize the Association in any way. The Government is not the only enforcer of the antitrust laws. For example, State Attorneys General and private plaintiffs are not privy to the parties' settlement and retain rights to challenge the policies at issue. Indeed, as the Government's own brief acknowledges, a private suit challenging the very policy the Government complains of is *currently* pending. Gov't Br. 10.

In any event, there is nothing "sweeping" about the District Court's order. It holds only that a change in presidential administration does not alone justify the Government reopening an investigation it promised to close only months ago. The Government remains free to investigate the Association for other issues or "some future version or application of [its] Participation Rule and Clear Cooperation Policy." *Nat'l Ass'n of Realtors*, 2023 WL 387572, at *5. Further, the District Court did not opine on whether the Government could have reopened this investigation had it made a compelling showing of changed circumstances. Because the

14

Government identified no change beyond the change in administration and a change of mind, the District Court's holding was a straightforward application of settled contract law.

Likewise, the Government's complaints of restrictions on its sovereign power miss the mark. Consider plea deals. There, too, the Government is engaged in the exercise of its sovereign authority—arguably, an exercise closer to the core of sovereign power than civil antitrust enforcement. And yet, once the Government has entered a plea deal, it is enforceable even if the Government starts to have second thoughts or if the prosecutor changes. *See Brown*, 5 F.4th at 916.

More fundamentally, the restriction that the Government complains of—that it is subject to the same contract principles as any other entity—is a feature, not a bug, of our system. The Government's use of contract law to resolve antitrust investigations prior to trial benefits both the Government and regulated parties. By agreeing to resolve its claims by settlement, the Government empowers private parties to seek enforcement of its promises in the courts. This system of amicable resolution of claims relies on the courts holding the Government to the terms of its contractual promises. Put differently,

constraining capricious government action in exchange for stability, credibility, and fairness is precisely the tradeoff the rule of law requires.

## Conclusion

Despite wielding immense power, the Government remains bound by its obligations regardless of its current personnel. This is a necessary feature of our nation's commitment to the rule of law, which has created a stable, fair, and predictable contracting system that in turn has promoted economic growth and innovation. This Court should preserve this system and reject the Government's attempt here to seize a power it has never had, that is at odds with long-settled principles of republican government, and that would thwart private parties' legitimate reliance interests.

Respectfully submitted,

*/s/ Jacob M. Coate*

Andrew R. Varcoe
Kevin R. Palmer*
U.S. Chamber of Commerce
Litigation Center
1615 H Street, NW
Washington, D.C. 20062

*\*Admitted in Massachusetts
only. Practicing under the*

Djordje Petkoski
Jacob M. Coate
Shearman & Sterling LLP
401 9th St. NW, Suite 800
Washington, D.C. 20004
(202) 508-8083

*Counsel for Amicus Curiae*

16

*supervision of members of the*
*D.C. Bar.*

Dated July 28, 2023

## Certificate of Compliance

Pursuant to Rule 32(g)(1), I certify that this brief was prepared using Century Schoolbook 14-point typeface and per the word-processing system used to create the document, contains 3201 words, excluding the parts exempted by the rules.

*/s/ Jacob M. Coate*
Jacob M. Coate

### Certificate of Service

I certify that, on July 28, 2023, the foregoing was electronically filed with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit through the Court's CM/ECF system, which effected service upon counsel of record.

*/s/ Jacob M. Coate*
Jacob M. Coate

19