ORAL ARGUMENT NOT YET SCHEDULED

**No. 23-5065**

In The

# United States Court of Appeals
## for the District of Columbia Circuit

NATIONAL ASSOCIATION OF REALTORS,

*Petitioner-Appellee,*

v.

UNITED STATES OF AMERICA, ET AL.,

*Respondents-Appellants.*

ON APPEAL FROM THE UNITED STATES DISTRICT
COURT FOR THE DISTRICT OF COLUMBIA
(JUDGE TIMOTHY J. KELLY)

**FINAL REPLY BRIEF OF APPELLANTS UNITED
STATES OF AMERICA, ET AL.**

JONATHAN S. KANTER
*Assistant Attorney General*
DOHA G. MEKKI
*Principal Deputy Assistant
Attorney General*
MAGGIE GOODLANDER
*Deputy Assistant Attorney General*
DAVID B. LAWRENCE
*Policy Director*
MARKUS BRAZILL
*Counsel to the Assistant
Attorney General*
DANIEL E. HAAR
NICKOLAI G. LEVIN
STEVEN J. MINTZ
*Attorneys*
U.S. Department of Justice,
Antitrust Division
950 Pennsylvania Ave., NW, Rm. 3224
Washington, DC 20530-0001
Tel. 202-353-0256
Email: Steven.Mintz@usdoj.gov

# TABLE OF CONTENTS

INTRODUCTION AND SUMMARY OF ARGUMENT ........................... 1

ARGUMENT ............................................................. 4

I.  THE DISTRICT COURT ERRONEOUSLY SET ASIDE CID NO. 30729. ........ 4

    A.  NAR Reads Sweeping Commitments into the November 2020 Letter. ....................................................... 5

    B.  NAR Sought, and the Division Repeatedly Rejected, the Very "Privilege" NAR Now Imports Into the November 2020 Letter. ...................................................... 12

    C.  NAR Does Not Seriously Dispute That the District Court Implied a Waiver of a Sovereign Power. ................................ 16

    D.  If The Letter Had Granted NAR Immunity, It Would Have Been Disclosed as Part of the Tunney Act Proceeding. ................ 21

    E.  The Negotiations Over the Reservation-of-Rights Clause in the Terminated Settlement Agreement Are Irrelevant. ............... 23

    F.  NAR's Interpretation Produces Anomalous Results. ............... 28

II.  NAR'S RELEVANCE AND BURDENSOMENESS OBJECTIONS TO CID NO. 30729 SHOULD BE OVERRULED. ....................................... 31

CONCLUSION .......................................................... 33

CERTIFICATE OF COMPLIANCE ........................................ 35

CERTIFICATE OF SERVICE ............................................ 36

# Table of Authorities

Page(s)

**CASES:**

*Adams v. Anne Arundel County Public Schools*,
2014 WL 2511473 (D. Md. June 3, 2014), *aff'd*, 789 F.3d 422 (4th Cir. 2015)........................................................................................................7

*Alliance to End Repression v. Chicago*,
742 F.2d 1007 (7th Cir. 1984)................................................... 19, 20, 31

*Arevalo v. Barr*,
950 F.3d 15 (1st Cir. 2020) ....................................................................8

*Capitol Services Management v. Vesta Corp.*,
933 F.3d 784 (D.C. Cir. 2019)..............................................................17

*Community for Creative Non-Violence v. Pierce*,
786 F.2d 1199 (D.C. Cir. 1986)............................................................18

*Copeland v. Marshall*,
641 F.2d 880 (D.C. Cir. 1980)................................................................8

*EEOC v. George Washington University*,
2020 WL 3489478 (D.D.C. June 26, 2020).........................................33

*Evans v. City of Chicago*,
10 F.3d 474 (7th Cir. 1993)..................................................................19

*Food Lion, Inc. v. United Food & Commercial Workers International Union, AFL-CIO-CLC*,
103 F.3d 1007 ......................................................................................33

*FTC v. Texaco, Inc.*,
555 F.2d 862 (D.C. Cir. 1977)..............................................................33

*Guedes v. BATFE*,
  920 F.3d 1 (D.C. Cir. 2019)...................................................17

*Heckler v. Chaney*,
  470 U.S. 821 (1985).............................................................8

*In re Application of the U.S. Senate Permanent Subcommittee on Investigations*,
  655 F.2d 1232 (D.C. Cir. 1981)..........................................20

*In re Sealed Case*,
  932 F.3d 915 (D.C. Cir. 2019)............................................33

*Koch v. Cox*,
  489 F.3d 384 (D.C. Cir. 2007)............................................22

*Lamps Plus, Inc. v. Varela*,
  139 S. Ct. 1407 (2019)........................................................21

*Lebron v. National Railroad Passenger Corp.*,
  513 U.S. 374 (1995)............................................................17

*Liff v. Office of Inspector General for U.S. Department of Labor*
  881 F.3d 912 (D.C. Cir. 2018)............................................22

*Local Union 1395 v. NLRB*,
  797 F.2d 1027 (D.C. Cir. 1986)..........................................15

*M & G Polymers USA, LLC v. Tackett*,
  574 U.S. 427 (2015)..............................................................1

*National Audubon Society, Inc. v. Watt*,
  678 F.2d 299 (D.C. Cir. 1982)............................................18

*Schellenbach v. SEC*,
  989 F.2d 907 (7th Cir. 1993)................................................9

*SEC v. Arthur Young & Co.*,
  584 F.2d 1018 (D.C. Cir. 1978)..........................................33

iv

*Senate of the Commonwealth of Puerto Rico. v. U.S. Department of
    Justice*,
    823 F.2d 574 (D.C. Cir. 1987)....................................................8

*Senate of the Commonwealth of Puerto Rico v. U.S. Department of
    Justice*,
    1992 WL 119127 (D.D.C. May 13, 1992)................................8

