ORAL ARGUMENT NOT YET SCHEDULED

## No. 23-5065

In The

# United States Court of Appeals
# for the District of Columbia Circuit

NATIONAL ASSOCIATION OF REALTORS,

*Petitioner-Appellee,*

v.

UNITED STATES OF AMERICA, ET AL.,

*Respondents-Appellants.*

ON APPEAL FROM THE UNITED STATES DISTRICT
COURT FOR THE DISTRICT OF COLUMBIA
(JUDGE TIMOTHY J. KELLY)

## PROOF BRIEF OF APPELLANTS UNITED STATES OF AMERICA, ET AL.

JONATHAN S. KANTER
*Assistant Attorney General*

DOHA G. MEKKI
*Principal Deputy Assistant Attorney General*

MAGGIE GOODLANDER
*Deputy Assistant Attorney General*

DAVID B. LAWRENCE
*Policy Director*

MARKUS BRAZILL
*Counsel to the Assistant Attorney General*

DANIEL E. HAAR
NICKOLAI G. LEVIN
STEVEN J. MINTZ

*Attorneys*
U.S. Department of Justice,
Antitrust Division
950 Pennsylvania Ave., NW, Rm. 3224
Washington, DC 20530-0001
Tel. 202-353-0256

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to Circuit Rule 28(a)(1), Respondents-Appellants United States of America, et al. certify as follows:

## A.   Parties and Amici

The parties that appeared before the District Court and that are before this Court are:

1.    Respondent-Appellant United States of America

2.    Respondent-Appellant Department of Justice, Antitrust Division

3.    (Before the District Court) Respondent-Appellant Richard A. Powers, in his capacity as former Acting Assistant Attorney General

4.    (Before this Court) Respondent-Appellant Jonathan S. Kanter, in his capacity as Assistant Attorney General (substituted for Richard A. Powers)

5.    Petitioner-Appellee National Association of Realtors

The District Court did not grant any motion to intervene by third parties or accept any proposed amicus briefs.

Appellants are not aware of any amici or intervenors in this Court

at this time.

**B.    Rulings Under Review**

1.    The Order of the Honorable Timothy J. Kelly, entered on
January 25, 2023, is reprinted in the Joint Appendix (JA) at JA___.
The Order is not published in the *Federal Supplement*.

2.    The Memorandum Opinion accompanying the Order, also
entered on January 25, 2023, is reprinted at JA__-___.  The
Memorandum Opinion is not yet published in the *Federal Supplement*,
but it is available electronically at 2023 WL 387572.

**C.    Related Cases**

The case now pending before this Court was not previously before
this Court or any court other than the District Court below.  Appellants
are not aware of any related case pending before this Court or any court.

/s/ Steven J. Mintz
Steven J. Mintz

Attorney for Respondents-
Appellants

# TABLE OF CONTENTS

Page

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES....i

TABLE OF AUTHORITIES ........................................................... v

GLOSSARY ..........................................................................xiii

JURISDICTIONAL STATEMENT ............................................. 1

INTRODUCTION................................................................... 1

STATEMENT OF ISSUES PRESENTED .................................. 3

PERTINENT STATUTES ........................................................ 3

STATEMENT OF THE CASE................................................... 4

    I.   The Antitrust Division's Investigative Authority ......................... 4

    II.  Factual Background and District Court Proceedings................... 6

        A. The Division's Initial Investigation of NAR Rules, Policies, and Practices ........................................................... 6

        B. The Negotiations that Led to a Proposed Final Judgment..11

        C. The Tunney Act Proceedings and the Division's Withdrawal of Consent to the Proposed Final Judgment.... 14

        D. CID No. 30729 and NAR's Petition Below........................... 19

        E. The District Court's Decision................................................ 20

STANDARD OF REVIEW........................................................ 24

SUMMARY OF ARGUMENT .................................................. 25

ARGUMENT ......................................................................... 28

    I.   THE DISTRICT COURT MISAPPLIED CONTRACT LAW IN SETTING ASIDE CID NO. 30729 ..................................................... 28

        A. The District Court Erred in Interpreting the Plain Text of the November 2020 Letter to Bar CID No. 30729................ 29

            1. The November 2020 Letter Simply Memorialized that the Division "Ha[d] Closed" Its Investigation................ 30

            2. The District Court Improperly Implied a Waiver of a Sovereign Power. .............................................................. 34

3. The District Court's Interpretation Fails to Give Effect to the "No Inference" Proviso and the Reservation-of-Rights Clause. .............................. 38

B. Context Confirms that the Parties Did Not Intend to Grant NAR Sweeping Antitrust Immunity. .................................... 42

1. As the Division Repeatedly Stated and NAR Understood, No Promise Was Intended Concerning Future Investigations. ............................... 42

2. The District Court's Interpretation Ignores the Governing Legal Framework. ....................................... 46

C. Interpreting the November 2020 Letter to Afford Implicit Immunity Produces Anomalous Results. ............................ 51

II. NAR's Relevance and Burdensomeness Objections to CID No. 30729 Should Be Overruled .......................................... 55

A. NAR Does Not Carry Its Burden on Relevance ................... 56

B. NAR Has Not Established an Undue Burden. ..................... 58

CONCLUSION .............................................................................. 60

CERTIFICATE OF COMPLIANCE ........................................... 61

CERTIFICATE OF SERVICE ................................................... 62

ADDENDUM .............................................................................. 63

# TABLE OF AUTHORITIES

CASES:                                                                  Pages

*Alliance to End Repression v. Chicago*,
   742 F.2d 1007 (7th Cir. 1984).......................................................37, 54

*America First Inv. Corp. v. Goland*,
   925 F.2d 1518 (D.C. Cir. 1991)..............................................................51

*Annapolis Citizens Class Overcharged for Water-Sewer, by Loudon*
   *Operations, LLC v. Stantec, Inc.*,
   No. 20-2603, 2021 WL 75766 (D.D.C. Jan. 8, 2021) ...........................58

*Arevalo v. Barr*,
   950 F.3d 15 (1st Cir. 2020).....................................................................54

*Armenian Assembly of Am., Inc.* v. *Cafesjian*,
   758 F.3d 265 (D.C. Cir. 2014).................................................................24

*Associated Container Transp. (Austl.) Ltd. v. United States*,
   705 F.2d 53 (2d Cir. 1983).......................................................................4

*Barrett v. United States*,
   423 U.S. 212 (1976)................................................................................30

*Beal Mortg., Inc. v. FDIC*,
   132 F.3d 85 (D.C. Cir. 1998)..................................................................38

*Bode & Grenier, LLP v. Knight*,
   808 F.3d 852 (D.C. Cir. 2015)................................................................41

*Bond v. United States*,
   572 U.S. 844 (2014)................................................................................55

*Bowden v. United States*,
   106 F.3d 433 (D.C. Cir. 1997).................................................................45

*Bowen v. Pub. Agencies Opposed to Soc. Sec. Entrapment*,
   477 U.S. 41 (1986) ...........................................................................34, 36

*Burton v. Administrator*,
  No. 89-2338, 1992 WL 300970 (D.D.C. July 10, 1992) ........................ 31

*BWX Elecs., Inc. v. Control Data Corp.*,
  929 F.2d 707 (D.C.Cir.1991) ................................................................ 38

*Chattanooga Pharm. Ass'n v. United States*,
  358 F.2d 864 (6th Cir. 1966) ............................................................... 58

*Clearfield Tr. Co. v. United States*,
  318 U.S. 363 (1943) ............................................................................. 30

*Community for Creative Non-Violence v. Pierce*,
  786 F.2d 1199 (D.C. Cir. 1986) ..................................................... 35, 54

*Consumer Fin. Prot. Bureau v. Accrediting Council for Indep. Colleges & Sch.*,
  854 F.3d 683 (D.C. Cir. 2017) ....................................................... 25, 28

*Cuomo v. Clearing House Ass'n, L.L.C.*,
  557 U.S. 519 (2009) ............................................................................. 35

*Curtin v. United Airlines, Inc.*,
  275 F.3d 88 (D.C. Cir. 2001) ............................................................... 45

*Deutsche Bank Nat'l Tr. Co. v. Fed. Deposit Ins. Corp.*,
  109 F. Supp. 3d 179 (D.D.C. 2015) ..................................................... 45

*EEOC v. George Washington University*,
  No. 17-cv-1978 2020 WL 3489478 (D.D.C. June 26, 2020) ................. 57

*Endicott Johnson Corp. v. Perkins*,
  317 U.S. 501 (1943) .......................................................................... 5, 56

*First Nat. Bank in St. Louis v. State of Missouri at inf. Barrett*,
  263 U.S. 640 (1924) ............................................................................. 35

*FTC v. Church & Dwight Co.*,
  665 F.3d 1312 (D.C. Cir. 2011) ........................................................ 5, 28

*FTC v. Invention Submission Corp.*,
 965 F.2d 1086 (D.C. Cir. 1992) ...................................................... 4, 6, 56

*FTC v. Ken Roberts Co.*,
 276 F.3d 583 (D.C. Cir. 2001) ........................................................... 4, 5

*FTC v. Texaco, Inc.*,
 555 F.2d 862 (D.C. Cir. 1977) ......................................................... 5, 59

*Gavinzel v. Crump*,
 89 U.S. 308 (1874) ............................................................................ 32

*Heckler v. Chaney*,
 470 U.S. 821 (1985) ..................................................................... 35, 54

*In re Int'l Bus. Machines Corp.*,
 687 F.2d 591 (2d Cir. 1982) .............................................................. 46

*ITT Continental Baking Co.*,
 420 U.S. 223 (1975) .......................................................................... 42

*J. Roderick MacArthur Found. v. F.B.I.*,
 102 F.3d 600 (D.C. Cir. 1996) ........................................................... 32

*Jeffries v. Barr*,
 965 F.3d 843 (D.C. Cir. 2020) ........................................................... 25

*Lesesne v. Doe*,
 712 F.3d 584 (D.C. Cir. 2013) ........................................................... 55

*LTV Corp. v. Gulf States Steel, Inc. of Alabama*,
 969 F.2d 1050 (D.C. Cir. 1992) ......................................................... 24

*M&G Polymers USA, LLC v. Tackett*,
 574 U.S. 427 (2015) .......................................................................... 30

*Marinello v. United States*,
 138 S. Ct. 1101 (2018) ...................................................................... 32

*Massachusetts v. Microsoft Corp.*,
 373 F.3d 1199 (D.C. Cir. 2004) ................................................... 15, 46

*Massachusetts Sch. of L. at Andover, Inc. v. United States*,
  118 F.3d 776 (D.C. Cir. 1997)........................................................ 15, 47

*Mastrobuono v. Shearson Lehman Hutton, Inc.*,
  514 U.S. 52 (1995)................................................................................38

*Merrion v. Jicarilla Apache Tribe*,
  455 U.S. 130 (1982)........................................................................34, 36

*Mesa Air Grp., Inc. v. Dep't of Transp.*,
  87 F.3d 498 (D.C. Cir. 1996)..............................................................32

*Moehrl v. Nat'l Ass'n of Realtors*,
  492 F. Supp. 3d 768 (N.D. Ill. 2020)....................................................6

*Moehrl v. Nat'l Ass'n of Realtors*,
  No. 19-CV-01610, 2023 WL 2683199 (N.D. Ill. Mar. 29, 2023) .............9

*National Audubon Soc'y, Inc. v. Watt*,
  678 F.2d 299 (D.C. Cir. 1982)............................................ 29, 37, 42, 46

*NLRB v. C & C Plywood Corp.*,
  385 U.S. 421 (1967)..............................................................................42

*PLS.Com, LLC v. NAR*,
  32 F.4th 824 (9th Cir. 2022) ..............................................................10

*PLS.Com, LLC v. Nat'l Ass'n of Realtors*,
  516 F. Supp. 3d 1047 (C.D. Cal. 2021)................................................52

*Resol. Tr. Corp. v. Frates*,
  61 F.3d 962 (D.C. Cir. 1995)................................................................56

*Resol. Tr. Corp. v. Walde*,
  18 F.3d 943 (D.C. Cir. 1994).............................................................5, 56

*Schellenbach v. SEC*,
  989 F.2d 907 (7th Cir. 1993)................................................................33

*Segar v. Mukasey*,
  508 F.3d 16 (D.C. Cir. 2007).........................................................24, 38

*Senate of the Com. of Puerto Rico on Behalf of Judiciary Comm. v. U.S. Dep't of Just.*,
  823 F.2d 574 (D.C. Cir. 1987)..............................................................33

*Trans-Bay Eng'rs & Builders, Inc., v. Hills*,
  551 F.2d 370 (D.C. Cir. 1976)..............................................................41

*Top Agent Network v. NAR*,
  No. 21-16494 (9th Cir. docketed Sept. 10, 2021) ..................................10

*United States Int'l Trade Comm'n v. ASAT, Inc.*,
  411 F.3d 245 (D.C. Cir. 2005)....................................................5, 25, 28

*United States v. Armour & Co.*,
  402 U.S. 673 (1971)..............................................................................53

*United States v. Cherokee Nation of Oklahoma*,
  480 U.S. 700 (1987)..............................................................................36

*United States v. Kanu*,
  695 F.3d 74 (D.C. Cir. 2012)................................................................29

*United States v. LTV Corp.*,
  746 F.2d 51 (D.C. Cir. 1984)................................................................15

*United States v. Mejia*,
  448 F.3d 436 (D.C. Cir. 2006)..............................................................25

*United States v. Microsoft Corp.*,
  56 F.3d 1448 (D.C. Cir. 1995)..............................................................37

*United States v. Microsoft Corp.,*
  147 F.3d 935 (D.C. Cir. 1998)........................................................24, 28

*United States v. Morton Salt Co.*,
  338 U.S. 632 (1950)................................................................................5

*United States v. Smith*,
  499 U.S. 160 (1991)..............................................................................31

*United States v. Western Elec. Co.*,
  12 F.3d 225 (D.C. Cir. 1993) ................................................................24

*United States v. Western Elec. Co.*,
  894 F.2d 430 (D.C. Cir. 1990) ..............................................................42

*United States v. Winstar Corp.*,
  518 U.S. 839 (1996) .......................................................................34, 51

*Village of Kaktovik v. Watt*,
  689 F.2d 222 (D.C. Cir. 1982) ..............................................................31

*WMATA v. Mergentime Corp.*,
  626 F.2d 959 (D.C. Cir. 1980) ..............................................................30

**STATUTES:**

15 U.S.C. § 1 ............................................................................................19

15 U.S.C. § 2 ............................................................................................19

15 U.S.C. § 16 ............................................................ 3, 11, 14, 15, 17, 47, 48

15 U.S.C. § 1311 ....................................................................................... 4

15 U.S.C. §§ 1311-1314 ........................................................................... 3, 4

15 U.S.C. § 1312 ...............................................................................4, 9, 22

15 U.S.C. § 1314 ...............................................................................1, 5, 19

28 U.S.C. § 1291 ........................................................................................1

**RULES:**

Fed. R. App. P. 4(a) ..................................................................................1

**REGULATIONS:**

28 C.F.R. § 50.6 .......................................................................................58

**OTHER AUTHORITIES:**

Restatement (Second) of Contracts § 20, § 184, § 201 (1981)...........45, 50

Richard A. Lord, *Williston on Contracts* (4th ed. 2012) .........................30

## GLOSSARY

| | |
|---|---|
| ACPA | Antitrust Civil Process Act, 15 U.S.C. §§ 1311-1314 |
| CID | Civil Investigative Demand |
| MLS | Multiple-Listing Service |
| NAR | National Association of Realtors |
| Tunney Act | Antitrust Procedures and Penalties Act, 15 U.S.C. § 16(b)-(h) |

## JURISDICTIONAL STATEMENT

The District Court had jurisdiction under 15 U.S.C. § 1314(e).  On January 25, 2023, the District Court entered "a final appealable Order" disposing of all parties' claims.  JA __ (Order).  This Court has jurisdiction under 15 U.S.C. § 1314(e) and 28 U.S.C. § 1291.  Appellants timely filed their Notice of Appeal on March 24, 2023.  *See* Fed. R. App. P. 4(a)(1)(B).

## INTRODUCTION

The Department of Justice's Antitrust Division ("Division") brings this appeal to restore its authority to investigate potentially anticompetitive rules, policies, and practices of the National Association of Realtors ("NAR").  Because NAR rules govern most residential home sales across the nation, they can have a significant economic impact on one of the most important transactions in many Americans' lives.  In its decision below, the District Court set aside a Civil Investigative Demand ("CID") issued by the Division to NAR on the grounds that it was barred by a "validly executed settlement agreement."  JA__ (Op. 6).  That decision effectively, and unjustifiably, blocks the Division from investigating this critical issue.