*United States v. Armour & Co.*,
    402 U.S. 673 (1971).........................................................3, 9

*United States v. Cherokee Nation of Oklahoma*,
    480 U.S. 700 (1987)............................................................18

*United States v. Harvey*,
    791 F.2d 294 (4th Cir. 1986)................................................21

*United States v. Mejia*,
    448 F.3d 436 (D.C. Cir. 2006).......................................31, 32

*United States v. Microsoft Corp.*,
    56 F.3d 1448 (D.C. Cir. 1995)............................................23

*United States v. Winstar Corp.*,
    518 U.S. 839 (1996)......................................... 16, 17, 18, 20

## STATUTES:

15 U.S.C. § 16 ...................................................................4, 23

15 U.S.C. § 1312(a)-(h) ..........................................................10

15 U.S.C. § 1314(b)(2)..............................................................1

**OTHER AUTHORITIES:**

Authority of the United States to Enter Settlements Limiting the
Future Exercise of Executive Branch Discretion,
23 Op. O.L.C. 126 (1999) ................................................................ 13, 19

RESTATEMENT (SECOND) OF CONTRACTS §20(1) & cmt. c, §20(2), §201
(1981) ............................................................................................... 15

*Reopen*, Merriam-Webster Dictionary, https://www.merriam-
webster.com/dictionary/reopen (last visited Aug. 11, 2023) ................. 7

*Reopen*, The Oxford Dictionary of the English Language
(2nd ed. 1989) ........................................................................................ 7

*Reopen*, Webster's Third New International Dictionary (2002) ............... 7

# GLOSSARY

| | |
|---|---|
| ACPA | Antitrust Civil Process Act, 15 U.S.C. §§ 1311-1314 |
| CID | Civil Investigative Demand |
| FOIA | Freedom of Information Act |
| MLS | Multiple-Listing Service |
| NAR | National Association of Realtors |
| Tunney Act | Antitrust Procedures and Penalties Act, 15 U.S.C. § 16(b)-(h) |

## INTRODUCTION AND SUMMARY OF ARGUMENT

On appeal, NAR does not dispute that, consistent with the Tunney Act, the United States properly exercised its unqualified right to withdraw from the Proposed Final Judgment before entry.  NAR Brief ("Resp.") 43.  Nor does NAR dispute that the termination of the Proposed Final Judgment released the parties from their respective rights and obligations thereunder, freeing NAR to resume its prior conduct.  *See id*.  And it is common ground that, under the Antitrust Civil Process Act (ACPA), NAR bears the burden of establishing that a "constitutional or other legal right or privilege" bars the Antitrust Division from issuing CID No. 30729.  15 U.S.C. § 1314(b)(2); *see* Resp. 18-19.

To this end, NAR's only claim is that a three-sentence letter sent on November 19, 2020 not only survived the United States' concededly proper termination, but also affords it a sweeping "legal right or privilege" immunizing it from investigation.  *But see M & G Polymers USA, LLC v. Tackett*, 574 U.S. 427, 429 (2015) ("contractual obligations will cease, in the ordinary course, upon termination" of the agreement).  The question whether this letter confers such a "right or privilege," the

1

parties also agree, is subject to de novo review by this Court.[1]

The only answer consistent with the text and context of that letter is no.  The letter simply memorializes that the Division "ha[d] closed" its investigation and "[a]ccordingly" NAR had no obligation to respond to two specifically enumerated CIDs that are not at issue in this case. It specifically warned NAR that "[n]o inference should be drawn . . . from the Division's decision to close its investigation."  NAR had also sought immunity from future investigation, but the Division repeatedly rejected that proposal.

Unable to secure express immunity from the Division, NAR seeks to infer it.  NAR accepts that "has closed" does not always imply "never to reopen," *see* Resp. 23, and the dictionary it cites includes a "legal definition" of "reopen" that refers to "resum[ing] the discussion or consideration of (a closed matter)," *infra* at 7.  It gives no weight either to the United States' rejection—three times—of proposals like NAR's interpretation of the November 2020 letter or to the letter's no-inference

---

[1] The only determination that NAR identifies as supposedly subject to clear-error review is whether the November 2020 letter was part of an agreement between NAR and the United States.  *See* Resp. 19.  But that determination is beside the point for this appeal.

proviso.  And it largely ignores the governing legal context—including the unmistakability principle and Tunney Act—by wrongly claiming that these legal principles are forfeited.

Instead, NAR devotes the greatest part of its brief to negotiations—both before and after submission to the District Court— over the reservation-of-rights clause in the *Proposed Final Judgment*. But the United States properly terminated the Proposed Final Judgment before the Tunney Act process concluded, leaving NAR to resort to implausible speculation to explain the relevance of these negotiations to the proper interpretation of the *November 2020 letter*.

Ultimately, under the District Court's misinterpretation, the November 2020 letter has afforded NAR almost three years of protection in the face of serious concerns of anticompetitive conduct— far more relief than NAR had "the bargaining power and skill to achieve" during the parties' negotiations.  *United States v. Armour & Co.,* 402 U.S. 673, 681-82 (1971).  It is well past time for NAR's rules to be assessed on their merits, and the Division has an obligation to investigate potential antitrust violations that may cost American homebuyers billions of dollars each year.  This Court should reverse the

3

District Court's Order and overrule NAR's other objections to the CID.