1

In reaching this extraordinary result, the District Court made several serious errors of basic contract law.  First, the District Court brushed aside the plain language of a letter merely reporting that an investigation had been closed and read into the letter an unstated forward-looking commitment not to further investigate NAR.  This interpretation also improperly implied a waiver of a sovereign power against the United States and ignored several other textual indications that the Division had no intention to limit its investigative authority.

The context was as clear as the text.  The Division expressly rejected NAR's requests that it promise not to investigate NAR—three times—before NAR acquiesced to proceeding without that promise.  And the Tunney Act context, under which the Division filed a (later withdrawn) proposed consent decree with NAR, confirms that the Division did not intend to make a binding commitment—or else it would have informed the District Court about the letter pursuant to its statutory obligations.  The District Court's interpretation of the letter also leads to the anomalous results that, after the Division withdrew from the proposed consent decree, the Division released NAR from any continuing obligations, yet the Division remains barred from

2

investigating two NAR rules—the Participation Rule and the Clear Cooperation Policy—absent "some future version or application" thereof.  That cannot be right.

For all of these reasons, the District Court's judgment should be reversed—and NAR's other objections to the CID should be overruled—such that NAR's petition to set aside or modify the CID is denied in full to allow the Division to resume its consequential investigation of conduct that affects over $100 billion in broker fees paid by Americans annually.

## STATEMENT OF ISSUES PRESENTED

1.    Whether the District Court misapplied contract law in setting aside CID No. 30729.

2.    Whether CID No. 30729 is otherwise lawful and enforceable.

## PERTINENT STATUTES

The Antitrust Civil Process Act, 15 U.S.C. §§ 1311-1314, and the Antitrust Penalties and Procedures Act, 15 U.S.C. § 16(b)-(h) (Tunney Act), are reprinted in the Addendum to this Brief.

## STATEMENT OF THE CASE

## I.    The Antitrust Division's Investigative Authority

Under the Antitrust Civil Process Act (ACPA), the Department of Justice's Antitrust Division has "broad investigatory powers." *Associated Container Transp. (Austl.) Ltd. v. United States*, 705 F.2d 53, 58 (2d Cir. 1983).  The Division may issue a CID to "any person" if there is "reason to believe" that person may have information "relevant to a civil antitrust investigation."  15 U.S.C. § 1312(a); *see also id.* § 1311(c) (defining "antitrust investigation" to mean "any inquiry conducted by any antitrust investigator for the purpose of ascertaining whether any person is or has been engaged in any antitrust violation or in any activities in preparation for a . . . transaction, which, if consummated, may result in an antitrust violation").

A CID is a form of administrative subpoena.  *See FTC v. Ken Roberts Co.*, 276 F.3d 583, 584-87 (D.C. Cir. 2001); *FTC v. Invention Submission Corp.*, 965 F.2d 1086, 1087 (D.C. Cir. 1992).  Accordingly, the Division's "investigatory authority is far-reaching, analogous to that of a grand jury, which 'can investigate merely on suspicion that the law is being violated, or even just because it wants assurance that it is not.'"

4

*Resol. Tr. Corp. v. Walde*, 18 F.3d 943, 947 (D.C. Cir. 1994) (quoting *United States v. Morton Salt Co.*, 338 U.S. 632, 642–43 (1950)).

The ACPA also sets forth procedures for enforcing, modifying, or setting aside a CID.  15 U.S.C. § 1314.  "[I]n light 'of the important governmental interest in the expeditious investigation of possible unlawful activity,' . . . the district court's role is 'strictly limited.'" *U.S. Int'l Trade Comm'n v. ASAT, Inc.*, 411 F.3d 245, 253 (D.C. Cir. 2005) (citation omitted).  "Unless it is patently clear that an agency lacks the jurisdiction that it seeks to assert, an investigative subpoena will be enforced." *FTC v. Church & Dwight Co.*, 665 F.3d 1312, 1317 (D.C. Cir. 2011) (quoting *Ken Roberts Co.*, 276 F.3d at 584).  In particular, "a subpoena enforcement action is [generally] not the proper forum in which to litigate disagreements over an agency's authority to pursue an investigation." *Church & Dwight Co.*, 665 F.3d at 1317 (quoting *Ken Roberts Co.*, 276 F.3d at 584).[1]  And as the District Court recognized,

---

[1] *See also Endicott Johnson Corp. v. Perkins,* 317 U.S. 501, 509 (1943) (enforcing subpoena issued by the Secretary of Labor even though the employer disputed whether its employees were covered by the underlying statute); *FTC v. Texaco, Inc.*, 555 F.2d 862, 880-81 & n.42 (D.C. Cir. 1977) (en banc) (enforcing an administrative subpoena despite a potential res judicata defense).

"the petitioner bears the burden of convincing the court that a CID should be set aside."  JA__ (Op. 4-5) (citations omitted); *see also Invention Submission*, 965 F.2d at 1090 (challenger must "show that the information is irrelevant").

## II.    Factual Background and District Court Proceedings

### A.    The Division's Investigation of NAR Rules, Policies, and Practices

This appeal arises from the Division's investigation into potentially unlawful rules, policies, and practices in the residential real-estate industry.  For many Americans, buying a home is one of the most expensive financial transactions of their life.  Under current industry practice, a buyer's real-estate agent generally receives 2.5-3% of a home's sale price as a commission, regardless of the quality or scope of services the agent actually provides to a home buyer.  This buyer-broker commission is in addition to the 2.5-3% commission generally paid to the listing broker, resulting in a total broker transaction fee of 5-6% of the home sale price, *see Moehrl v. Nat'l Ass'n of Realtors*, 492 F. Supp. 3d 768, 774-75 (N.D. Ill. 2020), which in some regions can be roughly the cost of a new car for many Americans.

6

Residential real estate in this country is marketed primarily through multiple-listing services ("MLSs").  An MLS is typically a joint venture of competing real-estate professionals.  Both buyer-brokers (who represent home buyers) and listing brokers (who represent home sellers) participate in the same MLS.  It operates as an online, subscription-based service that allows listing brokers to post homes for sale and buyer-brokers to view them in a single database.  In most regional markets, a single MLS, specific to that area, is the primary means of marketing homes.  JA __ (Complaint ¶¶9-10), __ (CIS at 4).

Most of the approximately 600 regional MLSs take direction from NAR, America's largest trade organization, with approximately 1.4 million members across all 50 states.  JA __ (Complaint ¶7).  NAR controls these MLSs nationwide through its roughly 1,400 local associations or boards.  *Id*.  Those MLSs must adopt, and member brokers must comply with, NAR's mandatory rules, including those outlined in NAR's *Handbook on Multiple Listing Policy*.  JA __ (Complaint ¶11), __ (CIS at 4-5).  NAR's rules and policies thus effectively determine the processes by which home sales—and competition between real-estate brokers—occur in the United States.

7

After receiving a complaint from an industry participant in June 2018, the Division opened an antitrust investigation into certain NAR rules and practices. An important part of the investigation concerned NAR's "Participation Rule," which appeared to raise significant competition concerns. This rule requires listing brokers to offer the same commission to all buyer-brokers when listing a particular property for sale on an MLS.[2] While the rule does not expressly specify the amount that must be offered, the industry custom is 2.5-3%, and buyer-brokers can easily check the amount offered in an MLS listing. By effectively affording *sellers' brokers* control over what *buyers* pay their brokers, the rule could curtail price competition among buyer-brokers. Potentially exacerbating these effects, buyer-brokers could steer customers to higher-commission listings—or discourage sellers' agents from offering lower commissions. *See, e.g.*, *Moehrl v. Nat'l Ass'n of Realtors*, No. 19-CV-01610, 2023 WL 2683199 (N.D. Ill. Mar. 29,

---

[2] NAT'L ASS'N OF REALTORS, HANDBOOK ON MULTIPLE LISTING POLICY 34 (2018), at Policy Statement 7.23, https://www.nar.realtor/sites/default/files/documents/2018-HMLP-v1.pdf (requiring listing broker to "make blanket unilateral offers of compensation to the other MLS participants"). Policy Statement 7.23 is identical in the 2023 version of NAR's Handbook.

2023) (granting class certification on private challenge raising such concerns).

During the investigation, the Division identified at least four other NAR policies and practices that raised competitive concerns:

1. <u>NAR's "Commission Concealment Rules</u>," under which NAR-affiliated brokers could conceal from homebuyers the blanket commission offered to buyer-brokers.

2. <u>NAR's "Free-Service Rule</u>," under which buyer-brokers were permitted to misrepresent to homebuyers that their services were free.

3. <u>NAR's "Commission-Filter Rules and Practices</u>," under which brokers could filter properties on an MLS based upon the rate of commission they would receive from the sale.

4. <u>NAR's "Lockbox Policy</u>," which prohibited licensed brokers who are not NAR members from accessing the lockboxes that contain the keys to listed properties.

*See* JA __ (Complaint ¶¶1, 16-26), __ (CIS at 5-10).

To further understand the competitive implications of the Participation Rule as well as the four other policies and practices (among others), in April 2019 the Division served CID No. 29935, JA__-__, pursuant to its authority under 15 U.S.C. § 1312(a).  NAR failed to comply substantially with this CID during the remaining 18 months of the Division's investigation.

In 2020, nearly two years into the Division's investigation, NAR added a new rule to its *Handbook*: the "Clear Cooperation Policy." Prompted by competition from upstart listing services, this rule generally requires listing brokers to publish a property listing on an MLS within one business day of beginning to market that property.[3] The Policy thereby restricts the choices available to home sellers and listing brokers who want to market homes outside the NAR-affiliated MLS system and potentially excludes new listing services that seek to compete against MLSs for home listings.  *See, e.g.*, *PLS.Com, LLC v. NAR*, 32 F.4th 824 (9th Cir. 2022) (allowing antitrust suit challenging Clear Cooperation Policy to proceed), *cert. denied*, 143 S. Ct. 567 (2023); *Top Agent Network v. NAR*, No. 21-16494 (9th Cir.) (pending antitrust challenge to Clear Cooperation Policy).  In total, the Division identified competition concerns with at least six NAR rules and practices.

To investigate whether the Clear Cooperation Policy also could meaningfully restrict competition, in June 2020 the Antitrust Division

---

[3] *See* https://www.nar.realtor/about-nar/policies/mls-clear-cooperation-policy, which first appeared in NAT'L ASS'N OF REALTORS, HANDBOOK ON MULTIPLE LISTING POLICY 32 (2020), at Policy Statement 8.0, https://www.nar.realtor/sites/default/files/documents/NAR-HMLP-2020-v2.pdf.

served a second CID, No. 30360, JA__-__.  NAR never complied with
this CID.

## B.    The Negotiations that Led to a Proposed Final Judgment

In early 2020, before NAR had substantially complied with CID
No. 29935—and before the Division issued CID No. 30360—the
previous leadership of the Division began discussions with NAR about a
proposed consent judgment.  These negotiations ultimately resulted in
the filing of a Complaint and Proposed Final Judgment on November
19, 2020 in the United States District Court for the District of Columbia
pursuant to the Tunney Act, 15 U.S.C. § 16.  *See* JA __ (Complaint);
JA___ (Proposed Final Judgment).  Had the Proposed Final Judgment
been adopted, it would have required changes to four NAR rules,
policies, and practices: (1) the commission-concealment rules, (2) the
free-service rule, (3) the commission-filter rules and practices, and (4)
the lockbox policy.  JA __ (PFJ ¶IV).  As the District Court recognized,
neither the Complaint—nor the corresponding provisions of the
Proposed Final Judgment—addressed the Participation Rule or the
Clear Cooperation Policy.  *See* JA __ (Op. 2).

11

During the course of discussions that culminated in the filing of the Complaint and Proposed Final Judgment, NAR sought commitments from the Division on the two key rules left unaddressed in that proposed final judgment: the Participation Rule and the Clear Cooperation Policy. NAR initially proposed that the Division "stipulate that NAR's Participation Rule would not be subject to further investigation any time in the next ten years." JA __ (NAR July 6, 2020 letter). NAR then proposed that the Division "issue a public closing statement indicating that (i) the Division has investigated the Participation Rule and the Clear Cooperation Policy; and (ii) it has decided to close those investigations because it has not concluded that the Participation Rule or the Clear Cooperation Policy causes harm to competition." *Id.*

In three separate written responses, the Division rejected NAR's proposals. In a letter dated July 13, 2020, the Division dismissed NAR's proposal for "a commitment to not challenge NAR rules and policies in the future" as "a *nonstarter*, especially in light of longstanding Department policies concerning settlements that affect future potential investigations." JA ___ (emphasis added). In a July 29,

12

2020 letter, the Division reiterated that it "cannot commit to never challenge NAR rules and policies in the future in light of longstanding Department policies on such commitments." JA ___. And the Division repeated in an August 12, 2020 letter that it "cannot commit to never investigating or challenging NAR's rules and policies in the future." JA___.

NAR then abandoned its demands for a stipulation against future investigations or a public closing statement. Instead, NAR made a narrower proposal: that the Division would send NAR a letter "confirming that [the Division] has closed its investigations and that NAR has no obligation to provide additional information or documents in response to CID No. 29935 or CID No. 30360." JA ___ (NAR August 6, 2020 letter); *see also* JA __ (NAR Oct. 26, 2020 email).

The Division agreed to send NAR a letter that would state that NAR has "no obligation to respond to" the two outstanding CIDs because the Division had closed its investigation into the Participation Rule and the Clear Cooperation Policy. JA__ (Division Oct. 28, 2020 email). On November 19, 2020, then-Assistant Attorney General

13

Makan Delrahim sent NAR a three-sentence letter, which states in its

entirety:

> This letter is to inform you that the Antitrust Division has
> closed its investigation into the National Association of
> REALTORS' Clear Cooperation Policy and Participation Rule.
> Accordingly, NAR will have no obligation to respond to CID
> Nos. 29935 and 30360 issued on April 12, 2019 and June 29,
> 2020, respectively.
>
> No inference should be drawn, however, from the Division's
> decision to close its investigation into these rules, policies or
> practices not addressed by the consent decree.

JA___.

The November 2020 letter thus memorialized the parties'

agreement that NAR had "no obligation to respond to" CID Nos. 29935

or 30360 and stated that "the Antitrust Division ha[d] closed its

investigation" into the Participation Rule and Clear Cooperation Policy,

but "[n]o inference should be drawn . . . from the Division's decision."

## C.    The Tunney Act Proceedings and the Division's Withdrawal of Consent to the Proposed Final Judgment

As a "proposal for a consent judgment . . . under the antitrust

laws," the Proposed Final Judgment with NAR could take effect only

after compliance with the special requirements of the Tunney Act. 15

U.S.C. § 16(b). The purpose of the Act is to address "concerns that

government consent decrees had been entered in secrecy and without adequate attention to the public interest." *United States v. LTV Corp.*, 746 F.2d 51, 52 n.2 (D.C. Cir. 1984).

Under the Tunney Act, before a district court can enter a proposed judgment, the United States must first publicly disclose its proposed agreement, including "any other materials and documents which the United States considered determinative in formulating" its proposed judgment. 15 U.S.C. § 16(b). Then, the United States "shall receive and consider any written comments," including potentially by amending or withdrawing the consent judgment, as necessary. *See id.* § 16(d). If the United States does not withdraw from the proposed final judgment, the court must then determine whether the proposed consent judgment is in the "public interest." *Id.* § 16(e).[4]

---

[4] For example, the United States moved to modify a 2008 proposed final judgment with NAR "[b]ased on comments received by the United States." *United States v. NAR*, No. 05-C-5140 (N.D. Ill. Nov. 7, 2008); *see also Massachusetts v. Microsoft Corp.*, 373 F.3d 1199, 1205 (D.C. Cir. 2004) (noting that modifications to a proposed agreement were made "in the light of the public comments"); *Massachusetts. Sch. of L. at Andover, Inc. v. United States*, 118 F.3d 776, 778 (D.C. Cir. 1997) (noting that "several modifications had been made" to a proposed settlement after public comment). For its part, the Federal Trade Commission has

In compliance with the Tunney Act, on November 19, 2020, the United States filed a Complaint along with a Stipulation and Order and Proposed Final Judgment.  JA__-__, __-__, __-__.  The Complaint alleged that the four aforementioned NAR policies violated section 1 of the Sherman Act.  JA__ (Complaint ¶29).  The Proposed Final Judgment, in turn, provided that the Division proposed to settle the allegations set forth in the Complaint in return for NAR taking corrective actions to address the four rules and practices identified in the proposed consent decree.  JA __, __ (PFJ at 1 & ¶V).