## ARGUMENT

### I. THE DISTRICT COURT ERRONEOUSLY SET ASIDE CID NO. 30729.

Much of NAR's brief is devoted to a defunct "settlement to resolve a federal antitrust investigation." Resp. 1, 19-20. The only proposed "settlement to resolve a federal antitrust investigation" culminated in the Proposed Final Judgment. As the United States explained and NAR accepts, such a proposed "resolut[ion]" of "a federal antitrust investigation" cannot take effect until the Tunney Act's procedural and substantive requirements are satisfied. *See* United States Brief ("Govt.") 14-18, 50 & n.10; Resp. 7 (recognizing "Proposed Final Judgment could not take effect until after the completion of procedures required by the Tunney Act, 15 U.S.C. § 16(b)-(h)."). But NAR does not dispute that, pursuant to its rights under the Proposed Final Judgment and obligations under the Tunney Act, the United States terminated that agreement. Govt. 18; 15 U.S.C. § 16(b); [JA207-208] (Notice of Withdrawal). Under the Tunney Act, then, there is no remaining federal antitrust settlement, and NAR's lengthy discussion of the parties' negotiations over the Proposed Final Judgment (Resp. 27-29,

35-36) is not only misleading, but irrelevant.

NAR is left to argue that the November 2020 letter not only survived the United States' withdrawal from the Proposed Final Judgment, but also that the letter afforded NAR sweeping immunity from reopening the investigation. But the November 2020 letter does not say, as NAR contends, that the Division cannot investigate the Participation Rule or Clear Cooperation Policy "absent a material change in circumstances" (Resp. 23) or only "if those policies change" (Resp. 16). It does not contain a promise of protection from future investigation that NAR had sought because the Division expressly rejected NAR's requests.

### A. NAR Reads Sweeping Commitments into the November 2020 Letter.

NAR contends that the November 2020 letter protects it from future investigation absent a "material change in circumstances." Resp. 23. The three-sentence letter states in full:

> This letter is to inform you that the Antitrust Division has closed its investigation into the National Association of REALTORS' Clear Cooperation Policy and Participation Rule.  Accordingly, NAR will have no obligation to respond to CID Nos. 29935 and 30360 issued on April 12, 2019 and June 29, 2020, respectively.
>
> No inference should be drawn, however, from the Division's decision to close its investigation into these rules, policies or practices not addressed by the consent decree.

None of these three sentences, when viewed together or in isolation, confers on NAR a "legal right or privilege" that bars CID No. 30729.

**a.**  On the first sentence, NAR repeats the District Court's reasoning that to "close" means to "end."  Resp. 21.  But NAR conceded that the Division did "close" its investigation.  [JA20] (Pet. ¶ 43) ("the Antitrust Division closed the investigations").  The question is whether saying that an investigation "has closed" indicates that it cannot be reopened, and the answer is no.

NAR wrongly contends (Resp. 21) that the plain meaning of "has closed" equates to an ongoing commitment not to reopen the investigation.  But to "reopen" or "resume" an investigation (as the District Court described it, [JA270] (Op. 8 n.2)) is not inconsistent with having "closed" it.  To the contrary, reopening presumes that the investigation previously was closed.  *See* Govt. 32-33; *e.g.*, *Adams v.*

6

*Anne Arundel Cnty.*, 2014 WL 2511473, \*4 (D. Md. June 3, 2014) ("if the investigation remained open—i.e., was not closed . . . —then it could not have been reopened"), *aff'd*, 789 F.3d 422 (4th Cir. 2015).

NAR is likewise wrong that "[r]esuming an investigation that has ended" is "a contradiction in terms." Resp. 21. The same dictionary NAR relies on gives a "legal definition" of "reopen" as "to resume the discussion or consideration of (a *closed* matter)." Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/reopen (last visited Aug. 11, 2023) (scroll down to "legal definition") (emphasis added); *see also Reopen*, Webster's Third New International Dictionary (2002) (same); *Reopen*, The Oxford Dictionary of the English Language (2d ed. 1989) ("To open again (something that has been *closed*)." (emphasis added)).

NAR reads additional words into the letter, inventing a standard that, once closed, a government investigation cannot reopen "absent a material change in circumstances." Resp. 23-24. No legal principle requires the United States to identify changed facts or new evidence to

reopen an investigation.[2]  Instead, the United States is permitted to

open and conduct investigations at any time within the requirements of

the law, whether a prior investigation into related conduct has been

closed.  *Cf. Arevalo v. Barr*, 950 F.3d 15, 17 (1st Cir. 2020) (after

immigration case lay dormant for five years "government rethought its

earlier decision to exercise prosecutorial discretion favorably to the

petitioner" and moved "to 'reinstate' the case"); *see also Heckler v.

Chaney*, 470 U.S. 821, 831 (1985) (describing factors guiding

prosecutorial discretion).  Changes in prosecutorial resources or

priorities result in closed investigations later reopening, and courts find

no inconsistency between closing and reopening.  *See* Govt. 32-34 (citing

cases); *Copeland v. Marshall*, 641 F.2d 880, 884 (D.C. Cir. 1980)

(Department of Labor closed and later reopened investigation into

---

[2] NAR notes (Resp. 23, 31) that in *Senate of the Commonwealth of P.R. on Behalf of Judiciary Comm. v. U.S. DOJ*, 823 F.2d 574 (D.C. Cir. 1987)—a case that underscores that this Court found no contradiction between the DOJ's officially closing and then later reopening an investigation—the reopening was based on "new evidence." But that case in no way suggests that new evidence is *required* for reopening. On remand, the district court noted that a "reevaluation" of the *existing* evidence, when the investigation appeared to be closed, could have been enough to trigger the work-product doctrine/FOIA exemption at issue. 1992 WL 119127, *8 & n.16 (D.D.C. May 13, 1992).

complaint of sex discrimination).

The Seventh Circuit's analysis in *Schellenbach v. SEC,* 989 F.2d 907 (7th Cir. 1993), is instructive. *See* Govt. 34. When the petitioner argued that a purported closing letter barred future investigation, the court looked to the relevant statute and found nothing to prohibit reopening the investigation. *See* 989 F.2d at 911. NAR tries to distinguish *Schellenbach* on the asserted ground that the November 2020 letter was the only consideration NAR received for entering into the (now-withdrawn) Proposed Final Judgment. Resp. 31-32; *see also* Resp. 24 (claiming NAR got "effectively nothing" in the Proposed Final Judgment). That is not true. The Proposed Final Judgment would have provided NAR the benefit of a negotiated resolution of specific claims while saving itself "the time, expense, and inevitable risk of litigation." *Armour & Co.*, 402 U.S. at 681. Of course, neither NAR nor the United States obtained any benefit ultimately from the Proposed Final Judgment because it was validly terminated.