Neither the Complaint nor the Proposed Final Judgment mentioned the Participation Rule or the Clear Cooperation Policy.  The Proposed Final Judgment also contained a reservation-of-rights clause, reaffirming that "[n]othing in this Final Judgment shall limit the right of the United States to investigate and bring actions to prevent or restrain violations of the antitrust laws concerning any Rule or practice

---

withdrawn from a proposed consent agreement altogether, noting that the "public comment period served its intended purpose" by identifying a "potentially erroneous" interpretation of law.  *See* Statement of the Federal Trade Commission, *In the Matter of Phoebe Putney Health Servs., Inc., et al.*, Dkt. No. 9348 (Sept. 4, 2014).

adopted or enforced by NAR or any of its Member Boards." JA __ (PFJ ¶XI).

As the plain terms of the Proposed Final Judgment made clear, the District Court's entry of the proposed consent decree was subject to "the requirements of the Antitrust Procedures and Penalties Act, 15 U.S.C. § 16," and that the parties must comply with the Act. JA__ (PFJ ¶XIII). Likewise, on November 20, 2020, the District Court entered the Stipulation and Order reaffirming the statutory instruction that the Proposed Final Judgment may be "entered by the Court" only "after compliance with the requirements of the Antitrust Procedures and Penalties Act (15 U.S.C. § 16)." JA __ (Stipulation ¶2). The Stipulation and Order also provided that "[t]he United States may withdraw its consent at any time before the entry of the proposed Final Judgment." *Id.*; *see* 15 U.S.C. §§ 16(b), (d).

In this case, the Division disclosed the Complaint, the Proposed Final Judgment, and a Competitive Impact Statement in the Federal Register. *See United States v. National Association of REALTORS® Proposed Final Judgment and Competitive Impact Statement*, 85 Fed. Reg. 81,489 (Dec. 16, 2020). The Federal Register notice invited public

17

comments by February 16, 2021.  Like the Complaint and Proposed
Final Judgment, these court filings did not append or mention the
November 19, 2020 letter.

After receiving several public comments, in 2021 the Division
proposed specific modifications to the Proposed Final Judgment to NAR,
but NAR refused.  On July 1, 2021, the United States exercised its
unilateral right to withdraw its consent to entry of the Proposed Final
Judgment, JA __ (withdrawal notice), and voluntarily dismissed the
Complaint, JA __.  The Tunney Act process therefore ended without the
District Court having made any "public interest" determination, and no
final judgment was entered.  By exercising its withdrawal right, "the
United States and [NAR] [were] released from all further obligations
under this Stipulation and Order," including under the Proposed Final
Judgment, "and the making of this Stipulation and Order w[as
confirmed to be] without prejudice to any party in this or any other
proceeding."  JA __ (Stipulation ¶6).

## D.    CID No. 30729 and NAR's Petition Below

After the Division ended the Tunney Act proceedings before the
District Court—and more than seven months after the Division had

closed its investigation into the Participation Rule and Clear Cooperation Policy—the Division determined that resuming the investigation into these rules was warranted and necessary in light of evidence of the continuing threat of anticompetitive effects of NAR's rules, policies, and practices on the residential real-estate industry. Accordingly, the Division served CID No. 30729 on NAR, JA__-__.

CID No. 30729 requests information concerning the Participation Rule, the Clear Cooperation Policy, and several other NAR rules, policies, and practices that raise antitrust concerns, including under the Sherman Act, 15 U.S.C. §§ 1, 2. By its terms, the CID invited NAR to discuss any questions or concerns it might have about the scope or meaning of the demand, but NAR did not raise any objection except to Specification 10, which the Division offered to withdraw once NAR explained its concern. The Division also extended NAR's time to comply with the CID.

Nevertheless, in September 2021, NAR filed a Petition to set aside or modify CID No. 30729 under 15 U.S.C. § 1314(b) on the asserted ground that the CID breached a judicially enforceable settlement with

the United States.  JA __-__.  The briefing on the Petition concluded in November 2021.

### E.    The District Court's Decision

On January 25, 2023, more than a year after briefing had been completed, and without holding any hearing, the District Court issued an 11-page decision setting aside CID No. 30729 on the ground that "a validly executed settlement agreement bars the CID at issue."  JA __ (Op. 6) and __ (Order).  The District Court did not identify any procedural deficiencies in the CID.  Instead, applying contract law, the District Court interpreted the November 2020 letter—which memorializes the parties' agreement that NAR had "no obligation to respond to" two outstanding CIDs and states that "the Antitrust Division has closed its investigation"—to immunize NAR from any federal antitrust investigation into its Participation Rule or Clear Cooperation Policy except "some future version or application of" those rules.  JA __ (Op. 10).

The District Court began by "identifying the terms of the parties' agreement."  JA __ (Op. 6-7).  With respect to its terms, the court stated that "the settlement agreement encompasses several written and oral

20

commitments," which it stated were "memorialized" in the following documents: (1) the court's own November 20, 2020 Order and Stipulation; (2) the Proposed Final Judgment, which the Division withdrew without objection on July 1, 2021; and (3) the November 2020 letter from then-Assistant Attorney General Delrahim.  JA __ (Op. 7); *see also* JA __ (Op. 10).  Each of these documents, the court stated, "must be considered part of the overall agreement."  JA __ (Op. 10).  The District Court stated numerous times that it was interpreting a single "overall agreement," and it referred to the "agreement" in the singular.[5]

---

[5] *See* JA __ (Op. 4) ("the 2020 settlement agreement"); JA __ (Op. 6) ("the parties dispute the terms of their settlement agreement"); *id*. ("that agreement"); *id*. ("The Court must first identify the terms of the parties' agreement"); JA __ (Op. 8) ("the Antitrust Division breached the settlement agreement*); id.* ("the new CID violates the agreement"); *id.* ("Because the agreement included the Antitrust Division's commitment to close its investigation into NAR's current Participation Rule and Clear Cooperation Policy, the government breached the agreement by reopening the investigation into those same rules and serving the new CID."); *id.* ("it follows that the agreement bars enforcement of the new CID"); JA __ (Op. 9) ("But these arguments change nothing about the agreement the government eventually struck"); *id.* ("the Court's interpretation of the agreement"); JA __ (Op. 10) ("the settlement agreement was not contained exclusively within the four corners of the Proposed Final Judgment").

Based on online dictionary definitions of the words "close" and "open," the District Court interpreted the terms of the November 2020 letter—"has closed"—to bar the Division from "reopening" any investigation into NAR's Participation Rule or Clear Cooperation Policy. JA ___ (Op. 8).  The court reasoned that "[f]rom there, it follows that the agreement bars enforcement of the new CID, issued to advance the same. *See* 15 U.S.C. § 1312(c)." *Id.*

Turning to the "no inference" sentence in that same letter, the District Court suggested that it might have been written to "inform *third parties* that the government had not found one way or the other that the Participation Rule and Clear Cooperation Policy were lawful, and so similar policies should not be assumed to pass muster." JA ___ (Op. 9-10).  Even under the Division's interpretation, the court declined to give effect to the clause on the ground that "under the law of contract the Antitrust Division was not free to unilaterally change the terms of the settlement agreement." *Id.*

The District Court also addressed the "Reservation of Rights" clause in the Proposed Final Judgment.  The clause, the court held, could not be read to permit the Division to serve CID No. 30729 because

22

"the settlement agreement was not contained exclusively within the four corners of the Proposed Final Judgment," and "[s]o even though that document said nothing about future investigations, it does not then follow that no such limits were a part of the settlement agreement as a whole." JA ___ (Op. 10).

The District Court recognized that the Division had rejected NAR's initial proposal and "refused to stipulate that either rule would not be subject to another investigation in the next decade, and it declined to give them its seal of approval." JA __ (Op. 9). It concluded, however, that these expressions of the Division's intent "change nothing about the agreement the government eventually struck," and posited that "[t]he agency's reservations, in context, are best understood as relating to any future versions of the policies in question." *Id.*

As the District Court recognized, the United States "withdrew its consent to the Proposed Final Judgment and voluntarily withdrew its complaint," JA __ (Op. 4) (citing ECF No. 1-17; ECF No. 1-18). Even so, the court held that "under the law of contract" the Division was bound by its agreement, which included the Proposed Final Judgment from which it lawfully withdrew its consent. JA __ (Op. 10). And it

23

concluded that "[a]t bottom, not setting aside the CID at issue would deprive NAR of the benefit for which it bargained." JA __ (Op. 11).

## STANDARD OF REVIEW

The District Court's decision setting aside CID No. 307289 rested entirely on its interpretation of the terms of an "overall agreement" between the Division and NAR. *See* JA __ (Op. 8-10). The "[i]nterpretation of the plain language of a contract is a question of law subject to de novo review by this court." *LTV Corp. v. Gulf States Steel, Inc. of Alabama*, 969 F.2d 1050, 1055 (D.C. Cir. 1992); *Segar v. Mukasey*, 508 F.3d 16, 22 (D.C. Cir. 2007); *see also, e.g.*, *Armenian Assembly of Am., Inc.* v. *Cafesjian*, 758 F.3d 265, 278 (D.C. Cir. 2014) (decision whether contract is ambiguous "is one we review de novo"). Moreover, "[t]he district court's construction of" an antitrust consent decree "is subject to de novo review." *United States v. W. Elec. Co.*, 12 F.3d 225, 229 (D.C. Cir. 1993); *United States v. Microsoft Corp.,* 147 F.3d 935, 945 & n.7 (D.C. Cir. 1998).

Although a district court's ultimate decision to set aside a CID is reviewed for abuse of discretion, where, as here, that decision rests upon legal conclusions and errors of law, this Court's review is de novo.

*ASAT, Inc.*, 411 F.3d at 253; *Consumer Fin. Prot. Bureau v. Accrediting Council for Indep. Colleges & Sch.*, 854 F.3d 683, 688 (D.C. Cir. 2017). "A district court's error of law is 'by definition' an abuse of discretion." *Jeffries v. Barr*, 965 F.3d 843, 855 (D.C. Cir. 2020) (citation omitted).

The District Court did not address NAR's relevance and burden objections to the CID, so this Court's review is de novo. *See United States v. Mejia*, 448 F.3d 436, 456 (D.C. Cir. 2006).

## SUMMARY OF ARGUMENT

In setting aside the CID, the District Court committed numerous reversible errors of contract law. CIDs, as administrative subpoenas, routinely are enforced unless it is patently clear that the issuing agency lacks the jurisdiction it seeks to assert. Nothing here meets that standard, and in finding otherwise the District Court misinterpreted the parties' settlement agreement and the closing letter in particular.

***First***, the Division simply did not commit to refrain from investigating NAR's Participation Rule and Clear Cooperation Policy, and no such wavier of its sovereign rights can be inferred. The plain text of the November 2020 letter states only that the Division "has closed" its prior investigation; the letter said nothing about future

25

investigations.  Many things open after having closed, as law enforcement investigations often do.  The District Court read a term into the letter—a commitment not to undertake any future investigations—that is not there.  Moreover, inferring such a commitment violates the principle of contract law that courts should not recognize terms ceding a sovereign right of the United States unless the contract waives that right in unmistakable terms.  The Executive Branch has a sovereign right to investigate and prosecute (or to decline to investigate or prosecute) potentially unlawful conduct, but the November 2020 letter did not waive that right at all, much less in unmistakable terms.  And inferring such a commitment here failed to interpret the letter's "has closed" sentence consistently with that same short letter's further instruction that NAR should draw "no inference" of any kind from the closing of the Division's investigation.  Similarly, inferring a commitment not to investigate in the future here ignores the reservation-of-rights clause in the Proposed Final Judgment, which was negotiated along with the November 2020 letter and expressly reserved the United States' right to investigate "any" NAR rule.  For each of these reasons, the District Court's interpretation was wrong.

26

**Second**, the District Court's interpretation ignores important context for the parties' proposed agreement. Three times, the Division pointedly rejected NAR's demands for the immunity afforded by the District Court's decision. The District Court's interpretation also fails to grapple with the requirements of the Tunney Act. Had the November letter embodied a promise not to investigate NAR, the parties would have disclosed it during the Tunney Act process.

**Third**, the court's interpretation of the November letter leads to the implausible result that NAR can resume the rules and practices prohibited by the withdrawn consent decree, but the Division cannot investigate two potentially anticompetitive rules.

For the foregoing reasons, the Division should be able to enforce the CID forthwith to carry out its important investigative function. Although the District Court did not reach NAR's relevance and burdensomeness objections to CID No. 30729, they can be overruled now because they clearly fail the applicable legal standards.

## ARGUMENT

This Court repeatedly has reaffirmed that "in light 'of the important governmental interest in the expeditious investigation of

27

possible unlawful activity,' [] the district court's role is 'strictly limited'" in the context of subpoena enforcement proceedings. *ASAT, Inc.*, 411 F.3d at 253; *see also Accrediting Council for Indep. Colleges & Sch.*, 854 F.3d at 688–89 ("Courts play a limited role in subpoena enforcement proceedings."). Accordingly, "'[u]nless it is patently clear that an agency lacks the jurisdiction that it seeks to assert, an investigative subpoena will be enforced.'" *Church & Dwight Co.*, 665 F.3d at 1317 (citation omitted).

No such patently clear bar to enforcement exists here. None can be found in the statements of the Division, such a bar would contradict the context of the purported agreement, and implying one would lead to absurd results.

## I.    THE DISTRICT COURT MISAPPLIED CONTRACT LAW IN SETTING ASIDE CID NO. 30729.

In determining whether a supposed "overall agreement" barred the CID, "[t]he court's task" was to apply "the bargain that the parties struck," *United States v. Microsoft Corp.*, 147 F.3d 935, 946 (D.C. Cir. 1998), not terms that one side proposed but the other rejected. In doing so, a court looks to the plain text of an agreement and, if necessary, to "the circumstances under which the agreement was made." *United*

*States v. Kanu*, 695 F.3d 74, 78 (D.C. Cir. 2012) (quoting *Nat'l Audubon Soc'y, Inc. v. Watt*, 678 F.2d 299, 307 (D.C. Cir. 1982)). The District Court's interpretation of the November 2020 letter as barring the Division's investigation into NAR's Participation Rule and Clear Cooperation Policy flouts these basic principles.

## A. The District Court Erred in Interpreting the Plain Text of the November 2020 Letter to Bar CID No. 30729.

The Division's November 2020 letter referred to an action that had been completed—the closing of a pending investigation—and said nothing about the Division's future investigations. The District Court implied a term into the letter that is not there. That interpretation both fails to apply the plain language of the letter and contravenes the principle that courts should not interpret federal-government contracts to require the United States to waive a sovereign right, unless the waiver is stated in unmistakable terms.

### 1. The November 2020 Letter Simply Memorialized that the Division "Ha[d] Closed" Its Investigation.

As an initial matter, "ordinary principles of contract law" require that "[w]here the words of a contract in writing are clear and

29

unambiguous, its meaning is to be ascertained in accordance with its plainly expressed intent." *M&G Polymers USA, LLC v. Tackett*, 574 U.S. 427, 435 (2015) (quoting 11 R. Lord, *Williston on Contracts* § 30:6, at 108 (4th ed. 2012)); *accord WMATA v. Mergentime Corp.*, 626 F.2d 959, 961 (D.C. Cir. 1980) ("Under general contract law, the plain and unambiguous meaning of an instrument is controlling.").[6]

Applying that principle here, the November 2020 letter's express terms nowhere purport to grant NAR immunity from any future investigation into its Participation Rule or Clear Cooperation Policy. The letter states simply that "the Antitrust Division has closed its investigation into the National Association of REALTORS' Clear Cooperation Policy and Participation Rule" and NAR will "accordingly" have "no obligation to respond to" two specifically enumerated CIDs. JA ___.  Phrased in the present perfect tense—"*has closed*"—the express terms of the letter "denot[e] an act that has been completed." *Barrett v. United States*, 423 U.S. 212, 216 (1976).  The letter's "plain language"

___

[6] Contracts with the United States are governed by federal common law.  *See Clearfield Tr. Co. v. United States*, 318 U.S. 363, 366 (1943).

simply cannot be read to impose a *future* obligation on either party.

Rather, the letter informed NAR that the Division had carried out the

action NAR requested as a condition to its signing the Proposed Final

Judgment.[7]

If the Division had intended its November 2020 letter to signal a

commitment to refrain from further investigating (or prosecuting) NAR,

i.e., that its investigation would *stay closed*, the letter "would have said

as much," *United States v. Smith*, 499 U.S. 160, 173 (1991) (applying

this principle in context of statutory interpretation).  But the letter said

---

[7] The District Court cited an unpublished district court decision
from 1992 and a separate writing in another case for the proposition
that the government cannot unilaterally rescind a contract.  JA __ (Op.
5-6).  But that did not happen here.  It is undisputed that the Division
had, and properly exercised, the right to withdraw from the Proposed
Final Judgment.