**b.** NAR also misreads the letter's second sentence that NAR "will have no obligation to respond to" two CIDs, wrongly claiming this is "a strong indicator" of a "forward-looking" commitment. Resp. 22. But, in

quoting the letter, NAR omits the language limiting it to two specifically enumerated CIDs, neither of which is at issue here.[3]  The sentence simply describes the effect of closing an investigation under agency practice:  CIDs issued pursuant to that investigation lapse.  By contrast, the question here is whether NAR has an obligation to respond to a later CID, No. 30729, validly issued by the Division on July 6, 2021.  The letter says nothing about the Division waiving its legal right to issue new investigative CIDs in the future.

**c.**  The last sentence of the November 2020 letter cautioned NAR to draw "[n]o inference" from the closing of the investigation.  That provision precludes the kind of inference of additional commitments that NAR seeks here.  As NAR concedes, the sentence "confirm[s] that

_____

[3] NAR mischaracterizes the Division as having "reissued" CIDs Nos. 29935 and 30360.  In truth, No. 30729 is a separate, new CID, triggering independent legal obligations and procedures under ACPA.  *See* 15 U.S.C. § 1312(a)-(h).  At any rate, even if a comparison of the CIDs' respective schedules were relevant, NAR's own comparison table reveals considerable differences between the 2020 CIDs and No. 30729, including eight additional specifications or sub-specifications in No. 30729, the omission of several prior specifications, and differences in scope in overlapping specifications.  *See* [JA231-242].  And, contrary to NAR's assertion, the District Court did not find No. 30729 "not materially different" from the prior CIDs; the court merely described No. 30729 as "similar" to them.  [JA266, JA270] (Op. 4, 8 n.2).

10

DOJ had reached no determination on the policies' lawfulness." Resp.
33. But NAR ignores the obvious import: that the Division *could*
determine such unlawfulness in the future, which it could not do
without reopening the investigation. *See* Govt. 39.

Instead, NAR primarily argues that the "no inference" sentence
cannot be read to negate the rest of the letter. Resp. 32. That
argument is question-begging: The question on appeal is whether "has
closed" imparts a potentially indefinite immunity from investigation.
As NAR recognizes, "a document should be read to give effect to all its
provisions and to render them consistent with each other." Resp. 22.
Contrary to this principle, NAR gives no effect to the third sentence.

NAR also complains that the "no inference" sentence was not
negotiated. Resp. 33. But NAR did not object to the sentence when it
received the letter, and NAR proceeded with the Proposed Final
Judgment. The contrast between NAR's reaction to the sentence in
2020, and its now-asserted argument that the letter afforded it
sweeping future immunity, is telling.

**B.    NAR Sought, and the Division Repeatedly Rejected, the Very "Privilege" NAR Now Imports Into the November 2020 Letter.**

The no-inference proviso could not have surprised NAR, because it reaffirmed the Division's repeated and emphatic rejections of NAR's requests for immunity.

NAR asserts that "[b]y the fall of 2020, NAR and DOJ had come to a rough understanding of the terms of a potential settlement" (Resp. 4). But NAR nowhere quotes or cites the key communications surrounding that supposed understanding.  As these exchanges reflect, the Division repeatedly stated it would not accept any provision that would limit its ability to investigate NAR's rules in the future.  *See* [JA248] (Division July 13, 2020 letter) (calling commitment not to investigate NAR "nonstarter"); [JA252] (Division July 29, 2020 letter) (Division "cannot commit to never challenge NAR rules and policies"); [JA259] (Division Aug. 12, 2020 letter) ("Division cannot commit to never investigating or challenging NAR's rules and policies in the future.").  They also reflect that NAR "accept[ed]" the Division's position.  *See* [JA260] (NAR Aug. 18, 2020 letter) ("accept[ing]" the Division's Aug. 12 proposal); [JA126] (NAR Oct. 26 redline) ("These terms are consistent with what DOJ

agreed to in [DAAG] Murray's August 12 letter"); Govt. 12-13.

NAR counters that the United States' rejections of a forward-looking commitment "shed[] little light" on the construction of the November 2020 letter (Resp. 34). That is an unreasonable reading of the Division's statements, which did not merely quibble with NAR's proposals at the margins or invite negotiation on this point; the United States described proposals to refrain from future investigations as "a *nonstarter*" because "the Division cannot commit to never investigating or challenging NAR's rules and policies in the future." [JA248, JA259] (July 13, August 12 letters) (emphasis added). NAR may dispute the Division's understanding of its own policies (Resp. 45),[4] but that is immaterial—the correspondences show that the Division rejected any

---

[4] The Office of Legal Counsel opinion cited by NAR (Resp. 45) does not contravene the Division's understanding. The opinion identifies no general constitutional or statutory impediment to settlements limiting executive discretion, but it does not claim that there are no policies advising against such settlements, and it recognizes that specific statutes, such as the Tunney Act, may prohibit such commitments. *See* 23 Op. O.L.C. 126, 129-30 (1999) (recognizing that "there may be sound policy reasons" to limit agreements that interfere with executive discretion); *id.* at 136-39, 140 n.9, 152 n.14 (noting Congress's power potentially to restrict consent decrees, including through the Tunney Act).

limitation on future investigations because it viewed such a grant of prospective immunity as inconsistent with its policies.