In any event, the cited cases are inapposite.  The principal issue in
*Burton v. Administrator*, No. 89-2338, 1992 WL 300970 (D.D.C. July 10,
1992), was whether an Assistant U.S. Attorney lacked the authority to
bind the General Services Administration.  In *Village of Kaktovik v.
Watt*, 689 F.2d 222 (D.C. Cir. 1982), "the government notified the court
that it would not honor its agreement" because the Department of the
Interior had not previously been consulted, *id*. at 233.  The majority
held that the agreement could *not* be enforced against the United States
because "plaintiffs consented to rescission of the settlement contract."
*Id.* at 231.

only "has closed," and that is all that NAR asked for from the Division,
*see* JA __ (NAR Oct. 26, 2020 email) ("has closed").  A court "cannot . . .
import words into the contract which would make it materially different
in a vital particular from what it now is." *Gavinzel v. Crump*, 89 U.S.
308, 319 (1874).

In holding otherwise, the District Court misconstrued the letter's
plain language.  The District Court reasoned that, as a matter of
dictionary English, the word "open . . . is the opposite of" the word
"clos[e]," so that by reopening the investigation the Division
contradicted the parties' agreement to close it.  JA__ (Op. 8).  But that
reasoning contradicts the "meaning ordinarily ascribed," *Mesa Air Grp.,
Inc. v. Dep't of Transp.*, 87 F.3d 498, 503 (D.C. Cir. 1996), to the words
"close" and "reopen," which are not opposites.  As with doors, folders,
and businesses, government investigations may be closed and then later
reopened.  *See*, *e.g.*, *Marinello v. United States*, 138 S. Ct. 1101, 1105
(2018) ("Between 2004 and 2009, the Internal Revenue Service (IRS)
opened, then closed, then reopened an investigation into the tax
activities of Carlo Marinello"); *J. Roderick MacArthur Found. v. F.B.I.*,
102 F.3d 600, 604 (D.C. Cir. 1996) ("information that was once collected

32

as part of a now-closed investigation may yet play a role in a new or reopened investigation"); *Senate of the Com. of Puerto Rico on Behalf of Judiciary Comm. v. U.S. Dep't of Just.*, 823 F.2d 574, 586 (D.C. Cir. 1987) ("the DOJ investigation into the Cerro Maravilla incident was closed officially on April 16, 1980, and did not reopen until August 1983") (footnote omitted).  Indeed, an investigation cannot be reopened unless that investigation previously had been closed.[8]

This understanding accords with the Seventh Circuit's treatment of a closing letter in *Schellenbach v. SEC*, 989 F.2d 907 (7th Cir. 1993). There, the National Association of Securities Dealers "reopen[ed]" an investigation after initially issuing a closing letter to the petitioner.  *Id.* at 909-11.  Rejecting the petitioner's argument that the closing letter somehow "bound" the Association, the Seventh Circuit discerned no "support for the proposition that the [Association] may not reopen an

---

[8] By holding that the Division is not barred from investigating the Participation Rule and Clear Cooperation Policy if NAR changes their "application," JA __ (Op. 10), the District Court's decision itself could require the Division to reopen its investigation, because determining whether the "application" of a rule has changed might require an investigation.

investigation." *Id.* at 911.  Rather, it "was perfectly free to reconsider the matter absent some due process violation." *Id.*

Because the plain language of the November 2020 letter lacks any promise not to reopen the investigation, that must control.

### 2. The District Court Improperly Implied a Waiver of a Sovereign Power.

The District Court's implying of an unwritten term is especially inappropriate where, as here, the effect is to waive a sovereign power of the United States.  As the Supreme Court has repeatedly held, "sovereign power, even when unexercised, is an enduring presence that governs all contracts subject to the sovereign's jurisdiction, and will remain intact unless surrendered in unmistakable terms." *Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 148 (1982); *accord Bowen v. Pub. Agencies Opposed to Soc. Sec. Entrapment*, 477 U.S. 41, 52 (1986) (same rule applied to Federal Government); *see also United States v. Winstar Corp.*, 518 U.S. 839, 878 (1996) (plurality op.) (summarizing the "collective holding" of Supreme Court precedents as "a contract with a sovereign government will not be read to include an unstated term exempting the other contracting party from the application of a subsequent sovereign act . . . , nor will an ambiguous term of a grant or

34

contract be construed as a conveyance or surrender of sovereign power"). Accordingly, it was error for the District Court to imply from silence a limitation on the Division's investigative and prosecutorial powers.

This Court has described "[t]he power to decide when to investigate, and when to prosecute" as lying "at the core of the Executive's duty to see to the faithful execution of the laws." *Cmty. for Creative Non-Violence v. Pierce*, 786 F.2d 1199, 1201 (D.C. Cir. 1986); *see also Heckler v. Chaney*, 470 U.S. 821, 832 (1985) ("the decision of a prosecutor in the Executive Branch not to indict [is] the special province of the Executive Branch, inasmuch as it is the Executive who is charged by the Constitution to 'take Care that the Laws be faithfully executed'"). Simply put, "the power of enforcement," no less than the power to legislate, is a sovereign power, "for such power is essentially inherent in the very conception of law." *First Nat. Bank in St. Louis v. State of Missouri at inf. Barrett*, 263 U.S. 640, 660 (1924); *accord Cuomo v. Clearing House Ass'n, L.L.C.*, 557 U.S. 519, 529 (2009) (power to enforce the law is a sovereign power).

35

By construing the November 2020 letter as implicitly surrendering the Division's right to investigate in the future, the District Court violated the unmistakability principle. The letter contained no provision, let alone an "unmistakable" one, by which the Division "specifically surrendered in terms which admit of no other reasonable interpretation" its power to investigate rules that govern the vast majority of residential real estate sales in the United States. *Merrion,* 455 U.S. at 148 (citation omitted); *cf. Bowen*, 477 U.S. at 52-53 (district court decision "heeded none of this Court's often-repeated admonitions that contracts should be construed, if possible, to avoid foreclosing exercise of sovereign authority").

In *United States v. Cherokee Nation of Oklahoma*, 480 U.S. 700, 707 (1987), the Supreme Court refused to infer a waiver of sovereign power from a treaty that was silent on whether the United States had conveyed its navigational easement on the Arkansas River to a tribe. The same result should follow here, where the November 2020 letter is silent on the question of the Division investigating NAR rules in the future.

36

Among other things, the unmistakability principle preserves important flexibility for the Executive to implement its policy priorities, as *Alliance to End Repression v. Chicago*, 742 F.2d 1007 (7th Cir. 1984) (en banc), illustrates.  In that case, the Seventh Circuit reasoned that to interpret a consent decree to bar a new administration from revising the FBI's investigatory guidelines, i.e., to interpret it as the government having "tied its [own] hands," would mean that the government "was trifling with the public safety of the people of Chicago and maybe even violating the President's constitutional obligation to 'take Care that the Laws be faithfully executed.'"  742 F.2d at 1014; *see also Nat'l Audubon Soc'y v. Watt,* 678 F.2d 299, 301 (D.C. Cir. 1982) (construing agreement between the United States and a private party to "avoi[d] potentially serious constitutional questions about the power of the Executive Branch to restrict its exercise of discretion by contract with a private party.").  By flouting those principles—and implying an unconsented limitation on the Division's ability to investigate potentially anticompetitive conduct—the District Court "improperly intruded on the government's prosecutorial role."  *United States v. Microsoft Corp.*, 56 F.3d 1448, 1457 (D.C. Cir. 1995).

37

### 3. The District Court's Interpretation Fails to Give Effect to the "No Inference" Proviso and the Reservation-of-Rights Clause.

The District Court's interpretation of the supposed "overall agreement" contravenes another "cardinal principle of contract construction"—namely, "that a document should be read to give effect to all its provisions and to render them consistent with each other." *Segar,* 508 F.3d at 22 (quoting *Mastrobuono v. Shearson Lehman Hutton, Inc.,* 514 U.S. 52, 63 (1995)).  In interpreting "commitments" like the one at issue in this case, a court "may not read the text . . . in isolation but must consider each in the context of the other."  *Id.*  In this instance, two other provisions of the same "overall agreement"—the "no inferences" sentence in the November 2020 letter and the reservation-of-rights clause in the Proposed Final Judgment—confirm that no overall agreement bars enforcement of the CID.

a.  To begin, the District Court's interpretation is "flatly inconsistent with the rest of" the November 2020 letter.  *Segar*, 508 F.3d at 24 (quoting *BWX Elecs., Inc. v. Control Data Corp*., 929 F.2d 707, 711 (D.C. Cir. 1991)); *see also Beal Mortg., Inc. v. FDIC*, 132 F.3d 85, 88 (D.C. Cir. 1998).  The last sentence of the letter warned NAR in

unqualified terms that it should draw "[n]o inference" of any kind from the closing of the investigation. That includes "[n]o inference" about future investigations, which confirms that the rest of the letter was not intended to bar reopening of the investigation.

The District Court posited that the "most obvious[]" reading of the sentence is that the Division had made no determination as to the lawfulness or unlawfulness of NAR's rules. JA __ (Op. 9-10). But even accepting that premise, the sentence would connote that the Division *could* determine NAR's rules to be unlawful in the future. That determination could be made only after a reopening of the investigation. The "no inference" sentence therefore confirms the Division's interpretation of the November 2020 letter.

The District Court also posited that the sentence might "inform *third parties*" about the conclusions the Division had reached. JA __ (Op. 9). But if the Division had wanted to inform third parties of the conclusions that it had (not) reached, it would have issued a public statement—something NAR requested, and the Division rejected. It makes little sense to suggest that the Division sought to communicate to the public through a private letter to NAR.

39

b.  Much like the "no inferences" sentence, the reservation-of-rights clause conflicts with the District Court's interpretation.  Not only was this term negotiated along with the November 2020 letter, but NAR expressly linked the two documents by telling the Division that NAR would "sign a consent decree including this provision [reservation of rights]" only if the Division would issue a letter.  *See* JA __ (markup attached to NAR Oct. 26, 2020 email).

As the reservation-of-rights provision states, "Nothing in this Final Judgment shall limit the right of the United States to investigate and bring actions to prevent or restrain violations of the antitrust laws concerning any Rule or practice adopted or enforced by NAR or any of its Member Boards."  JA __ (PFJ ¶XI).  In the contemporaneously filed Competitive Impact Statement, the United States explained that this clause was intended to "reserve[] the rights of the United States to investigate and bring actions to prevent or restrain violations of the antitrust laws concerning any rule, policy, or practice adopted or enforced by NAR."  JA__ (CIS at 16).  Accordingly, the November 2020 letter cannot be read to bargain away exactly what the Division

reserved in the clause:  the ability to investigate "any Rule or practice adopted or enforced by NAR."

Dismissing the significance of the reservation-of-rights clause, the District Court reasoned that the clause applied only to the Proposed Final Judgment, so that other documents could limit the Division's ability to investigate in the future.  JA __ (Op. 10).  But the District Court simply did not consider how the reservation-of-rights clause bears on the proper interpretation of the November 2020 letter as part of the context for the creation of the letter.  *See Bode & Grenier, LLP v. Knight*, 808 F.3d 852, 863 (D.C. Cir. 2015) ("Where two or more written agreements are contemporaneously executed as part of one complete package, they should be construed together and should be construed as consistent with each other") (quoting *Trans-Bay Eng'rs & Builders, Inc., v. Hills*, 551 F.2d 370, 379 (D.C. Cir. 1976)).  That failure is especially incongruous when considering how the District Court viewed the Proposed Final Judgment (which contained the clause) and the November 2020 letter as part of one "overall agreement."  Under the District Court's implausible interpretation, the Division reserved and ceded the same right within the very same agreement.

41

**B.  Context Confirms that the Parties Did Not Intend to Grant NAR Sweeping Antitrust Immunity.**

The proposed settlement agreement with NAR, "like other contracts, must be interpreted in light of the circumstances under which the agreement was made." *Nat'l Audubon Soc'y*, 678 F.2d at 307. This context includes "the circumstances surrounding the formation of the" agreement, *United States v. W. Elec. Co.*, 894 F.2d 430, 434 (D.C. Cir. 1990) (quoting *ITT Continental Baking Co.*, 420 U.S. 223, 238 (1975)), as well as the applicable legal backdrop, *Nat'l Audubon Soc'y*, 678 F.2d at 307-08; *NLRB v. C & C Plywood Corp.*, 385 U.S. 421, 430 (1967).  Both considerations reinforce that the parties did not intend to grant NAR ongoing immunity from investigation.

**1.  As the Division Repeatedly Stated and NAR Understood, No Promise Was Intended Concerning Future Investigations.**

The parties' negotiations leading to the Proposed Final Judgment and the November 2020 letter, *see* pp. 11-14 above, show that the Division *three times* refused to make any commitment about future investigations and never retreated from that position.  *See* JA __, __, __ (Division July 13, July 29, and August 12, 2020 letters).  First, when NAR requested that the Division "stipulate that NAR's Participation

42

Rule would not be subject to further investigation any time in the next ten years," JA __ (NAR July 6, 2020 letter), the Division responded clearly that any "commitment to not challenge NAR rules and policies in the future," was "a nonstarter."  JA __ (July 13, 2020 letter).

Second, when NAR modified its settlement proposal to demand that the Division agree that "any changes to the Participation Rule and/or the Clear Cooperation Policy, along with the other commitments by NAR discussed [previously in the letter], will completely address all of the Division's concerns and that the Division will close its investigation,"  JA __ (NAR July 14, 2020 letter), the Division reiterated that "we *cannot commit* to never challenge NAR rules and policies in the future."  JA __ (July 29, 2020 letter) (emphasis added).  Finally, on August 12, 2020, when the Division first agreed to send NAR a letter in some fashion, it *again* reiterated that "the Division cannot commit to never investigating or challenging NAR's rules and policies in the future."  JA ___.

The parties' correspondence also shows that *NAR itself* did not view the November 2020 letter, standing alone, as barring future investigations.  NAR's July 6, 2020 letter, JA __, listed its specific

demands in separately numbered paragraphs. In paragraph 2(b), NAR demanded that the Division "*stipulate* that NAR's Participation Rule would not be subject to further investigation any time in the next ten years," (emphasis added). But then in separate paragraph 2(c), NAR demanded that the Division "send a closing letter to NAR confirming that it has no obligation to provide additional information or documents in response to CID No. 29935 or CID No. 30360." NAR thereby implied that it did not view the letter by itself (as opposed to a formal stipulation) as barring future investigation.

Likewise, NAR's August 6, 2020 letter listed its demands in separate paragraphs. In paragraph 2, NAR demanded a "closing letter," but then in separate paragraph 3 demanded a "public statement" that "the relief reflected in the *consent decree* addresses all of the concerns the Division identified with respect to those policies," JA__ (emphasis added), thereby again implying that the letter itself would have no effect on any future investigations.

Where, as here, NAR plainly knew the Division's position but NAR had not communicated to the Division its now-asserted position that the November 2020 letter standing alone would bar future

investigations, the *Restatement (Second) of Contracts* (1981) provides that:

> [t]he manifestations of the parties are operative in accordance with the meaning attached to them by one of the parties [here, the Division] if . . . (a) that party does not know of any different meaning attached by the other, and the other knows the meaning attached by the first party or (b) that party has no reason to know of any different meaning attached by the other, and the other has reason to know the meaning attached by the first party.

Section 20(2)(a, b); *id*. § 201(2).[9]  The Division's position therefore should control.

The District Court brushed aside the parties' negotiations as "chang[ing] nothing about the agreement the government eventually struck, which required it to close its investigations into those policies." JA __ (Op. 9).  But the agreement eventually struck said nothing about prohibiting future investigations, *see* pp. 29-34 above, so any question should have been answered by the Division's clearly communicated position as expressed in its correspondence with NAR.

---

[9] In applying federal common law, courts look to the *Restatement (Second) of Contracts*.  *See Curtin v. United Airlines, Inc.*, 275 F.3d 88, 93 n.6 (D.C. Cir. 2001); *Bowden v. United States*, 106 F.3d 433, 439 (D.C. Cir. 1997); *Deutsche Bank Nat'l Tr. Co. v. Fed. Deposit Ins. Corp.*, 109 F. Supp. 3d 179, 197 (D.D.C. 2015).