NAR also elides the obvious flaw in the District Court's reasoning here: If the Division refused to forgo investigating two NAR rules for ten years, it obviously rejected the greater promise to forgo investigating them for a potentially indefinite period. NAR has no explanation—much less any evidence—for how, when, or why the parties' minds met on an understanding that "has closed" confers prospective immunity notwithstanding the Division's consistent and "accept[ed]" position during negotiations that it could not agree to NAR's request for such a commitment.

Equally telling, these communications confirm that NAR understood the difference between a commitment not to investigate and a letter confirming that the Division "has closed" its investigation. In particular, NAR's July 6, 2020 letter [JA247] proposed that the Division provide a letter to NAR memorializing the closure of the Division's investigation *and* a public commitment barring a future investigation. *See also* [JA257] (NAR Aug. 6 letter) (requesting Division letter confirming closing *and* a public statement that it had no further

14

concern with Participation Rule and Clear Cooperation Policy). That NAR sought both what it eventually received (a letter memorializing closure) and what it did not (a future commitment) underscores that NAR did not believe that a letter memorializing the closing of an investigation would bar a future one and that the Division had no reason to ascribe such a belief to NAR. *See* Govt. 44-45.[5] Ignoring these facts, NAR implicitly concedes that it did not communicate to the Division its now-asserted position that the November 2020 letter standing alone would bar future investigations. Under *Restatement (Second) of Contracts* §§ 20(2) (a, b) and 201(2), *see* Govt. 45, the Division's interpretation therefore should control.

---

[5] Even if the objective evidence indicated that NAR had a contrary interpretation, at most that would show that while the parties agreed on the same words ("has closed"), there was a material difference of understanding and therefore no agreement on this issue for the District Court to enforce. *See Local Union 1395 v. NLRB*, 797 F.2d 1027, 1036 (D.C. Cir. 1986) ("absent mutual consent" on an issue "there could be no binding contractual commitment"); *Restatement* § 20(1) & cmt. c ("Even though the parties manifest mutual assent to the same words of agreement, there may be no contract because of a material difference of understanding as to the terms of the exchange.").

### C.    NAR Does Not Seriously Dispute That the District Court Implied a Waiver of a Sovereign Power.

The District Court's interpretation of the November 2020 letter also conflicts with the principle that, absent "unmistakable terms," "a contract with a sovereign government will not be read to include an unstated term exempting the other contracting party from the application of a subsequent sovereign act." *United States v. Winstar Corp.*, 518 U.S. 839, 878 (1996) (plurality op.); *see* Govt. 34-37. The letter did not waive the Division's power to reinvestigate, much less in "unmistakable" terms.

NAR urges this Court, wrongly, to ignore the unmistakability principle. But contrary to NAR's assertion (Resp. 36-37), the United States did not forfeit this principle. While not incanting the words "unmistakability principle," the United States noted below that the "power to issue subpoenas as [an agency] performs its investigatory function is a broad-ranging one which courts are reluctant to trammel," and argued NAR "ha[d] not met its high burden" to overcome that reluctance. ECF No. 20 at 11.

Moreover, a party cannot forfeit specific interpretive principles or

16

canons that support a properly preserved issue.  *See Guedes v. BATFE*, 920 F.3d 1, 22 (D.C. Cir. 2019) (this Court "would give no mind to a litigant's failure to invoke interpretive canons such as expressio unius or constitutional avoidance"); *Capitol Servs. Mgmt. v. Vesta Corp.*, 933 F.3d 784, 790 (D.C. Cir. 2019); *accord Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374, 378-79 (1995).  The unmistakability principle is simply an additional canon of construction that supports the United States' consistent interpretation of the letter, an issue on which the District Court ruled.

On the merits, NAR's description of the unmistakability principle as limited to subsequent legislative acts (Resp. 37) is too narrow.  The Supreme Court's precedents, as summarized by *Winstar*, apply the principle to prevent courts from implying into government agreements unstated terms that would restrict "a subsequent sovereign act (*including* an Act of Congress)."  518 U.S. at 878 (emphasis added).  As the word "including" indicates, the principle is not limited to cases involving implied limitations on legislative power.  There plainly are aspects of sovereign power besides legislation, including the power of law enforcement that necessarily includes investigation.  *See Cmty. for*

*Creative Non-Violence v. Pierce*, 786 F.2d 1199, 1201 (D.C. Cir. 1986) (sovereign "power to decide when to investigate, and when to prosecute").

Reflecting as much, the Court in *Winstar* understood *United States v. Cherokee Nation of Oklahoma*, 480 U.S. 700 (1987), as applying the unmistakability principle to something other than a legislative act—the United States' retention of its "navigable servitude" in the Arkansas River. *See* 518 U.S. at 878 (conveyance of the government's "navigational easement" was as "an aspect of sovereignty").

Moreover, cases applying the "unmistakability principle" in practice without reciting that terminology confirm that the principle is not limited to the legislative-acts context. In *National Audubon Society, Inc. v. Watt,* 678 F.2d 299 (D.C. Cir. 1982), for instance, this Court construed a stipulation without an "express durational limitation" as lasting only for a reasonable time "based upon the context of the agreement"—especially, the absence of any clear indication that the agreement sought "to restrict [the Executive's] exercise of discretion." *Id.* at 301, 307; Govt. 37. Likewise, in *Alliance to End Repression v.*

18

*Chicago*, 742 F.2d 1007 (7th Cir. 1984) (en banc), the Seventh Circuit applied the same principle so as not to read a consent decree as inconsistent with a subsequent DOJ revision of the FBI's investigatory guidelines—a sovereign *executive* act, not an act of Congress. *See id*. at 1013 ("a court will hesitate to assume that by signing a consent decree the government knowingly bartered away important public interests").