## 2. The District Court's Interpretation Ignores the Governing Legal Framework.

The District Court's construction of an "overall agreement" likewise failed to consider the requirements of the Tunney Act as background to understanding the parties' actions and intent. Unlike other types of government agreements, antitrust consent judgments must abide by the procedural and substantive requirements of the Tunney Act. Enacted in 1974, the Tunney Act "strives to elicit greater public input" in the government's settlement of antitrust cases, *In re Int'l Bus. Machines Corp.*, 687 F.2d 591, 600 (2d Cir. 1982), and to "ensure[] the district court has before it the information it needs in order to make an informed determination whether the decree is in the public interest," *Massachusetts v. Microsoft Corp.*, 373 F.3d 1199, 1246 (D.C. Cir. 2004). In light of this legal backdrop, it is clear that the parties did not intend the November 2020 letter to carry the meaning ascribed to it by the District Court. *See Nat'l Audubon Soc'y*, 678 F.2d at 307 (contract should be construed as consistent with applicable legal constraints).

First, the Tunney Act requires that, along with any proposed consent judgment, "any other materials and documents which the

46

United States considered determinative in formulating such proposal, shall also be made available to the public at the district court." 15 U.S.C. § 16(b); *see also* § 16(d).  In this case, the District Court reasoned that the "commitments" memorialized in the November 2020 letter to NAR were "essential to the parties' reaching a settlement," JA __ (Op. 7-8).  If the November 2020 letter was "essential" to an overall agreement because it included a promise about future investigations, it may have been a determinative document, *see Massachusetts School of Law at Andover v. United States*, 118 F.3d 776, 785 (D.C. Cir. 1997), that the Division would have made available for public comment and for the District Court's review.

Second, under the District Court's construction, the November 2020 letter would have fallen within the Tunney Act's requirement for "an explanation of the proposal" in the "competitive impact statement," which must include "an explanation of any unusual circumstances giving rise to such proposal or any provision contained therein." 15 U.S.C. § 16(b)(3).  But the Competitive Impact Statement did not mention the November 2020 letter, because the parties did not intend it to shield other NAR rules from scrutiny.  Rather, the Competitive

47

Impact Statement explained without qualification that the reservation-
of-rights clause in the Proposed Final Judgment "reserves the rights of
the United States to investigate and bring actions to prevent or restrain
violations of the antitrust laws concerning *any* rule, policy, or practice
adopted or enforced by NAR." JA __ (CIS at 16) (emphasis added).
That explanation contravenes the District Court's interpretation of the
November 2020 letter. Had the letter included an additional term
barring future investigations, the Division would have addressed it in
the Competitive Impact Statement in compliance with the Tunney Act.

Third, if the November 2020 letter contained a commitment by the
Division to refrain from future investigations, the letter would have
fallen within the Tunney Act's expansive description of factors that a
court "shall consider" as part of its "public interest" determination for
the Proposed Final Judgment, *see* 15 U.S.C. § 16(e)(1)(A), and the
Division would have identified it as part of the District Court's public-
interest determination.

All told, the parties' treatment of the letter as separate from the
Tunney Act process shows that both parties understood the letter as
doing nothing more than what its plain text said—confirming the

48

closing of an investigation and relieving NAR from having to respond to two CIDs—and not as containing any commitment about future investigations.  If the parties had intended to preclude a subsequent investigation into the Participation Rule or the Clear Cooperation Policy, they would have included it as part of the Tunney Act procedures.  NAR never raised any concerns during the Tunney Act process with the Division or the District Court about the omission of the three-sentence letter that it now claims affords it sweeping immunity from investigation.

To avoid this obvious disconnect, at times NAR seemingly has portrayed the November 2020 letter as separate from the proposed consent judgment.  NAR agreed in the Stipulation that the Division had the express right to withdraw from the Proposed Final Judgment.  JA __ (Stipulation ¶2); *see also* JA__ (Pet. ¶35) (NAR agreed to "a provision that provided the Antitrust Division could withdraw from the proposed Consent Judgment" before entry by the District Court).  But, in NAR's telling, the November 2020 letter nevertheless remains in force, standing alone, even after the Division's withdrawal from the Proposed Final Judgment.

Yet NAR has hardly been consistent, elsewhere in its Petition describing the "closing letter . . . as part of *the overall settlement agreement*." JA__ (Pet. ¶55 (emphasis added)). Drawing upon this alternative theory, the District Court identified only one "overall agreement." Neither the court nor NAR offered any way to reconcile their "overall agreement" with the Tunney Act process.[10]

### C.     Interpreting the November 2020 Letter to Afford Implicit Immunity Produces Anomalous Results.

Contracts should not be interpreted to produce absurd results, but that consideration cuts against the decision below, not in favor of it. In construing the November 2020 letter to shield NAR from federal antitrust scrutiny, the District Court expressed concern that the

---

[10] Even if there was only a single agreement, the District Court cited no authority to support its holding that only part of that agreement, the November 2020 Letter, could remain in force despite the primary part of the agreement, the Proposed Final Judgment, having been withdrawn. *Cf. Restatement (Second) of Contracts* § 184 ("If less than all of an agreement is unenforceable [on grounds of public policy], a court may nevertheless enforce the rest of the agreement . . . if the performance as to which the agreement is unenforceable is *not* an essential part of the agreed exchange.") (emphasis added). The Proposed Final Judgment inarguably *was* essential to any overall agreement here. If there truly was a single agreement, it therefore would have been nullified when the United States exercised its right to withdraw from the Proposed Final Judgment.

November 2020 letter would otherwise be "worth nothing but the paper on which it was written." JA __ (Op. 9). "At bottom," the District Court concluded, "not setting aside the CID at issue would deprive NAR of the benefit for which it bargained." JA __ (Op. 11).

Courts avoid contract interpretations that would "produce an absurd result." *Am. First Inv. Corp. v. Goland*, 925 F.2d 1518, 1521 (D.C. Cir. 1991) (avoiding interpretation that would "produce an absurd result"); *United States v. Winstar Corp.*, 518 U.S. 839, 907 (1996) (plurality op.) (avoiding interpretation of contract that "would be absurd"). Rather than avert an absurd result, however, the District Court's opinion causes one, depriving the United States of Executive authority for no benefit.

Even though the November 2020 letter made no commitment to refrain from future investigations, NAR received several benefits, for which the District Court did not account:

- First, NAR was relieved from the responsibility of responding to the initial CIDs. Because those costs can be significant, even deferring the costs for a period of time

provides meaningful value to the party that is served with a CID.

- Second, NAR was spared the risk that its responsive documents might become public in the context of a to-be-filed complaint, which would weaken its position in pending litigation with private litigants.

- Third, nothing prohibited NAR from publicizing the letter. And NAR did precisely that, trying to use the letter to NAR's advantage by submitting it, the day after receiving it, in an antitrust suit NAR was litigating against a private plaintiff.[11]

- Lastly, NAR received written confirmation that the Antitrust Division "ha[d] closed" its investigation. Though the Division was not foreclosed from later reopening the NAR investigation, including if new Division leadership reached different conclusions about whether an investigation

---

[11] *See* JA __ (NAR's Response to Plaintiff's Notice of Supplemental Authority at 1, Ex. B, *PLS.com, LLC v. Nat'l Ass'n of Realtors*, 516 F. Supp. 3d 1047 (C.D. Cal. 2021) (Case No. 2:20-cv-04790), ECF 88).

into NAR was worth prioritizing, the closure still had
significant value because as a practical matter most closed
investigations are not reopened.

That the November 2020 letter's relief did not extend as far as
NAR initially sought does not make it worthless.  As the Supreme Court
explained in *United States v. Armour & Co.*, consent decrees represent a
negotiated compromise, "and the resultant decree embodies as much of
those opposing purposes as the respective parties have the bargaining
power and skill to achieve."  402 U.S. 673, 681-82 (1971).  NAR was able
to bargain for a letter with concrete benefits; there is no cause to imply
extra terms to give it much more.

To the contrary, it is the District Court's interpretation that gives
NAR the benefit of a term that the Division expressly rejected.  And it
leads to an anomalous result:  NAR has been relieved of its obligations
under the Proposed Final Judgment, but the Division is precluded—for
an indeterminate period into the future—from investigating the
Participation Rule and Clear Cooperation Policy.  Nothing suggests that
the parties intended such an absurd result.

The District Court also suggested that the January 2021 change in presidential administrations cannot justify reopening the Division's investigation.  JA __ (Op. 10) ("the only intervening change was that in presidential administrations").  "[A]n agency's decision not to prosecute or enforce," however, "is a decision generally committed to an agency's absolute discretion."  *Heckler v. Chaney*, 470 U.S. 821, 831 (1985).  "[W]hen reviewing the exercise of that power, the judicial authority is, therefore, at its most limited."  *Cmty. for Creative Non-Violence,* 786 F.2d at 1201.  The court's implication that there is something improper about a prosecutor reopening an investigation that had reached no conclusion is wrong.  Whether as a result of changes in leadership, priorities, or other factors, in our constitutional system those decisions are well within the discretion of the Executive Branch.  *See also Alliance to End Repression,* 742 F.2d at 1014 (refusing to interpret consent decree as the Department of Justice having "tied its hands to such an extent."); *Arevalo v. Barr*, 950 F.3d 15, 17 (1st Cir. 2020) (government exercised its "prosecutorial discretion" to close an immigration proceeding administratively, but after presidential election

54

"the government rethought its earlier decision" and moved to reinstate the case).

The Division insisted on maintaining the right to reopen its investigation precisely to preserve that prosecutorial discretion.  *Cf. Bond v. United States*, 572 U.S. 844, 865 (2014) ("Prosecutorial discretion involves" consideration of "public policy").  In any event, NAR knew (or should have expected) that a change of administrations was coming when it received the letter on November 19, 2020, and that awareness should have informed its assessment of the practical benefit that termination of the investigation would entail.

## II.   NAR's Relevance and Burdensomeness Objections to CID No. 30729 Should Be Overruled.

NAR's Petition asserted objections to the CID based on relevance and burden.  Given the sixteen months expended already by the District Court and these objections' complete lack of merit, they should be overruled now to prevent further delay of the Division's investigation.  *See Lesesne v. Doe*, 712 F.3d 584, 588 (D.C. Cir. 2013) (addressing a "straightforward legal question that does not require further factual development").

## A.    NAR Does Not Carry Its Burden on Relevance.

"It is well established that a district court must enforce a federal agency's investigative subpoena if the information sought is reasonably relevant—or, put differently, not plainly incompetent or irrelevant to any lawful purpose of the [agency.]" *Invention Submission*, 965 F.2d at 1089 (internal citations and quotation marks omitted); *see Endicott Johnson Corp.*, 317 U.S. at 509.  An agency's "own appraisal of relevancy must be accepted so long as it is not obviously wrong." *Invention Submission*, 965 F.2d at 1089 (internal quotation marks, citations omitted); *accord Resol. Tr. Corp. v. Frates*, 61 F.3d 962, 964 (D.C. Cir. 1995) (in evaluating the propriety of a subpoena, courts "defer to the agency's appraisal of relevancy") (quoting *RTC v. Walde*, 18 F.3d 943, 946-47 (D.C. Cir. 1994)).  The objecting party bears the burden to show that the information sought is irrelevant.  *See Invention Submission*, 965 F.2d at 1090.

NAR first objected to overbreadth, claiming that some of the CID's specifications seek "all documents."  JA __ (Pet. ¶¶179–181).  But NAR's objection ignored that each of these specifications stated the specific subject matter for its "all documents" request, and NAR did not identify

which subjects of investigation might be irrelevant, or explain why, and therefore did not carry its burden.[12]  None of these subjects is irrelevant, let alone anywhere near so irrelevant as to be "obviously wrong."  NAR's Reply offered only the conclusory assertion that the requests are "facially overbroad."  ECF 21, at 17.

Second, NAR asserted, without support, that Specifications 14 and 15 seek "privileged information."  JA __ (Pet. ¶185).  That is simply not true.  The CID's instructions make clear that NAR must "[p]roduce . . . *non-privileged* portions of any responsive document . . . for which a privilege claim is asserted," and provide a privilege log for material withheld as privileged.  JA __ (CID at 11) (emphasis added).

Third, NAR objected to Specification 4, which seeks documents related to a "business review" letter that NAR requested from the Division in 2018.  JA __ (Pet. ¶¶182-184).  The "business review" procedure allows private parties to explain proposed business conduct

---

[12] NAR cited an unpublished district court decision, *EEOC v. George Washington University*, No. 17-cv-1978, 2020 WL 3489478 (D.D.C. June 26, 2020), but that case concerned a request for the entire contents of three persons' email boxes, regardless of the subject matter. *See id.* at *2, *7.  By contrast, here the CID's specifications relate only to specified subjects.

and ask the Division to "state its enforcement intentions" about that conduct. 28 C.F.R. § 50.6. NAR's "business review" request proposed a practice by which NAR would have encouraged brokers to list all of their properties with a NAR-affiliated MLS. The considerations animating that proposed policy—such as NAR's reasons to limit off-MLS listings or potential effects of limiting off-MLS listings—are relevant to the Division's investigation of the Clear Cooperation Policy, which similarly encourages brokers to use NAR-affiliated MLSs. This basis for relevance also is not "obviously wrong."[13]

## B.    NAR Has Not Established an Undue Burden.

Regarding burdensomeness, this Court "emphasize[s] that the question is whether the demand is *unduly* burdensome. . . . Some

_____

[13] NAR asserted that Specification 4 "is apparently intended to harass NAR," JA __ (Pet. ¶182), but provided no facts to show that the Division had that intention. *Chattanooga Pharm. Ass'n v. United States*, 358 F.2d 864, 866-67 (6th Cir. 1966), cited by NAR, bears no relation to this case because the government there did not respond to the petitioner's allegation of harassment-by-CID, so the court took the allegation as admitted. *Annapolis Citizens Class Overcharged for Water-Sewer, by Loudon Operations, LLC v. Stantec, Inc.*, No. 20-2603, 2021 WL 75766 (D.D.C. Jan. 8, 2021), is inapposite because it did not involve a CID or agency subpoena and merely granted plaintiff's motion for voluntary dismissal while sanctioning plaintiff's counsel for acts that were part of his long history of improper conduct.

burden on subpoenaed parties is to be expected and is necessary in furtherance of the agency's legitimate inquiry and the public interest." *Texaco, Inc.*, 555 F.2d at 882 (emphasis in original). The objecting party's burden of proof "is not easily met where, as here, the agency inquiry is pursuant to a lawful purpose and the requested documents are relevant to that purpose." *Id.*

NAR asserted burdensomeness against Specifications 14 and 15, which ask for information about real estate brokers withdrawing from MLSs in the past 15 years. JA __ (Pet. ¶¶185-87). But NAR does not show, with any facts, why the specifications are *unduly* burdensome. NAR offered no explanation of what would be required to retrieve the information, nor did NAR explain, for example, whether it keeps records of members who withdraw. NAR's burden of proof "is not easily met" because the information is relevant to the Division's investigation of the Participation Rule. In particular, it is relevant to the investigation to explore, for example, what effects changing or eliminating rules or policies might have on brokers and MLSs, such as brokers' willingness to stay members of, or to leave, MLSs, and on any related past or present trends in MLS membership. The Division is

entitled to address these issues by investigating the reasons why

brokers withdraw from MLSs.

## CONCLUSION

This Court should reverse the District Court's judgment and

overrule NAR's objections to CID No. 30729.

Respectfully submitted.

/s/ Steven J. Mintz
STEVEN J. MINTZ

JONATHAN S. KANTER
  *Assistant Attorney General*
DOHA G. MEKKI
  *Principal Deputy Assistant*
  *Attorney General*
MAGGIE GOODLANDER
  *Deputy Assistant Attorney*
  *General*
DAVID B. LAWRENCE
  *Policy Director*
MARKUS BRAZILL
  *Counsel to the Assistant*
  *Attorney General*
DANIEL E. HAAR
NICKOLAI G. LEVIN
STEVEN J. MINTZ
  *Attorneys*
  U.S Department of Justice
  Antitrust Division
  950 Pennsylvania Ave., NW
  Room 3224
  Washington, DC 20530-0001
  Tel. 202-353-0256
  Email: steven.mintz@usdoj.gov

## CERTIFICATE OF COMPLIANCE

1.    This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) because this document contains 11,683 words, excluding the portions exempted by Fed. R. App. P. 32(f).

2.    This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally-spaced typeface using Microsoft Word 2010 in New Century Schoolbook font, size 14.

/s/ Steven J. Mintz
Steven J. Mintz

Attorney for Respondents-
Appellants United States of
America, et al.

61

## CERTIFICATE OF SERVICE

I hereby certify that on June 2, 2023, I caused the foregoing Proof

Brief for Appellants the United States of America, et al. to be filed through

this Court's CM/ECF system.  All participants in the case are registered

CM/ECF users and will be served by the CM/ECF system.