Indeed, the Office of Legal Counsel opinion cited by NAR (Resp. 45) agrees that courts disfavor overbroad readings of agreements with private parties that would impinge upon sovereign rights: "[C]ourts often construe the actual terms of executive branch settlements narrowly on the assumption that they are not intended to bind subsequent administrations and out of respect for executive branch prerogatives." 23 Op. O.L.C. at 146 (citing *Evans v. City of Chicago*, 10 F.3d 474, 479 (7th Cir. 1993) (en banc), and *Alliance to End Repression*). Here, the Court need not even read the November 2020 letter "narrowly" to conclude that it does not afford NAR potentially indefinite immunity from investigation; it need only refuse to read in a provision that does not appear.

19

The unmistakability principle typically does not arise in the situations raised by NAR.  Resp. 38.  In such circumstances, the government typically either expressly waives its sovereign power, or the court can construe the contract so as not to interfere with the government's exercise of a sovereign power, as in *Winstar* itself, *see* 518 U.S. at 881.[6]  And it does not apply where a party asserts only private obligations.  Even so, *Winstar* accepts the possibility that the unmistakability principle could, depending on the particular facts, apply to "an enormous variety of [government] contracts."  *Id.* at 880.

NAR erroneously claims that "courts have frequently construed ambiguities in such agreements against the government."  Resp. 38. The only case NAR cites involves a criminal defendant's plea agreement, where the court reasoned that the attendant "constitutional and supervisory concerns" should *supersede* contract-law principles.

---

[6] *E.g.*, *In re Application of United States Senate Permanent Subcommittee on Investigations*, 655 F.2d 1232, 1238 (D.C. Cir. 1981) (government promised in plea agreement that it had "no intention of recommending any indictment").

*United States v. Harvey*, 791 F.2d 294, 300 (4th Cir. 1986).[7]  NAR cites

no authority extending this principle to any civil consent decrees, let

alone antitrust decrees subject to the Tunney Act or nonjudicially

supervised letters sent to private parties.  Rather, only unmistakable

language in the November 2020 letter could effect a waiver of the

United States' right to investigate NAR.  *See Alliance to End*

*Repression*, 742 F.2d at 1113.

### D.    If The Letter Had Granted NAR Immunity, It Would Have Been Disclosed as Part of the Tunney Act Proceeding.

The District Court's interpretation of the November 2020 letter

also fails to account for the governing legal framework of the Tunney

Act.  If the letter carried the sweeping, immunity-granting effect

ascribed to it by the District Court, it would have been disclosed to the

public and the court as part of the Tunney Act review.  But the letter

---

[7] *Harvey* also referenced *contra proferentem*, *see* 791 F.2d at 301, but that principle has no purchase where, as here, both parties participated in negotiating a provision.  *See Lamps Plus, Inc. v. Varela*, 139 S. Ct. 1407, 1417 (2019); [JA109] (NAR Oct. 26, 2020 email) (proposing "has closed" formulation for November 2020 letter).  Even if NAR had not, *contra proferentem* "applies 'only as a last resort' when the meaning of a provision remains ambiguous after exhausting the ordinary methods of interpretation."  *Id.* (citation omitted).

was not disclosed, indicating that the parties understood it as merely confirming a past act: that the Division had closed its investigation and relieved NAR from responding to two specifically enumerated CIDs. *See* Govt. 47-49.

As with the unmistakability principle, NAR primarily tries to dodge the important legal context by claiming that it was "forfeited." Resp. 40.  This entire matter arises out of a Tunney Act proceeding. [JA6] (notice of related case).  As such, the Tunney Act was referenced in the record, by the parties, and by the District Court.  *E.g.*, [JA147] (Stipulation ¶2), [JA176] (PFJ ¶XIII), [JA21, JA22] (Pet. ¶¶47, 52, 56). And like the unmistakability principle, the Tunney Act simply provides an additional legal authority in support of the United States' consistent interpretation of the November 2020 letter.  *See, e.g.*, *Koch v. Cox*, 489 F.3d 384, 391 (D.C. Cir. 2007) (party's "invocation of the HIPAA regulation is new and supports his position but it is not itself a new claim or defense"); *Liff v. Office of Inspector Gen. for United States DOL*, 881 F.3d 912, 919 (D.C. Cir. 2018) (similar).

NAR's argument that a district court conducting a Tunney Act review cannot "reach beyond the complaint" (Resp. 40) confuses the

22

Act's public-interest standard with its procedural requirements. It is true that, in conducting a public-interest determination, a judge cannot "reach beyond the complaint *to evaluate claims that the government did not make* and to inquire as to why they were not made." *United States v. Microsoft Corp.*, 56 F.3d 1448, 1459 (D.C. Cir. 1995) (emphasis added). But the Tunney Act separately requires the disclosure of "determinative" documents, 15 U.S.C. § 16(b), and an explanation of "any unusual circumstances giving rise to such proposal or any provision contained therein," *id.* § 16(b)(3); Govt. 15, 46-48.

Applying these requirements here, a district court may not refuse to enter a consent decree based on its belief that the United States should have brought different, or broader, claims. *Microsoft*, 56 F.3d at 1459. But if, as NAR claims, a settlement of certain claims were conditioned on immunity from investigation for other claims, that benefit would be disclosed and subject to public comment-and-response under the determinative-document and unusual-circumstances requirements. 15 U.S.C. § 16(b). Neither the United States nor NAR suggested that the November 2020 letter triggered these obligations, confirming that the letter was neither intended to, nor granted, such

immunity.[8]

### E. The Negotiations Over the Reservation-of-Rights Clause in the Terminated Consent Decree Are Irrelevant.

**a.** Instead of focusing on the three-sentence letter it claims gives it immunity from suit, NAR devotes much of its brief to negotiations in 2020 and 2021 over the reservation-of-rights provision (the latter of which NAR mislabels a "course of performance"). Resp. 4-11, 15, 25-29. But the reservation-of-rights provision is found in the Proposed Final Judgment, not the November 2020 letter. And, again, NAR does not dispute that the United States properly terminated the Proposed Final Judgment before the Tunney Act process was completed.