/s/ Steven J. Mintz
Steven J. Mintz

Attorney for Respondents-
Appellants United States of
America, et al.

# ADDENDUM

## § 15f. Actions by Attorney General

### (a) Notification to State attorney general

Whenever the Attorney General of the United States has brought an action under the antitrust laws, and he has reason to believe that any State attorney general would be entitled to bring an action under this Act based substantially on the same alleged violation of the antitrust laws, he shall promptly give written notification thereof to such State attorney general.

### (b) Availability of files and other materials

To assist a State attorney general in evaluating the notice or in bringing any action under this Act, the Attorney General of the United States shall, upon request by such State attorney general, make available to him, to the extent permitted by law, any investigative files or other materials which are or may be relevant or material to the actual or potential cause of action under this Act.

(Oct. 15, 1914, ch. 323, §4F, as added Pub. L. 94–435, title III, §301, Sept. 30, 1976, 90 Stat. 1395.)

#### REFERENCES IN TEXT

The antitrust laws, referred to in subsec. (a), are defined in section 12 of this title.

This Act, referred to in text, is act Oct. 15, 1914, ch. 323, 38 Stat. 730, as amended, known as the Clayton Act, which is classified generally to sections 12, 13, 14 to 19, 21, and 22 to 27 of this title, and sections 52 and 53 of Title 29, Labor. For further details and complete classification of this Act to the Code, see References in Text note set out under section 12 of this title and Tables.

#### EFFECTIVE DATE

Injuries sustained prior to Sept. 30, 1976, not covered by this section, see section 304 of Pub. L. 94–435, set out as a note under section 15c of this title.

## § 15g. Definitions

For the purposes of sections 15c, 15d, 15e, and 15f of this title:

(1) The term ''State attorney general'' means the chief legal officer of a State, or any other person authorized by State law to bring actions under section 15c of this title, and includes the Corporation Counsel of the District of Columbia, except that such term does not include any person employed or retained on—

(A) a contingency fee based on a percentage of the monetary relief awarded under this section; or

(B) any other contingency fee basis, unless the amount of the award of a reasonable attorney's fee to a prevailing plaintiff is determined by the court under section 15c(d)(1) of this title.

(2) The term ''State'' means a State, the District of Columbia, the Commonwealth of Puerto Rico, and any other territory or possession of the United States.

(3) The term ''natural persons'' does not include proprietorships or partnerships.

(Oct. 15, 1914, ch. 323, §4G, as added Pub. L. 94–435, title III, §301, Sept. 30, 1976, 90 Stat. 1396.)

#### EFFECTIVE DATE

Injuries sustained prior to Sept. 30, 1976, not covered by this section, see section 304 of Pub. L. 94–435, set out as a note under section 15c of this title.

## § 15h. Applicability of parens patriae actions

Sections 15c, 15d, 15e, 15f, and 15g of this title shall apply in any State, unless such State provides by law for its nonapplicability in such State.

(Oct. 15, 1914, ch. 323, §4H, as added Pub. L. 94–435, title III, §301, Sept. 30, 1976, 90 Stat. 1396.)

#### EFFECTIVE DATE

Injuries sustained prior to Sept. 30, 1976, not covered by this section, see section 304 of Pub. L. 94–435, set out as a note under section 15c of this title.

## § 16. Judgments

### (a) Prima facie evidence; collateral estoppel

A final judgment or decree heretofore or hereafter rendered in any civil or criminal proceeding brought by or on behalf of the United States under the antitrust laws to the effect that a defendant has violated said laws shall be prima facie evidence against such defendant in any action or proceeding brought by any other party against such defendant under said laws as to all matters respecting which said judgment or decree would be an estoppel as between the parties thereto: *Provided*, That this section shall not apply to consent judgments or decrees entered before any testimony has been taken. Nothing contained in this section shall be construed to impose any limitation on the application of collateral estoppel, except that, in any action or proceeding brought under the antitrust laws, collateral estoppel effect shall not be given to any finding made by the Federal Trade Commission under the antitrust laws or under section 45 of this title which could give rise to a claim for relief under the antitrust laws.

### (b) Consent judgments and competitive impact statements; publication in Federal Register; availability of copies to the public

Any proposal for a consent judgment submitted by the United States for entry in any civil proceeding brought by or on behalf of the United States under the antitrust laws shall be filed with the district court before which such proceeding is pending and published by the United States in the Federal Register at least 60 days prior to the effective date of such judgment. Any written comments relating to such proposal and any responses by the United States thereto, shall also be filed with such district court and published by the United States in the Federal Register within such sixty-day period. Copies of such proposal and any other materials and documents which the United States considered determinative in formulating such proposal, shall also be made available to the public at the district court and in such other districts as the court may subsequently direct. Simultaneously with the filing of such proposal, unless otherwise instructed by the court, the United States shall file with the district court, publish in the Federal Register, and thereafter furnish to any person upon request, a competitive impact statement which shall recite—

(1) the nature and purpose of the proceeding;

(2) a description of the practices or events giving rise to the alleged violation of the antitrust laws;

(3) an explanation of the proposal for a consent judgment, including an explanation of any unusual circumstances giving rise to such proposal or any provision contained therein, relief to be obtained thereby, and the anticipated effects on competition of such relief;

(4) the remedies available to potential private plaintiffs damaged by the alleged violation in the event that such proposal for the consent judgment is entered in such proceeding;

(5) a description of the procedures available for modification of such proposal; and

(6) a description and evaluation of alternatives to such proposal actually considered by the United States.

**(c) Publication of summaries in newspapers**

The United States shall also cause to be published, commencing at least 60 days prior to the effective date of the judgment described in subsection (b) of this section, for 7 days over a period of 2 weeks in newspapers of general circulation of the district in which the case has been filed, in the District of Columbia, and in such other districts as the court may direct—

(i) a summary of the terms of the proposal for consent judgment,

(ii) a summary of the competitive impact statement filed under subsection (b) of this section,

(iii) and a list of the materials and documents under subsection (b) of this section which the United States shall make available for purposes of meaningful public comment, and the place where such materials and documents are available for public inspection.

**(d) Consideration of public comments by Attorney General and publication of response**

During the 60-day period as specified in subsection (b) of this section, and such additional time as the United States may request and the court may grant, the United States shall receive and consider any written comments relating to the proposal for the consent judgment submitted under subsection (b) of this section. The Attorney General or his designee shall establish procedures to carry out the provisions of this subsection, but such 60-day time period shall not be shortened except by order of the district court upon a showing that (1) extraordinary circumstances require such shortening and (2) such shortening is not adverse to the public interest. At the close of the period during which such comments may be received, the United States shall file with the district court and cause to be published in the Federal Register a response to such comments. Upon application by the United States, the district court may, for good cause (based on a finding that the expense of publication in the Federal Register exceeds the public interest benefits to be gained from such publication), authorize an alternative method of public dissemination of the public comments received and the response to those comments.

**(e) Public interest determination**

(1) Before entering any consent judgment proposed by the United States under this section, the court shall determine that the entry of such judgment is in the public interest. For the purpose of such determination, the court shall consider—

(A) the competitive impact of such judgment, including termination of alleged violations, provisions for enforcement and modification, duration of relief sought, anticipated effects of alternative remedies actually considered, whether its terms are ambiguous, and any other competitive considerations bearing upon the adequacy of such judgment that the court deems necessary to a determination of whether the consent judgment is in the public interest; and

(B) the impact of entry of such judgment upon competition in the relevant market or markets, upon the public generally and individuals alleging specific injury from the violations set forth in the complaint including consideration of the public benefit, if any, to be derived from a determination of the issues at trial.

(2) Nothing in this section shall be construed to require the court to conduct an evidentiary hearing or to require the court to permit anyone to intervene.

**(f) Procedure for public interest determination**

In making its determination under subsection (e) of this section, the court may—

(1) take testimony of Government officials or experts or such other expert witnesses, upon motion of any party or participant or upon its own motion, as the court may deem appropriate;

(2) appoint a special master and such outside consultants or expert witnesses as the court may deem appropriate; and request and obtain the views, evaluations, or advice of any individual, group or agency of government with respect to any aspects of the proposed judgment or the effect of such judgment, in such manner as the court deems appropriate;

(3) authorize full or limited participation in proceedings before the court by interested persons or agencies, including appearance amicus curiae, intervention as a party pursuant to the Federal Rules of Civil Procedure, examination of witnesses or documentary materials, or participation in any other manner and extent which serves the public interest as the court may deem appropriate;

(4) review any comments including any objections filed with the United States under subsection (d) of this section concerning the proposed judgment and the responses of the United States to such comments and objections; and

(5) take such other action in the public interest as the court may deem appropriate.

**(g) Filing of written or oral communications with the district court**

Not later than 10 days following the date of the filing of any proposal for a consent judgment under subsection (b) of this section, each defendant shall file with the district court a description of any and all written or oral communications by or on behalf of such defendant, including any and all written or oral communications on behalf of such defendant by any officer, director, employee, or agent of such defendant,

or other person, with any officer or employee of the United States concerning or relevant to such proposal, except that any such communications made by counsel of record alone with the Attorney General or the employees of the Department of Justice alone shall be excluded from the requirements of this subsection. Prior to the entry of any consent judgment pursuant to the antitrust laws, each defendant shall certify to the district court that the requirements of this subsection have been complied with and that such filing is a true and complete description of such communications known to the defendant or which the defendant reasonably should have known.

**(h) Inadmissibility as evidence of proceedings before the district court and the competitive impact statement**

Proceedings before the district court under subsections (e) and (f) of this section, and the competitive impact statement filed under subsection (b) of this section, shall not be admissible against any defendant in any action or proceeding brought by any other party against such defendant under the antitrust laws or by the United States under section 15a of this title nor constitute a basis for the introduction of the consent judgment as prima facie evidence against such defendant in any such action or proceeding.

**(i) Suspension of limitations**

Whenever any civil or criminal proceeding is instituted by the United States to prevent, restrain, or punish violations of any of the antitrust laws, but not including an action under section 15a of this title, the running of the statute of limitations in respect to every private or State right of action arising under said laws and based in whole or in part on any matter complained of in said proceeding shall be suspended during the pendency thereof and for one year thereafter: *Provided, however,* That whenever the running of the statute of limitations in respect of a cause of action arising under section 15 or 15c of this title is suspended hereunder, any action to enforce such cause of action shall be forever barred unless commenced either within the period of suspension or within four years after the cause of action accrued.

(Oct. 15, 1914, ch. 323, § 5, 38 Stat. 731; July 7, 1955, ch. 283, § 2, 69 Stat. 283; Pub. L. 93–528, § 2, Dec. 21, 1974, 88 Stat. 1706; Pub. L. 94–435, title III, § 302(2), Sept. 30, 1976, 90 Stat. 1396; Pub. L. 96–349, § 5(a), Sept. 12, 1980, 94 Stat. 1157; Pub. L. 108–237, title II, § 221(b), June 22, 2004, 118 Stat. 668.)

REFERENCES IN TEXT

The antitrust laws, referred to in subsecs. (a), (b), and (g) to (i), are defined in section 12 of this title.

AMENDMENTS

2004—Subsec. (d). Pub. L. 108–237, § 221(b)(1), inserted at end "Upon application by the United States, the district court may, for good cause (based on a finding that the expense of publication in the Federal Register exceeds the public interest benefits to be gained from such publication), authorize an alternative method of public dissemination of the public comments received and the response to those comments."

Subsec. (e). Pub. L. 108–237, § 221(b)(2), designated introductory provisions as par. (1), substituted "court shall" for "court may", added subpars. (A) and (B) and par. (2), and struck out former pars. (1) and (2) which read as follows:

"(1) the competitive impact of such judgment, including termination of alleged violations, provisions for enforcement and modification, duration or relief sought, anticipated effects of alternative remedies actually considered, and any other considerations bearing upon the adequacy of such judgment;

"(2) the impact of entry of such judgment upon the public generally and individuals alleging specific injury from the violations set forth in the complaint including consideration of the public benefit, if any, to be derived from a determination of the issues at trial."

Subsec. (g). Pub. L. 108–237, § 221(b)(3), inserted "by any officer, director, employee, or agent of such defendant" before ", or other person" in first sentence.

1980—Subsec. (a). Pub. L. 96–349 made collateral estoppel inapplicable in any action or proceeding brought under the antitrust laws to any finding made by the Commission under the antitrust laws or under section 45 of this title which could give rise to a claim for relief under the antitrust laws; struck out "or by the United States under section 15a of this title," after "under said laws"; and deleted from proviso "or to judgments or decrees entered in actions under section 15a of this title" after "testimony has been taken".

1976—Pub. L. 94–435 substituted "private or State right of action" for "private right of action" and "section 15 or 15c" for "section 15".

1974—Subsecs. (b) to (i). Pub. L. 93–528 added subsecs. (b) to (h) and redesignated former subsec. (b) as (i).

1955—Act July 7, 1955, substituted subsec. (a) for first paragraph, to provide that final judgments in actions under the antitrust laws by the United States shall be prima facie evidence in damage suits by the United States as well as in private damage suits, and substituted subsec. (b) for second paragraph, to provide for a one-year suspension of limitations.

EFFECTIVE DATE OF 1980 AMENDMENT

Pub. L. 96–349, § 5(b), Sept. 12, 1980, 94 Stat. 1157, provided that: "The amendments made by this section [amending this section] shall apply only with respect to actions commenced after the date of the enactment of this Act [Sept. 12, 1980]."

SUSPENSION OF LIMITATION

Act Oct. 10, 1942, ch. 589, 56 Stat. 781, as amended June 30, 1945, ch. 213, 59 Stat. 306, provided for the suspension of any existing statutes of limitations relating to violations of antitrust laws now indictable or subject to civil proceedings under any existing statutes, until June 30, 1946.

FINDINGS AND PURPOSES OF 2004 AMENDMENT

Pub. L. 108–237, title II, § 221(a), June 22, 2004, 118 Stat. 668, provided that:

"(1) FINDINGS.—Congress finds that—

"(A) the purpose of the Tunney Act [probably means section 2 of Pub. L. 93–528 which amended this section] was to ensure that the entry of antitrust consent judgments is in the public interest; and

"(B) it would misconstrue the meaning and Congressional intent in enacting the Tunney Act to limit the discretion of district courts to review antitrust consent judgments solely to determining whether entry of those consent judgments would make a 'mockery of the judicial function'.

"(2) PURPOSES.—The purpose of this section [amending this section] is to effectuate the original Congressional intent in enacting the Tunney Act and to ensure that United States settlements of civil antitrust suits are in the public interest."

**§ 17. Antitrust laws not applicable to labor organizations**

The labor of a human being is not a commodity or article of commerce. Nothing contained in

Sec.
1312.    Civil investigative demands.
1313.    Custodian of documents, answers and transcripts.
1314.    Judicial proceedings.

## § 1311. Definitions

For the purposes of this chapter—

(a) The term "antitrust law" includes:

(1) Each provision of law defined as one of the antitrust laws by section 12 of this title; and

(2) Any statute enacted on and after September 19, 1962, by the Congress which prohibits, or makes available to the United States in any court of the United States any civil remedy with respect to any restraint upon or monopolization of interstate or foreign trade or commerce;

(b) The term "antitrust order" means any final order, decree, or judgment of any court of the United States, duly entered in any case or proceeding arising under any antitrust law;

(c) The term "antitrust investigation" means any inquiry conducted by any antitrust investigator for the purpose of ascertaining whether any person is or has been engaged in any antitrust violation or in any activities in preparation for a merger, acquisition, joint venture, or similar transaction, which, if consummated, may result in an antitrust violation;

(d) The term "antitrust violation" means any act or omission in violation of any antitrust law, any antitrust order or, with respect to the International Antitrust Enforcement Assistance Act of 1994 [15 U.S.C. 6201 et seq.], any of the foreign antitrust laws;

(e) The term "antitrust investigator" means any attorney or investigator employed by the Department of Justice who is charged with the duty of enforcing or carrying into effect any antitrust law;

(f) The term "person" means any natural person, partnership, corporation, association, or other legal entity, including any person acting under color or authority of State law;

(g) The term "documentary material" includes the original or any copy of any book, record, report, memorandum, paper, communication, tabulation, chart, or other document, and any product of discovery;

(h) The term "custodian" means the custodian or any deputy custodian designated under section 1313(a) of this title;

(i) The term "product of discovery" includes without limitation the original or duplicate of any deposition, interrogatory, document, thing, result of the inspection of land or other property, examination, or admission obtained by any method of discovery in any judicial litigation or in any administrative litigation of an adversarial nature; any digest, analysis, selection, compilation, or any derivation thereof; and any index or manner of access thereto; and

(j) The term "agent" includes any person retained by the Department of Justice in connection with the enforcement of the antitrust laws.