NAR fails to explain how the initial negotiations in 2020 or subsequent exchanges in 2021 about this clause could bear on the

---

[8] NAR argues that it had no responsibilities under the Tunney Act (Resp. 42 n.9). But NAR acknowledged in both the Proposed Final Judgment (§ XIII, [JA176]) and its Petition (¶¶ 47, 52, [JA21, JA22]), that the Division complied with the Act, even though the November 2020 letter was not disclosed. The reasonable inference is that the parties (including NAR, which never urged that the letter be disclosed) understood the letter to have so little significance to the public and the District Court that disclosure was unnecessary.

meaning of the November 2020 letter.  If the Division believed that the letter granted sweeping immunity, it presumably would have made the letter the focus of the 2021 negotiations.  But the Division did not seek to modify the November 2020 letter, and never even mentioned it.  To bridge this chasm, NAR posits a theory of contract interpretation whereby the United States terminated the Proposed Final Judgment in a futile attempt to change the meaning of the November 2020 letter. *See* Resp. 28-29.  That argument defies common sense; the negotiations over the reservation-of-rights clause do not change the meaning of the letter.

**b.** Even if the negotiations over the reservation-of-rights provision in the Proposed Final Judgment could inform the meaning of the November 2020 letter, NAR draws the wrong conclusion.

*2020 Negotiations.*  NAR emphasizes (i) its proposed striking on October 16, 2020 of the Division's initial version of the reservation-of-rights clause and (ii) the Division's modification of the clause to exclude reference to the Participation Rule and Clear Cooperation Policy (Resp. 25-26).  But the Division made that modification only *after* NAR had dropped its demand for a commitment not to investigate those rules for

25

a ten-year period, so the Division had no reason to include an express

reservation as to those specific rules.[9]

In fact, the final reservation-of-rights clause confirmed what the

no-inference proviso said.  Govt. 40-41.  In response, NAR merely

repeats the District Court's refusal to see how the reservation-of-rights

clause bears on the interpretation of the letter (Resp. 33), even though

it was NAR's interpretation that both were part of the same agreement.

Contrary to NAR's contention that the government knows how to

include an express reservation of rights, the Division had no need to do

so in the letter because by November 2020 NAR had dropped its

demand for a commitment as to future investigations and asked only for

a statement confirming that the Division "ha[d] closed" its current

---

[9] NAR did not indicate during the parties' negotiations, as it now
claims, that it struck the provision to obtain "relief from the
investigations."  Resp. 25; *see id*. at 26, 35.  To the contrary, NAR did
not explain or reference the proposed deletion of the clause.  *See* [JA72]
(NAR Oct. 16, 2020 email) (attaching redline); [JA88] (redline striking
clause).  Moreover, both the initial and final versions of the Proposed
Final Judgment referred only to what the "final judgment" limited.  So
if, as NAR now contends (Resp. 33), the reservation-of-rights clause has
no bearing on the November 2020 letter because it applies only to the
Proposed Final Judgment, NAR would have had no need to strike the
reservation-of-rights clause in its October 16 revisions.

investigation.  *See* [JA109] (NAR Oct. 26, 2020 email) (proposing "has closed" phrasing).

*2021 Discussions.*  NAR misconstrues the Division's reason for seeking to modify the reservation-of-rights clause and withdraw from the Proposed Final Judgment.  The Division did so not because anything in the November 2020 letter precluded future investigations, but because, in the Division's view, the Proposed Final Judgment was too narrow:  The Proposed Final Judgment did not commit NAR to reforming the Participation Rule or Clear Cooperation Policy, and the Division did not want to assume any risk that the "narrower" (Resp. 5) reservation-of-rights clause could be potentially misread (whether through claim preclusion or otherwise) to insufficiently protect the Division's right to investigate these major NAR rules in the future.  By terminating the Proposed Final Judgment, the United States forwent that proposed decree's benefits to ensure the United States' right to investigate the Participation Rule and Clear Cooperation Policy in the future.  NAR offers nothing but outlandish speculation to suggest that the United States terminated the Proposed Final Judgment to somehow

change the meaning of the November 2020 letter.[10]

## F.    NAR's Interpretation Produces Anomalous Results.

The upshot of the District Court's decision is that NAR bears no obligations, while the Division remains barred, indefinitely, from investigating two major NAR rules absent "some future version or application." [JA272] (Op. 10). This anomaly was not caused by the Division's choice to withdraw from the Proposed Final Judgment, as NAR contends (Resp. 43), but rather by the District Court's misinterpretation of the November 2020 letter: By attaching startling breadth to a three-sentence letter (that somehow survived the United States' exercise of its termination right), the District Court gave NAR— to use its own words—immunity "in return for effectively nothing." Resp. 24.

Equally anomalous is the District Court and NAR's conception of

---

[10] These same flaws in NAR's proposed inference apply to NAR's reading of the Division's July 1, 2021 press release. The release did not mention the November 2020 letter, and it explained that the Proposed Final Judgment "resolved only some of the Department's concerns with NAR's rules" and that the Division sought "a broader investigation of NAR's rules and conduct" beyond the practices addressed by the Proposed Final Judgment. [JA60].

one "overall agreement" that somehow consists of completely divisible parts. Resp. 44 n.11. Neither the District Court nor NAR plausibly explains how, if there were a single "overall agreement," the November 2020 letter can remain in force after the Division terminated the heart of that supposed agreement. *See* Govt. 50 & n.10. Indeed, the provision addressing the effect of termination strongly suggests the opposite. Govt. 18 (noting that, under the parties' Stipulation, "the making of this Stipulation and Order," which included the attached Proposed Final Judgment, would be "without prejudice to any party in this or any other proceeding."). At the very least, if the November 2020 letter carried the significance attached to it by the District Court, it would have been strange to exclude it from the termination right.