(k) The term "foreign antitrust laws" has the meaning given such term in section 12 of the International Antitrust Enforcement Assistance Act of 1994 [15 U.S.C. 6211].

(Pub. L. 87–664, § 2, Sept. 19, 1962, 76 Stat. 548; Pub. L. 94–435, title I, § 101, Sept. 30, 1976, 90 Stat. 1383; Pub. L. 96–349, §§ 2(a), 7(a)(1), Sept. 12, 1980, 94 Stat. 1154, 1158; Pub. L. 103–438, § 3(e)(1)(A), Nov. 2, 1994, 108 Stat. 4598.)

### References in Text

This chapter, referred to in opening phrase, was in the original "this Act", meaning Pub. L. 87–664, which is classified generally to this chapter. For complete classification of this Act to the Code, see Short Title note below and Tables.

The International Antitrust Enforcement Assistance Act of 1994, referred to in subsec. (d), is Pub. L. 103–438, Nov. 2, 1994, 108 Stat. 4597, which is classified principally to chapter 88 (§ 6201 et seq.) of this title. For complete classification of this Act to the Code, see Short Title note set out under section 6201 of this title and Tables.

### Amendments

1994—Subsec. (d). Pub. L. 103–438, § 3(e)(1)(A)(i), substituted ", any" for "or any" and inserted before semicolon at end "or, with respect to the International Antitrust Enforcement Assistance Act of 1994, any of the foreign antitrust laws".

Subsec. (k). Pub. L. 103–438, § 3(e)(1)(A)(ii), added subsec. (k).

1980—Subsec. (g). Pub. L. 96–349, § 2(a)(1), extended definition of "documentary material" to include any product of discovery.

Subsec. (h). Pub. L. 96–349, § 2(a)(2), substituted a semicolon for period at end.

Subsec. (i). Pub. L. 96–349, § 2(a)(3), added subsec. (i).

Subsec. (j). Pub. L. 96–349, § 7(a)(1), added subsec. (j).

1976—Subsec. (a). Pub. L. 94–435, § 101(1), in par. (1) inserted "and" after semicolon preceding par. (2), struck out par. (2) which included the Federal Trade Commission Act in definition of antitrust law for purposes of this chapter, redesignated par. (3) as (2), struck out "(A)" before "any restraint", and struck out subpar. (B) which related to any unfair trade practice in or affecting interstate or foreign trade or commerce.

Subsec. (c). Pub. L. 94–435, § 101(2), inserted "or in any activities in preparation for a merger, acquisition, joint venture, or similar transaction, which if consummated, may result in an antitrust violation;" after "engaged in any antitrust violation".

Subsec. (f). Pub. L. 94–435, § 101(3), included "any natural person" and "any person acting under color or authority of State law" in definition of "person".

Subsec. (h). Pub. L. 94–435, § 101(4), substituted "the custodian" for "the antitrust document custodian".

### Effective Date of 1976 Amendment

Section 106 of Pub. L. 94–435 provided that: "The amendments to the Antitrust Civil Process Act [see section 1 of Pub. L. 87–664 set out as a Short Title note under this section] and to section 1505 of title 18, United States Code, made by this title [title I of Pub. L. 94–435] shall take effect on the date of enactment of this Act [Sept. 30, 1976], except section 3(i)(8) of the Antitrust Civil Process Act [section 1312(i)(8) of this title] (as amended by this Act) shall take effect on the later of (1) the date of enactment of this Act [Sept. 30, 1976], or (2) October 1, 1976. Any such amendment which provides for the production of documentary material, answers to interrogatories, or oral testimony shall apply to any act or practice without regard to the date on which it occurred."

### Short Title of 1980 Amendment

Section 1 of Pub. L. 96–349 provided: "That this Act [amending sections 15, 15a, 15c, 16, 18, and 1311 to 1314 of this title, section 1905 of Title 18, Crimes and Crimi-

nal Procedure, and section 1927 of Title 28, Judiciary and Judicial Procedure, and enacting provisions set out as notes under sections 15, 16, and 18 of this title] may be cited as the 'Antitrust Procedural Improvements Act of 1980'.''

### SHORT TITLE

Section 1 of Pub. L. 87–664 provided: ''That this Act [enacting this chapter and amending section 1505 of Title 18, Crimes and Criminal Procedure] may be cited as the 'Antitrust Civil Process Act'.''

### SAVINGS PROVISION

Section 7 of Pub. L. 87–664 provided that: ''Nothing contained in this Act [see Short Title note above] shall impair the authority of the Attorney General, the Assistant Attorney General in charge of the Antitrust Division of the Department of Justice, or any antitrust investigator to (a) lay before any grand jury impaneled before any district court of the United States any evidence concerning any alleged antitrust violation, (b) invoke the power of any such court to compel the production of any evidence before any such grand jury, or (c) institute any proceeding for the enforcement of any order or process issued in execution of such power, or to punish disobedience of any such order of process by any person, including a natural person.''

## § 1312. Civil investigative demands

### (a) Issuance; service; production of material; testimony

Whenever the Attorney General, or the Assistant Attorney General in charge of the Antitrust Division of the Department of Justice, has reason to believe that any person may be in possession, custody, or control of any documentary material, or may have any information, relevant to a civil antitrust investigation, or with respect to the International Antitrust Enforcement Assistance Act of 1994 [15 U.S.C. 6201 et seq.], an investigation authorized by section 3 of such Act [15 U.S.C. 6202], he may, prior to the institution of a civil or criminal proceeding by the United States thereon, issue in writing, and cause to be served upon such person, a civil investigative demand requiring such person to produce such documentary material for inspection or copying or reproduction, to answer in writing written interrogatories, to give oral testimony concerning documentary material or information, or to furnish any combination of such material, answers, or testimony. Whenever a civil investigative demand is an express demand for any product of discovery, the Attorney General or the Assistant Attorney General in charge of the Antitrust Division shall cause to be served, in any manner authorized by this section, a copy of such demand upon the person from whom the discovery was obtained and notify the person to whom such demand is issued of the date on which such copy was served.

### (b) Contents; return date for demand for product of discovery

Each such demand shall—
(1) state the nature of—
(A) the conduct constituting the alleged antitrust violation, or
(B) the activities in preparation for a merger, acquisition, joint venture, or similar transaction, which, if consummated, may result in an antitrust violation,

which are under investigation and the provision of law applicable thereto;

(2) if it is a demand for production of documentary material—
(A) describe the class or classes of documentary material to be produced thereunder with such definiteness and certainty as to permit such material to be fairly identified;
(B) prescribe a return date or dates which will provide a reasonable period of time within which the material so demanded may be assembled and made available for inspection and copying or reproduction; and
(C) identify the custodian to whom such material shall be made available; or

(3) if it is a demand for answers to written interrogatories—
(A) propound with definiteness and certainty the written interrogatories to be answered;
(B) prescribe a date or dates at which time answers to written interrogatories shall be submitted; and
(C) identify the custodian to whom such answers shall be submitted; or

(4) if it is a demand for the giving of oral testimony—
(A) prescribe a date, time, and place at which oral testimony shall be commenced; and
(B) identify an antitrust investigator who shall conduct the examination and the custodian to whom the transcript of such examination shall be submitted.

Any such demand which is an express demand for any product of discovery shall not be returned or returnable until twenty days after a copy of such demand has been served upon the person from whom the discovery was obtained.

### (c) Protected material or information; demand for product of discovery superseding disclosure restrictions except trial preparation materials

(1) No such demand shall require the production of any documentary material, the submission of any answers to written interrogatories, or the giving of any oral testimony, if such material, answers, or testimony would be protected from disclosure under—
(A) the standards applicable to subpenas or subpenas duces tecum issued by a court of the United States in aid of a grand jury investigation, or
(B) the standards applicable to discovery requests under the Federal Rules of Civil Procedure, to the extent that the application of such standards to any such demand is appropriate and consistent with the provisions and purposes of this chapter.

(2) Any such demand which is an express demand for any product of discovery supersedes any inconsistent order, rule, or provision of law (other than this chapter) preventing or restraining disclosure of such product of discovery to any person. Disclosure of any product of discovery pursuant to any such express demand does not constitute a waiver of any right or privilege, including without limitation any right or privilege which may be invoked to resist discovery of trial preparation materials, to which the person making such disclosure may be entitled.

**(d) Service; jurisdiction**

(1) Any such demand may be served by any antitrust investigator, or by any United States marshal or deputy marshal, at any place within the territorial jurisdiction of any court of the United States.

(2) any such demand or any petition filed under section 1314 of this title may be served upon any person who is not to be found within the territorial jurisdiction of any court of the United States, in such manner as the Federal Rules of Civil Procedure prescribe for service in a foreign country. To the extent that the courts of the United States can assert jurisdiction over such person consistent with due process, the United States District Court for the District of Columbia shall have the same jurisdiction to take any action respecting compliance with this chapter by such person that such court would have if such person were personally within the jurisdiction of such court.

**(e) Service upon legal entities and natural persons**

(1) Service of any such demand or of any petition filed under section 1314 of this title may be made upon a partnership, corporation, association, or other legal entity by—

(A) delivering a duly executed copy thereof to any partner, executive officer, managing agent, or general agent thereof, or to any agent thereof authorized by appointment or by law to receive service of process on behalf of such partnership, corporation, association, or entity;

(B) delivering a duly executed copy thereof to the principal office or place of business of the partnership, corporation, association, or entity to be served; or

(C) depositing such copy in the United States mails, by registered or certified mail, return receipt requested, duly addressed to such partnership, corporation, association, or entity at its principal office or place of business.

(2) Service of any such demand or of any petition filed under section 1314 of this title may be made upon any natural person by—

(A) delivering a duly executed copy thereof to the person to be served; or

(B) depositing such copy in the United States mails by registered or certified mail, return receipt requested, duly addressed to such person at his residence or principal office or place of business.

**(f) Proof of service**

A verified return by the individual serving any such demand or petition setting forth the manner of such service shall be proof of such service. In the case of service by registered or certified mail, such return shall be accompanied by the return post office receipt of delivery of such demand.

**(g) Sworn certificates**

The production of documentary material in response to a demand served pursuant to this section shall be made under a sworn certificate, in such form as the demand designates, by the person, if a natural person, to whom the demand is directed or, if not a natural person, by a person or persons having knowledge of the facts and circumstances relating to such production, to the effect that all of the documentary material required by the demand and in the possession, custody, or control of the person to whom the demand is directed has been produced and made available to the custodian.

**(h) Interrogatories**

Each interrogatory in a demand served pursuant to this section shall be answered separately and fully in writing under oath, unless it is objected to, in which event the reasons for the objection shall be stated in lieu of an answer, and it shall be submitted under a sworn certificate, in such form as the demand designates, by the person, if a natural person, to whom the demand is directed or, if not a natural person, by a person or persons responsible for answering each interrogatory, to the effect that all information required by the demand and in the possession, custody, control, or knowledge of the person to whom the demand is directed has been submitted.

**(i) Oral examinations**

(1) The examination of any person pursuant to a demand for oral testimony served under this section shall be taken before an officer authorized to administer oaths and affirmations by the laws of the United States or of the place where the examination is held. The officer before whom the testimony is to be taken shall put the witness on oath or affirmation and shall personally, or by someone acting under his direction and in his presence, record the testimony of the witness. The testimony shall be taken stenographically and transcribed. When the testimony is fully transcribed, the officer before whom the testimony is taken shall promptly transmit a copy of the transcript of the testimony to the custodian.

(2) The antitrust investigator or investigators conducting the examination shall exclude from the place where the examination is held all other persons except the person being examined, his counsel, the officer before whom the testimony is to be taken, and any stenographer taking such testimony. The provisions of section 30[1] of this title shall not apply to such examinations.

(3) The oral testimony of any person taken pursuant to a demand served under this section shall be taken in the judicial district of the United States within which such person resides, is found, or transacts business, or in such other place as may be agreed upon by the antitrust investigator conducting the examination and such person.

(4) When the testimony is fully transcribed, the antitrust investigator or the officer shall afford the witness (who may be accompanied by counsel) a reasonable opportunity to examine the transcript; and the transcript shall be read to or by the witness, unless such examination and reading are waived by the witness. Any changes in form or substance which the witness desires to make shall be entered and identified upon the transcript by the officer or the anti-

[1] See References in Text note below.

trust investigator with a statement of the reasons given by the witness for making such changes. The transcript shall then be signed by the witness, unless the witness in writing waives the signing, is ill, cannot be found, or refuses to sign. If the transcript is not signed by the witness within thirty days of his being afforded a reasonable opportunity to examine it, the officer or the antitrust investigator shall sign it and state on the record the fact of the waiver, illness, absence of the witness, or the refusal to sign, together with the reason, if any, given therefor.

(5) The officer shall certify on the transcript that the witness was duly sworn by him and that the transcript is a true record of the testimony given by the witness, and the officer or antitrust investigator shall promptly deliver it or send it by registered or certified mail to the custodian.

(6) Upon payment of reasonable charges therefor, the antitrust investigator shall furnish a copy of the transcript to the witness only, except that the Assistant Attorney General in charge of the Antitrust Division may for good cause limit such witness to inspection of the official transcript of his testimony.

(7)(A) Any person compelled to appear under a demand for oral testimony pursuant to this section may be accompanied, represented, and advised by counsel. Counsel may advise such person, in confidence, either upon the request of such person or upon counsel's own initiative, with respect to any question asked of such person. Such person or counsel may object on the record to any question, in whole or in part, and shall briefly state for the record the reason for the objection. An objection may properly be made, received, and entered upon the record when it is claimed that such person is entitled to refuse to answer the question on grounds of any constitutional or other legal right or privilege, including the privilege against self-incrimination. Such person shall not otherwise object to or refuse to answer any question, and shall not by himself or through counsel otherwise interrupt the oral examination. If such person refuses to answer any question, the antitrust investigator conducting the examination may petition the district court of the United States pursuant to section 1314 of this title for an order compelling such person to answer such question.

(B) If such person refuses to answer any question on grounds of the privilege against self-incrimination, the testimony of such person may be compelled in accordance with the provisions of Part V of title 18.

(8) Any person appearing for oral examination pursuant to a demand served under this section shall be entitled to the same fees and mileage which are paid to witnesses in the district courts of the United States.

(Pub. L. 87–664, §3, Sept. 19, 1962, 76 Stat. 548; Pub. L. 94–435, title I, §102, Sept. 30, 1976, 90 Stat. 1384; Pub. L. 96–349, §2(b)(1)–(3), Sept. 12, 1980, 94 Stat. 1154; Pub. L. 103–438, §3(e)(1)(B), Nov. 2, 1994, 108 Stat. 4598.)

REFERENCES IN TEXT

The International Antitrust Enforcement Assistance Act of 1994, referred to in subsec. (a), is Pub. L. 103–438,

Nov. 2, 1994, 108 Stat. 4597, which is classified principally to chapter 88 (§6201 et seq.) of this title. For complete classification of this Act to the Code, see Short Title note set out under section 6201 of this title and Tables.

This chapter, referred to in subsecs. (c)(1)(B), (2) and (d), was in the original "this Act", meaning Pub. L. 87–664, which is classified generally to this chapter. For complete classification of this Act to the Code, see Short Title note set out under section 1311 of this title and Tables.

Section 30 of this title, referred to in subsec. (i)(2), was repealed by Pub. L. 107–273, div. C, title IV, §14102(f), Nov. 2, 2002, 116 Stat. 1922.

AMENDMENTS

1994—Subsec. (a). Pub. L. 103–438 inserted "or, with respect to the International Antitrust Enforcement Assistance Act of 1994, an investigation authorized by section 3 of such Act" after "investigation" and "by the United States" after "proceeding".

1980—Subsec. (a). Pub. L. 96–349, §2(b)(1), inserted provision for service and notice of a civil investigative demand for any product of discovery.

Subsec. (b). Pub. L. 96–349, §2(b)(2), inserted provision respecting time demand for product of discovery is returnable.

Subsec. (c). Pub. L. 96–349, §2(b)(3), designated existing provisions as par. (1), redesignated as cls. (A) and (B) former cls. (1) and (2), and added par. (2).

1976—Subsec. (a). Pub. L. 94–435 struck out "under investigation" before "may be in possession", inserted "or may have any information" after "any documentary material", and inserted provision requiring the production of documentary material for inspection or reproduction, answers in writing to written interrogatories, the giving of oral testimony concerning documentary material or information, and the furnishing of any combination of such material, answers, or testimony.