In addition, both the District Court's "some future version or application" test and NAR's "material change" alternative are completely unworkable. Neither the District Court nor NAR explained how to make such a determination, let alone how the United States is supposed to determine whether that threshold has been satisfied without issuing a CID. Govt. 33 n.8. And nothing in the District Court's construction would seemingly prohibit the United States from

29

suing NAR without an investigation, creating the perverse incentive to sue immediately.

By contrast, the Division's interpretation of the letter yields no such anomalies. As the United States explained, the letter gave NAR concrete benefits even if did not bar future investigations. Govt. 50-53. The District Court overlooked those benefits, and NAR tries to minimize them, but they show that the letter was far from worthless.

Attacking a strawman, NAR and amicus Chamber of Commerce mischaracterize the Division's argument as asserting that NAR should have expected the investigation to reopen with the change in administrations. Resp. 44-45. Not so. The closed investigation gave NAR the benefit of repose in the short term, and the prospect that it could continue longer, but NAR should have expected the *possibility* of reopening because government resources and priorities are subject to change. *See Alliance to End Repression*, 742 F.2d at 1012 (consent decree "envisages and accepts the possibility that the Levi Guidelines would be superseded; the plaintiffs assumed the risk that a subsequent set of guidelines might not be as much to their liking").

Finally, NAR's and amicus's hyperbole about the government "repudiat[ing]" its contracts (Resp. 44-46) begs the question. The Proposed Final Judgment contained a termination right that was properly exercised. And the November 2020 letter simply contained no ongoing commitment not to investigate NAR. There is therefore no commitment for the government to "repudiat[e]."

*     *     *

The key question on appeal is narrow but important: Whether the Division, having properly withdrawn from a proposed consent decree, is nonetheless barred from reopening an investigation by a three-sentence letter memorializing that the Division "ha[d] closed" its investigation but saying nothing about future investigations. The only answer consistent with the text and context of that letter is "no."

## II.   NAR'S RELEVANCE AND BURDENSOMENESS OBJECTIONS TO CID NO. 30729 SHOULD BE OVERRULED.

This Court should overrule NAR's remaining objections to the new CID. In *United States v. Mejia*, 448 F.3d 436, 456 (D.C. Cir. 2006), this Court examined classified information and concluded that it "falls far short" of the legal standard for overcoming a government privilege claim. This Court explained that it "conducted our [its] review de novo

because the district court did not determine whether the classified material" met that legal standard, but instead decided a different question. *Id*.

This Court can take the same approach here. Overruling NAR's objections de novo does not require any factual or legal investigation. Indeed, NAR's brief in the District Court argued that the contested specifications are "facially" overbroad (ECF No. 21 at 17).

None of NAR's boilerplate objections could justify modifying the CID. In repeating its relevance objection, NAR quotes out of context one magistrate judge's decision in an employment discrimination case that focused on the proportionality—not relevance—of requests for particular custodians' electronically stored information *without any subject-matter limitation*. Resp. 47; *see EEOC v. George Washington Univ.*, 2020 WL 3489478, at \*2, \*4-13 (D.D.C. June 26, 2020).[11] By contrast, NAR has not explained "which subjects of investigation"

_____

[11] Equally inapposite is NAR's citation (Resp. 47) to *Food Lion, Inc. v. United Food & Com. Workers Int'l Union*, AFL-CIO-CLC, 103 F.3d 1007 (D.C. Cir. 1997), which held that information sought by a Rule 45 subpoena in private litigation was too removed from the parties in the case because the subpoena was directed to a third-party for fourth-party documents.

identified in each of the CID's specifications "might be irrelevant or explain why."  Govt. 57; *see In re Sealed Case*, 932 F.3d 915, 929-30 (D.C. Cir. 2019) (enforcing a grand jury subpoena for "[a]ll documents"); *SEC v. Arthur Young & Co.*, 584 F.2d 1018, 1028-29, 1031 (D.C. Cir. 1978) (same, for an administrative subpoena).  Nor did NAR, the largest trade association in the United States, "show, with any facts, why" enforcement of the CID would "unduly disrupt or seriously hinder normal operations."  Govt. 58-60; *FTC v. Texaco, Inc.*, 555 F.2d 862, 882 (D.C. Cir. 1977) (en banc).  This Court should not countenance NAR's attempts to further delay complying with the CID.

## CONCLUSION

This Court should reverse the District Court's judgment and overrule NAR's objections to CID No. 30729.

Respectfully submitted.

/s/ Steven J. Mintz
STEVEN J. MINTZ

JONATHAN S. KANTER
  *Assistant Attorney General*
DOHA G. MEKKI
  *Principal Deputy Assistant*
  *Attorney General*
MAGGIE GOODLANDER
  *Deputy Assistant Attorney*
  *General*

DAVID B. LAWRENCE
*Policy Director*
MARKUS BRAZILL
*Counsel to the Assistant*
*Attorney General*
DANIEL E. HAAR
NICKOLAI G. LEVIN
STEVEN J. MINTZ
*Attorneys*
U.S Department of Justice
Antitrust Division
950 Pennsylvania Ave., NW
Room 3224
Washington, DC 20530-0001
Tel. 202-353-0256
Email: steven.mintz@usdoj.gov

## CERTIFICATE OF COMPLIANCE

1.     This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) because this document contains 6,442 words, excluding the portions exempted by Fed. R. App. P. 32(f).

2.     This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally-spaced typeface using Microsoft Word 2010 in New Century Schoolbook font, size 14.

/s/ Steven J. Mintz
Steven J. Mintz

Attorney for Respondents-Appellants United States of America, et al.

35

## CERTIFICATE OF SERVICE

I hereby certify that on August 18, 2023, I caused the foregoing Final Reply for Appellants the United States of America, et al. to be filed through this Court's CM/ECF system.  All participants in the case are registered CM/ECF users and will be served by the CM/ECF system.

/s/ Steven J. Mintz
Steven J. Mintz

Attorney for Respondents-Appellants United States of America, et al.