Subsec. (b). Pub. L. 94–435 restructured subsec. (b) and as so restructured, in par. (1) inserted provisions of cl. (B), in par. (2), added cls. (B) and (C), in par. (3) substituted provisions relating to written interrogatories for provisions relating to prescription of a return date for demanded material, and in par. (4), substituted provisions relating to oral testimony for provisions requiring a demand to identify the custodian to whom demanded material shall be made available.

Subsec. (c). Pub. L. 94–435 inserted provision relating to the submission of answers to written interrogatories and the giving of oral testimony, struck out provisions of par. (1) relating to the reasonableness requirement for demands for documentary material, redesignated par. (2) as (1) and provided that protected status of any information or material would be determined by standards applicable in the case of a subpena or subpena duces tecum issued by a court of the United States, and added par. (2).

Subsec. (d). Pub. L. 94–435 redesignated existing provisions as par. (1) and added par. (2).

Subsec. (e). Pub. L. 94–435 redesignated existing provisions as par. (1), inserted "return receipt requested" after "certified mail" in par. (C), and added par. (2).

Subsecs. (g) to (i). Pub. L. 94–435 added subsecs. (g) to (i).

EFFECTIVE DATE OF 1976 AMENDMENT

Amendment by Pub. L. 94–435 effective Sept. 30, 1976, except subsec. (i)(8) of this section effective Oct. 1, 1976, see section 106 of Pub. L. 94–435, set out as a note under section 1311 of this title.

## § 1313. Custodian of documents, answers and transcripts

### (a) Designation

The Assistant Attorney General in charge of the Antitrust Division of the Department of Jus-

tice shall designate an antitrust investigator to serve as custodian of documentary material, answers to interrogatories, and transcripts of oral testimony received under this chapter, and such additional antitrust investigators as he shall determine from time to time to be necessary to serve as deputies to such officer.

**(b) Production of materials**

Any person, upon whom any demand under section 1312 of this title for the production of documentary material has been duly served, shall make such material available for inspection and copying or reproduction to the custodian designated therein at the principal place of business of such person (or at such other place as such custodian and such person thereafter may agree and prescribe in writing or as the court may direct, pursuant to section 1314(d)[1] of this title) on the return date specified in such demand (or on such later date as such custodian may prescribe in writing). Such person may upon written agreement between such person and the custodian substitute copies for originals of all or any part of such material.

**(c) Responsibility for materials; disclosure**

(1) The custodian to whom any documentary material, answers to interrogatories, or transcripts of oral testimony are delivered shall take physical possession thereof, and shall be responsible for the use made thereof and for the return of documentary material, pursuant to this chapter.

(2) The custodian may cause the preparation of such copies of such documentary material, answers to interrogatories, or transcripts of oral testimony as may be required for official use by any duly authorized official, employee, or agent of the Department of Justice under regulations which shall be promulgated by the Attorney General. Notwithstanding paragraph (3) of this subsection, such material, answers, and transcripts may be used by any such official, employee, or agent in connection with the taking of oral testimony pursuant to this chapter.

(3) Except as otherwise provided in this section, while in the possession of the custodian, no documentary material, answers to interrogatories, or transcripts of oral testimony, or copies thereof, so produced shall be available for examination, without the consent of the person who produced such material, answers, or transcripts, and, in the case of any product of discovery produced pursuant to an express demand for such material, of the person from whom the discovery was obtained, by any individual other than a duly authorized official, employee, or agent of the Department of Justice. Nothing in this section is intended to prevent disclosure to either body of the Congress or to any authorized committee or subcommittee thereof.

(4) While in the possession of the custodian and under such reasonable terms and conditions as the Attorney General shall prescribe, (A) documentary material and answers to interrogatories shall be available for examination by the person who produced such material or answers, or by any duly authorized representative of such person, and (B) transcripts of oral testimony

shall be available for examination by the person who produced such testimony, or his counsel.

**(d) Use of investigative files**

(1) Whenever any attorney of the Department of Justice has been designated to appear before any court, grand jury, or Federal administrative or regulatory agency in any case or proceeding, the custodian of any documentary material, answers to interrogatories, or transcripts of oral testimony may deliver to such attorney such material, answers, or transcripts for official use in connection with any such case, grand jury, or proceeding as such attorney determines to be required. Upon the completion of any such case, grand jury, or proceeding, such attorney shall return to the custodian any such material, answers, or transcripts so delivered which have not passed into the control of such court, grand jury, or agency through the introduction thereof into the record of such case or proceeding.

(2) The custodian of any documentary material, answers to interrogatories, or transcripts of oral testimony may deliver to the Federal Trade Commission, in response to a written request, copies of such material, answers, or transcripts for use in connection with an investigation or proceeding under the Commission's jurisdiction. Such material, answers, or transcripts may only be used by the Commission in such manner and subject to such conditions as apply to the Department of Justice under this chapter.

**(e) Return of material to producer**

If any documentary material has been produced in the course of any antitrust investigation by any person pursuant to a demand under this chapter and—

(1) any case or proceeding before any court or grand jury arising out of such investigation, or any proceeding before any Federal administrative or regulatory agency involving such material, has been completed, or

(2) no case or proceeding, in which such material may be used, has been commenced within a reasonable time after completion of the examination and analysis of all documentary material and other information assembled in the course of such investigation,

the custodian shall, upon written request of the person who produced such material, return to such person any such material (other than copies thereof furnished to the custodian pursuant to subsection (b) of this section or made by the Department of Justice pursuant to subsection (c) of this section) which has not passed into the control of any court, grand jury, or agency through the introduction thereof into the record of such case or proceeding.

**(f) Appointment of successor custodians**

In the event of the death, disability, or separation from service in the Department of Justice of the custodian of any documentary material, answers to interrogatories, or transcripts of oral testimony produced under any demand issued pursuant to this chapter, or the official relief of such custodian from responsibility for the custody and control of such material, answers, or transcripts, the Assistant Attorney General in charge of the Antitrust Division shall promptly (1) designate another antitrust investigator to

---

[1] See References in Text note below.

serve as custodian of such material, answers, or transcripts, and (2) transmit in writing to the person who produced such material, answers, or testimony notice as to the identity and address of the successor so designated. Any successor designated under this subsection shall have with regard to such material, answers, or transcripts all duties and responsibilities imposed by this chapter upon his predecessor in office with regard thereto, except that he shall not be held responsible for any default or dereliction which occurred prior to his designation.

(Pub. L. 87–664, § 4, Sept. 19, 1962, 76 Stat. 549; Pub. L. 94–435, title I, § 103, Sept. 30, 1976, 90 Stat. 1387; Pub. L. 96–349, §§ 2(b)(4), 7(a)(2), Sept. 12, 1980, 94 Stat. 1155, 1158.)

REFERENCES IN TEXT

Section 1314(d) of this title, referred to in subsec. (b), was redesignated section 1314(e) of this title by Pub. L. 96–349.

This chapter, referred to in subsecs. (c), (e), and (f), was in the original "this Act", meaning Pub. L. 87–664, which is classified generally to this chapter. For complete classification of this Act to the Code, see Short Title note set out under section 1311 of this title and Tables.

AMENDMENTS

1980—Subsec. (c)(2). Pub. L. 96–349, § 7(a)(2), provided for use of copies of documentary material by agents of the Department of Justice, including use by such agents in connection with the taking of oral testimony.

Subsec. (c)(3). Pub. L. 96–349, §§ 2(b)(4), 7(a)(2), inserted ", and, in the case of any product of discovery produced pursuant to an express demand for such material, of the person from whom the discovery was obtained" before ", by any individual" and reference to "agent" of the Department of Justice.

1976—Subsec. (a). Pub. L. 94–435 substituted "custodian of documentary material, answers to interrogatories, and transcripts of oral testimony received under this chapter" for "antitrust documentary custodian".

Subsec. (b). Pub. L. 94–435 struck out "issued" after "any demand", inserted "for the production of documentary material" before "has been duly served", and substituted "copies for originals of all or any part of such material" for "for copies of all or any part of such material originals thereof".

Subsec. (c). Pub. L. 94–435, among other changes, inserted provisions relating to answers to interrogatories and transcripts of oral testimony and, in par. (1), substituted "of documentary material" for "thereof", in par. (2), inserted "by any duly authorized official or employee of the Department of Justice" after "for official use", and inserted a provision relating to the use of documentary material, answers to interrogatories, and transcripts in connection with the taking of oral testimony, in par. (3), inserted "Except as otherwise provided in this section" before "while in the possession", substituted "no documentary material" for "no material", "official" for "officer, member", and inserted provision relating to disclosure of information to Congress or authorized committees or subcommittees thereof, in par. (4), added cl. (B).

Subsec. (d). Pub. L. 94–435, among other changes, in par. (1), inserted provisions relating to answers to interrogatories and transcripts of oral testimony, substituted a provision that an attorney designated under this section be from the Department of Justice for a provision that a designated attorney be appearing on behalf of the United States, provided that such an attorney can make an appearance under this section before a Federal administrative or regulatory agency in addition to a court or grand jury, and added par. (2).

Subsec. (e). Pub. L. 94–435, among other changes, inserted provisions of subsec. (f) relating to the institu-

tion of a case or proceeding within a reasonable time after examination and analysis of any evidence assembled during the course of an investigation, and relating to written demand for the return of such material, and, in addition, provided that copies furnished the custodian pursuant to subsec. (b) of this section need not be returned by the custodian.

Subsecs. (f), (g). Pub. L. 94–435 redesignated subsec. (g) as (f). Former subsec. (f) redesignated (e)(2).

EFFECTIVE DATE OF 1976 AMENDMENT

Amendment by Pub. L. 94–435 effective Sept. 30, 1976, see section 106 of Pub. L. 94–435, set out as a note under section 1311 of this title.

§ 1314. Judicial proceedings

(a) Petition for enforcement; venue

Whenever any person fails to comply with any civil investigative demand duly served upon him under section 1312 of this title or whenever satisfactory copying or reproduction of any such material cannot be done and such person refuses to surrender such material, the Attorney General, through such officers or attorneys as he may designate, may file, in the district court of the United States for any judicial district in which such person resides, is found, or transacts business, and serve upon such person a petition for an order of such court for the enforcement of this chapter.

(b) Petition for order modifying or setting aside demand; time for petition; suspension of time allowed for compliance with demand during pendency of petition; grounds for relief

(1) Within twenty days after the service of any such demand upon any person, or at any time before the return date specified in the demand, whichever period is shorter, or within such period exceeding twenty days after service or in excess of such return date as may be prescribed in writing, subsequent to service, by any antitrust investigator named in the demand, such person may file and serve upon such antitrust investigator, and in the case of any express demand for any product of discovery upon the person from whom such discovery was obtained, a petition for an order modifying or setting aside such demand—

(A) in the district court of the United States for the judicial district within which such person resides, is found, or transacts business; or

(B) in the case of a petition addressed to an express demand for any product of discovery, only in the district court of the United States for the judicial district in which the proceeding in which such discovery was obtained is or was last pending.

(2) The time allowed for compliance with the demand in whole or in part as deemed proper and ordered by the court shall not run during the pendency of such petition in the court, except that such person shall comply with any portions of the demand not sought to be modified or set aside. Such petition shall specify each ground upon which the petitioner relies in seeking such relief and may be based upon any failure of such demand to comply with the provisions of this chapter, or upon any constitutional or other legal right or privilege of such person.

**(c) Petition for order modifying or setting aside demand for production of product of discovery; grounds for relief; stay of compliance with demand and of running of time allowed for compliance with demand**

Whenever any such demand is an express demand for any product of discovery, the person from whom such discovery was obtained may file, at any time prior to compliance with such express demand, in the district court of the United States for the judicial district in which the proceeding in which such discovery was obtained is or was last pending, and serve upon any antitrust investigator named in the demand and upon the recipient of the demand, a petition for an order of such court modifying or setting aside those portions of the demand requiring production of any such product of discovery. Such petition shall specify each ground upon which the petitioner relies in seeking such relief and may be based upon any failure of such portions of the demand to comply with the provisions of this chapter, or upon any constitutional or other legal right or privilege of the petitioner. During the pendency of such petition, the court may stay, as it deems proper, compliance with the demand and the running of the time allowed for compliance with the demand.

**(d) Petition for order requiring performance by custodian of duties; venue**

At any time during which any custodian is in custody or control of any documentary material or answers to interrogatories delivered, or transcripts of oral testimony given by any person in compliance with any such demand, such person, and, in the case of an express demand for any product of discovery, the person from whom such discovery was obtained, may file, in the district court of the United States for the judicial district within which the office of such custodian is situated, and serve upon such custodian a petition for an order of such court requiring the performance by such custodian of any duty imposed upon him by this chapter.

**(e) Jurisdiction; appeal; contempts**

Whenever any petition is filed in any district court of the United States under this section, such court shall have jurisdiction to hear and determine the matter so presented, and to enter such order or orders as may be required to carry into effect the provisions of this chapter. Any final order so entered shall be subject to appeal pursuant to section 1291 of title 28. Any disobedience of any final order entered under this section by any court shall be punished as a contempt thereof.

**(f) Applicability of Federal Rules of Civil Procedure**

To the extent that such rules may have application and are not inconsistent with the provisions of this chapter, the Federal Rules of Civil Procedure shall apply to any petition under this chapter.

**(g) Disclosure exemption**

Any documentary material, answers to written interrogatories, or transcripts of oral testimony provided pursuant to any demand issued under this chapter shall be exempt from disclosure under section 552 of title 5.

(Pub. L. 87–664, §5, Sept. 19, 1962, 76 Stat. 551; Pub. L. 94–435, title I, §104, Sept. 30, 1976, 90 Stat. 1389; Pub. L. 96–349, §2(b)(5), Sept. 12, 1980, 94 Stat. 1155.)

References in Text

This chapter, referred to in text, was in the original ''this Act'', meaning Pub. L. 87–664, which is classified generally to this chapter. For complete classification of this Act to the Code, see Short Title note set out under section 1311 of this title and Tables.

The Federal Rules of Civil Procedure, referred to in subsec. (f), are set out in the Appendix to Title 28, Judiciary and Judicial Procedure.

Amendments

1980—Subsec. (b). Pub. L. 96–349, §2(b)(5)(A), designated existing provisions as par. (1), provided for filing and serving a petition for an order modifying or setting aside a demand in the case of an express demand for any product of discovery upon the person from whom the discovery was obtained, incorporated existing provision in cl. (A), added cl. (B), and designated existing provisions as par. (2).

Subsecs. (c), (d). Pub. L. 96–349, §2(b)(5)(B) to (D), added subsec. (c), redesignated former subsec. (c) as (d) and authorized petition, in the case of an express demand for any product of discovery, by the person from whom the discovery was obtained, for an order requiring performance by the custodian of his duties. Former subsec. (d) redesignated (e).

Subsecs. (e) to (g). Pub. L. 96–349, §2(b)(5)(B), redesignated former subsecs. (d) to (f) as (e) to (g), respectively.

1976—Subsec. (a). Pub. L. 94–435, §104(a), struck out provision which permitted a petition for an enforcement order to be filed in the judicial district where a person who had failed to comply with a demand and who transacted business in one or more districts, maintained his principal place of business, or in such other district, in which such person transacted business, as was agreed upon by the parties to the petition.

Subsec. (b). Pub. L. 94–435, §104(b), (c), inserted ''or within such period exceeding twenty days after service or in excess of such return date as may be prescribed in writing, subsequent to service, by any antitrust investigator named in the demand,'' after ''whichever period is shorter'', substituted ''antitrust investigator'' for ''custodian'' before ''a petition for an order'', and inserted proviso that petitioner should comply with portions of a contested demand which are not being challenged.

Subsec. (c). Pub. L. 94–435, §104(d), substituted ''or answers to interrogatories delivered, or transcripts of oral testimony given'' for ''delivered''.

Subsec. (f). Pub. L. 94–435, §104(e), added subsec. (f).

Effective Date of 1976 Amendment

Amendment by Pub. L. 94–435 effective Sept. 30, 1976, see section 106 of Pub. L. 94–435, set out as a note under section 1311 of this title.

## CHAPTER 35—SEAT BELT REGULATION

### §§ 1321 to 1323. Repealed. Pub. L. 89–563, title I, § 117(a), Sept. 9, 1966, 80 Stat. 727

Sections, Pub. L. 88–201, §§1–3, Dec. 13, 1963, 77 Stat. 361, provided for the promulgation of standards for seat belts in motor vehicles and set the penalty for the unlawful sale, importation, or introduction into commerce of seat belts not meeting the published standards. For savings provision, see section 117(b) to (e) of Pub. L. 89–563, formerly set out as a note under section 1301 of this title.

## CHAPTER 36—CIGARETTE LABELING AND ADVERTISING

Sec.
1331.    Congressional declaration of policy and purpose.